I/S

RELATED DDJ

DANIEL CARLOS GARCIA
1920 Boston Way
Modesto, CA 95355-8918
Tel. No.: (442) 324-3740
DanielCarlosGarcia@comcast.net

FEE
PAID

FILED
CLERK, U.S. DISTRICT COURT

2/22/21

CENTRAL DISTRICT OF CALIFORNIA
BY:      CS      DEPUTY

*Plaintiff pro se*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**(EASTERN DIVISION)**

DANIEL CARLOS GARCIA,

      Plaintiff,

vs.

COUNTY OF RIVERSIDE, CALIFORNIA; MICHAEL HESTRIN; PAUL ZELLERBACH; RODRIC (ROD) ANTHONY PACHECO; OTIS STERLING III; LISA DIMARIA; ALAN D. TATE; KIRSTEN SEEBART; JESSE MALE; KRISTI KIRK; ROBERT A. HIGHTOWER; RICHARD (RICK) W. PICKOWITZ; BRUCE R. BLANCK; ED BERAKOVICH; RODNEY BISHOP; ELBA JIMENEZ; JANUARY PAPANASTASATOS; CHAD BIANCO; STANLEY SNIFF, JR.; HAROLD REED; GEOFFREY RAYA; RAYMOND GREGORY; DANIEL EAGLIN; SERGIO MAGDALENO; PAUL TESINSKY; GARETH LEWIS; MARGARET BRANDES; MATTHEW (MATT) DIAZ; SARA HIGUERA; MELISA NAVARRO; KENNETH REICHLE; SCOTT PHILLIPS; HOLLY BACKSTROM; ERIC SULTAN; PAUL ANGULO; RON MILLER II; CAITLIN CAMILO; STATE OF CALIFORNIA; JOHN W. VINEYARD; REBECCA (BECKY) DUGAN; DAVID BRYAN DOWNING; MICHELE D. LEVINE; DAVID A. GUNN; DEAN BENJAMINI; ANTHONY R. VILLALOBOS; KRISTINE HINOS; TERRI ELIZABETH RUNYON; BRENAMAN JASMINE; CITY OF PALM SPRINGS; BRYAN REYES; AL FRANZ; DAVID DOMINGUEZ; FRANK BROWNING; SIMON MIN; GLOBAL TEL LINK (GTL); JEFFREY HAIDINGER; BRIAN OLIVER; CRAIG ANTHONY MCCARTHY; JOHN/JANE DOES 1-50,

      Defendants.

CASE NO.: EDCV21-313-VAP(JC)

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL**

Through this verified complaint, plaintiff DANIEL CARLOS GARCIA hereby alleges as follows:

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 1

**INTRODUCTION**

1.      This civil rights lawsuit is brought by plaintiff Daniel Carlos Garcia pursuant to 42 U.S.C. §1983 and §1985 against all Defendants for actions under color of state law in violation of Plaintiff's clearly established rights under the laws and Constitution of the United States.

2.      Plaintiff Daniel Carlos Garcia was sentenced to life in prison without the possibility of parole and has spent nearly twelve years imprisoned for crimes that he did not commit—the alleged 2008 murder of Clifford Lambert, conspiracy to commit murder, and various theft-based crimes.

3.      No physical or forensic evidence ever inculpated Mr. Garcia in the alleged murder of Mr. Lambert. The prosecution conceded that Mr. Garcia was not the actual killer, had never met or communicated with the actual killer, and was not present for the alleged crime, but, rather, was 500 miles away in Northern California during the alleged murder. Because Mr. Garcia always said—truthfully—that he was innocent, no witness testimony at trial implicated him in the alleged murder either. The sole evidence implicating Mr. Garcia in the alleged murder conspiracy were text messages that the prosecution falsely claimed had been authored by Mr. Garcia and that were never demonstrated to have ever been transmitted or received.

4.      During the 2012 trial of Mr. Garcia and his codefendant Kaushal Niroula, it was discovered that the laptop computers issued by the court to the defendants for their usage had recorded conversations that had taken place in the courtroom during court recesses in the proceedings. The recordings revealed that the trial judge David B. Downing and his staff had met *ex parte* with the assigned prosecutor Riverside County Deputy District Attorney, Lisa DiMaria, to discuss the merits of the case, and to conspire to intentionally and unlawfully rig the trial in favor of the prosecution to ensure that Mr. Garcia would be wrongfully convicted.

5.      As a direct and proximate result of Defendants' unlawful and egregious conduct, Mr. Garcia was falsely accused and charged with murder, maliciously prosecuted, wrongfully convicted, sentenced to life in prison without the possibility of parole, and spent nearly twelve years imprisoned for a crime he did not commit.

6.      On June 8, 2020, Mr. Garcia's unlawful conviction was finally overturned in full when his *unopposed* petition for a writ of habeas corpus was finally granted in the Superior Court for Riverside County in consolidated case nos. RIC-1604066 and RIC-1720070. This lawsuit promptly followed.

**JURISDICTION**

7.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 over the claims arising out of violations of the United States Constitution.

8.      The jurisdiction of this Court is conferred by 28 U.S.C. §1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. §1983 for civil rights actions, and §1985 for conspiracy to interfere with civil rights, to redress the deprivation under color of state law, statute, ordinance, regulation, custom, or usages of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of all persons within the jurisdiction of the United States.

9.      This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§2201 and 2202 and is empowered to grant injunctive relief pursuant to Federal Rules of Civil Procedure No. 65.

10.     This Court has supplemental jurisdiction over Plaintiff's pendent California state law claims pursuant to 28 U.S.C. §1367(a).

**VENUE**

11.     Pursuant to 28 U.S.C. §1391(b), venue is proper in the Central District of California, the judicial district in which the claims in this action arose, where Plaintiff is currently detained, and in which the Defendants either reside or are employed.

**NOTICE OF RELATED CASES**

12.     Case captioned *People of the State of California v. Daniel Carlos Garcia, Kaushal Niroula, David Replogle, Miguel Adolfo Bustamante, Craig Anthony McCarthy and Russell Herbert Manning,* Case No. INF064492, filed in the Superior Court of California for the County of Riverside, Indio Branch, is the underlying criminal action filed by the Riverside County District Attorney's Office against Plaintiff Daniel Carlos Garcia and others that gave rise to the claims in this lawsuit.

13.     Case captioned *Kaushal Niroula v. Daniel Carlos Garcia et al.,* Case No. 5:12-cv-00814-VAP filed in the United States District Court for the Central District of California before the Honorable Virginia A. Phillips, Chief U.S. District Court Judge, is a federal civil rights lawsuit filed by Plaintiff Daniel Carlos Garcia's criminal codefendant Kaushal Niroula alleging violations of his civil rights arising out of substantially the same facts and circumstances as this lawsuit.

14.     Case captioned *Daniel Garcia et al. v. County of Riverside, County of Riverside Board of Supervisors et al.*, Case No. 5:11-cv-00034-VAP-OP filed in the United States District Court for the Central District of California before the Honorable Virginia A. Phillips, Chief U.S. District Court Judge, is a federal civil rights lawsuit previously filed by Plaintiff Daniel Carlos Garcia alleging violations of his legally protected rights arising from the same underlying criminal action against many of the same defendants. This action was filed *before* Plaintiff's 2012 unlawful conviction, whereas the current action follows *after* the 2012 conviction and subsequent 2020 reversal, and raises additional facts and causes of action against new defendants that had not yet occurred at the time of the first suit.

15.     Case captioned *Daniel Carlos Garcia v. Kim Holland*, Case No. 5:13-cv-01160-VAP-JC is a federal Writ of Habeas Corpus Petition by a person in state custody filed by Petitioner in United States District Court for the Central District of California before the Honorable Virginia A. Phillips, Chief U.S. District Court Judge, for violation of his constitutional rights; the writ was denied *without prejudice* because Petitioner's direct appeal was still pending in state court at the time the writ was filed.

16.     Case captioned *Quinton Gray, Angela Patterson, and Stanley Kujansky, et al. v. County of Riverside,* Case No. 5:13-cv-00444-VAP-OP filed in the United States District Court for the Central District of California before the Honorable Virginia A. Phillips, Chief U.S. District Court Judge, is a federal class-action civil rights lawsuit brought by current and former inmates of Riverside County jails for violations of their constitutional right to adequate medical and mental health care and safe conditions of confinement, seeking declaratory and injunctive relief only. Many of the causes of action raised by Plaintiff Daniel Carlos Garcia in the instant lawsuit are based on substantially the same evidence and operative facts as the *Gray* matter.

17.     Case captioned *David Replogle v. Stuart Sherman, Warden,* Case No. 5:15-CV-00597-RSWL, filed in United States District Court for the Central District of California before the Honorable Ronald S.W. Lew, was a Federal Habeas Corpus petition of a state prisoner filed by Plaintiff Daniel Carlos Garcia's criminal codefendant David Replogle, raising similar claims of violations of federal and state rights by the same Defendants named in this action and based on substantially the same evidence and operative facts. The action was dismissed

1     after being rendered moot due to the granting of Replogle's state habeas corpus petition.[11]

2         18.     Case captioned *Miguel Adolfo Bustamante v. Joe A. Lizarraga, Warden*, Case No. 5:15-CV-

3     00614-RSWL, filed in United States District Court for the Central District of California before the Honorable

4     Ronald S.W. Lew, was a Federal Habeas Corpus petition of a state prisoner, filed by Plaintiff Daniel Carlos

5     Garcia's criminal codefendant Miguel Adolfo Bustamante, raising similar claims of violations of federal and state

6     rights by the same Defendants named in this action and based on substantially the same evidence and operative

7     facts. The action was denied and appealed to the Ninth Circuit Court.[2]

8         19.     Case captioned *Daniel Carlos Garcia v. City of Sacramento, California et al.,* Case No. 2:21-cv-

9     00036-KJM-KJN is a federal civil rights lawsuit, filed in United States District Court for the Eastern District of

10    California before the Honorable Kimberly J. Mueller, filed by Plaintiff Daniel Carlos Garcia alleging violation of

11    his civil rights at the time of his arrest.

12                                          **PARTIES**

13        20.     Plaintiff DANIEL CARLOS GARCIA is, and at all times relevant herein was, an individual

14    residing in the State of California, and a citizen of the United States.

15        21.     Defendant COUNTY OF RIVERSIDE is, and at all times relevant herein was, a public entity

16    existing within the State of California. At all times relevant to this action, the Office of the Riverside County

17    District Attorney, the Riverside County Sheriff's Department, the Riverside County Probation Department, the

18    Office of County Counsel, and the Office of the Riverside County Comptroller are and were a part of the County of

19    Riverside.

20        22.     Defendant MICHAEL HESTRIN is the current District Attorney of Riverside County, a position

21    he has held for approximately six years and one month, since January 2015. As District Attorney, Defendant

22    Hestrin has ultimate responsibility for the promulgation and implementation of the policies, procedures, and

23    practices of his office and is responsible for the management, supervision, training and discipline of all employees

24

25

26        [1] On June 8, 2020, Judge David A. Gunn of the Superior Court for Riverside County granted the
27    unopposed habeas corpus petition in case no. RIC1805856, thereby vacating David Replogle's 2010 criminal
      conviction in case no. INF064492 and ordering a new trial.
          [2] On June 8, 2020, Judge David A. Gunn of the Superior Court for Riverside County granted the
28    unopposed habeas corpus petition in case no. RIC2001305, thereby vacating Miguel Adolfo Bustamante's 2010
      criminal conviction in case no. INF064492 and ordering a new trial.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 5

of the Office of the District Attorney and has a duty to ensure that all subordinate prosecutors under his supervision act in a fair, ethical, and legal manner. Defendant Hestrin has ultimate authority over the commencement and termination of criminal prosecutions and collateral matters, within Riverside County. As to all claims presented herein against him, Defendant Hestrin is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights, and in his official capacity for injunctive and declaratory relief. At all relevant times herein, Defendant Hestrin has acted under color of state law.

23. Defendant PAUL ZELLERBACH is a former District Attorney of Riverside County, a position he held from approximately January 2011 through December 2014. In 2012, during Plaintiff's criminal trial, Defendant Zellerbach had ultimate authority over the prosecution of all criminal defendants charged within Riverside County, and had a duty to ensure all subordinate prosecutors under his supervision acted in a fair, ethical, and legal manner. At all relevant times herein, Defendant Zellerbach acted under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights.

24. Defendant RODRIC (ROD) ANTHONY PACHECO is a former District Attorney of Riverside County, a position he held from approximately January 2007 through December 2010. In 2009, Defendant Pacheco had ultimate authority over the decision to commence criminal prosecutions in Riverside County—including against Plaintiff—and had a duty to ensure all subordinate prosecutors under his supervision acted in a fair, ethical, and legal manner. At all relevant times herein, Defendant Pacheco acted under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights.

25. Defendant OTIS STERLING III is currently a sitting judge of the Superior Court of California for the County of Riverside, a position he has held since approximately January 2012. Defendant Sterling was previously a duly appointed and acting Supervising Deputy District Attorney for the County of Riverside from 2009 until 2012, and managed and supervised the investigation and prosecution of Plaintiff in criminal case no. INF064492. At all relevant times herein, Defendant Sterling was acting under color of state law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Sterling is a resident of the State of California and of this judicial district.

26. Defendant LISA DIMARIA is, and at all relevant times herein was, a Deputy District Attorney for the County of Riverside, who from 2009 to 2020, was assigned to prosecute Plaintiff in criminal case no.

1   INF064492. At all relevant times herein, Defendant DiMaria was acting under color of state law and in her

2   individual capacity within the scope of her employment pursuant to the statutes, ordinances, regulations, policies,

3   customs, and usage of the County of Riverside and the State of California. Upon information and belief, Defendant

4   DiMaria is a resident of the State of California and of this judicial district.

5          27.     Defendant ALAN D. TATE is, and at all relevant times herein was, a Senior Deputy District

6   Attorney for the County of Riverside and a duly appointed and acting supervisor of the Writs and Appeals Division

7   who managed and supervised the Riverside County District Attorney's Office's response to Plaintiff's petition for

8   resentencing and a petition for a writ of habeas corpus in case no. RIC1720070 (which consolidated with the

9   related habeas corpus petition in case no. RIC1604066). At all relevant times herein, Defendant Tate was acting

10  under color of state law and in his individual capacity within the scope of his employment pursuant to the statutes,

11  ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon

12  information and belief, Defendant Tate is a resident of the State of California and of this judicial district.

13         28.     Defendant KIRSTEN SEEBART is a former Deputy District Attorney for Riverside County who,

14  while working in the Writs and Appeals Division, was assigned to research and prepare the District Attorney's

15  formal return to Plaintiff's petition for a writ of habeas corpus in case no. RIC1720070. At all relevant times herein,

16  Defendant Seebart was acting under color of state law and in her individual capacity within the scope of her

17  employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of

18  Riverside and the State of California. Upon information and belief, Defendant Seebart is a resident of the State of

19  California and of this judicial district.

20         29.     Defendant JESSE MALE is, and at all relevant times herein was, is a former Deputy District

21  Attorney for Riverside County who, while working in the Writs and Appeals Division in 2020, assisted in preparing

22  and filing a non-opposition to Plaintiff's petition for a writ of habeas corpus in case no. RIC1720070 (which was

23  consolidated with the related habeas corpus petition in case no. RIC1604066), and has assisted the assigned

24  prosecutors DDA's Kirk and Hightower in preparing and arguing motions and opposition pleadings during the

25  retrial proceedings in 2020. At all relevant times herein, Defendant Male was acting under color of state law and in

26  his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies,

27  customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant

28  Male is a resident of the State of California and of this judicial district.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 7

30.     Defendant KRISTI KIRK is, and at all relevant times herein was, a Lead Deputy District Attorney for the County of Riverside and a duly appointed and acting supervisor who was assigned to manage and prosecute the 2020 retrial of Plaintiff in criminal case no. INF064492. At all relevant times herein, Defendant Kirk is and was acting under color of state law and in her individual capacity within the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Kirk is a resident of the State of California and of this judicial district.

31.     Defendant ROBERT A. HIGHTOWER is, and at all relevant times herein was, a Senior Deputy District Attorney for the County of Riverside, who in 2020 was assigned to prosecute the retrial of Plaintiff in criminal case no. INF064492. At all relevant times herein, Defendant Hightower is and was acting under color of state law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Hightower is a resident of the State of California and of this judicial district.

32.     Defendant RICHARD (RICK) W. PICKOWITZ is, and at all relevant times herein was, a Senior Investigator for the District Attorney of Riverside County who was assigned to assist DDA Lisa DiMaria in the investigation of Plaintiff's criminal case no. INF064492. At all relevant times herein, Defendant Pickowitz was acting under color of state law and in his individual capacity under the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Pickowitz is a resident of the State of California and of this judicial district.

33.     Defendant BRUCE R. BLANCK is, and at all relevant times herein was, an Investigator for the District Attorney of Riverside County who was assigned to assist DDA DiMaria in the investigation of Plaintiff's criminal case no. INF064492. At all relevant times herein, Defendant Blanck was acting under color of state law and in his individual capacity under the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Blanck is a resident of the State of California and of this judicial district.

34.     Defendant ED BERAKOVICH is, and at all relevant times herein was, a Senior Investigator for the District Attorney of Riverside County who was assigned to assist DDA DiMaria in the investigation of

Plaintiff's criminal case no. INF064492. At all relevant times herein, Defendant Berakovich was acting under color of state law and in his individual capacity under the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Berakovich is a resident of the State of California and of this judicial district.

35.     Defendant RODNEY BISHOP at all relevant times herein was, a former Senior Investigator for the District Attorney of Riverside County who was assigned to assist DDA DiMaria in the investigation of Plaintiff's criminal case no. INF064492. At all relevant times herein, Defendant Bishop was acting under color of state law and in his individual capacity under the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Bishop is a resident of the State of California and of this judicial district.

36.     Defendant ELBA JIMENEZ is, and at all relevant times herein was, an Investigative Technician for the District Attorney of Riverside County who was assigned to assist prosecutors in the investigation of Plaintiff's criminal case no. INF064492. At all relevant times herein, Defendant Jimenez was acting under color of state law and in her individual capacity under the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Jimenez is a resident of the State of California and of this judicial district.

37.     Defendant JANUARY PAPANASTASATOS is, and at all relevant times herein was, a Paralegal for the District Attorney of Riverside County who was assigned to assist prosecutors with the organization and dissemination of evidence and discovery in Plaintiff's criminal case no. INF064492. At all relevant times herein, Defendant Papanastasatos was acting under color of state law and in her individual capacity under the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Papanastasatos is a resident of the State of California and of this judicial district.

38.     Defendant CHAD BIANCO is the current Sheriff of Riverside County, a position he has held from approximately January 2019 through the present. As Sheriff, Defendant Bianco has ultimate responsibility for the promulgation and implementation of the Sheriff's Department policies, procedures, and practices, and for the management, supervision, training, and discipline of all subordinates and employees of the Riverside County Sheriff's Department to ensure their compliance with all statutes, ordinances, regulations, policies, customs, and

usages of the County of Riverside and the State of California. At all relevant times herein, Defendant Bianco has

acted under color of state law and is being sued in his individual capacity for damages associated with violations of

clearly established federal and state rights, and in his official capacity for injunctive and declaratory relief. Upon

information and belief, Defendant Bianco is a resident of the State of California and of this judicial district.

39.     Defendant STANLEY SNIFF, JR., is a former Sheriff of Riverside County, a position he held

from approximately September 2007 through December 2018. During his tenure as County Sheriff, Defendant Sniff

had ultimate responsibility for the promulgation and implementation of the Sheriff's Department policies,

procedures, and practices, and for the management of the Riverside County Sheriff's Department and its five county

jails. At all relevant times herein, Defendant Sniff acted under color of state law and is being sued in his individual

capacity for damages associated with violations of clearly established federal and state rights.

40.     Defendant HAROLD REED is, and at relevant times herein was, a Captain for the Riverside

County Sheriff's Department and current commander of the Larry D. Smith Correctional Facility in Banning,

California—one of the five county jails operated by the Sheriff's Department. Defendant Reed is a duly appointed

and acting supervisor in the Sheriff's Department who, as Facility Commander, is responsible for the management,

supervision, training, and discipline of all subordinates under his command to ensure their compliance with all

statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of

California. Defendant Reed has ultimate responsibility for the orderly operation of the jail facility and to provide for

the safety, security, and welfare of each inmate under his custody. At all relevant times herein, Defendant Reed has

acted under color of state law and is being sued in his individual capacity for damages associated with violations of

clearly established federal and state rights, and in his official capacity for injunctive and declaratory relief. Upon

information and belief, Defendant Reed is a resident of the State of California and of this judicial district.

41.     Defendant GEOFFREY RAYA is a former Captain for the Riverside County Sheriff's

Department who was previously assigned as the commander of the old Indio Jail.[3] As a facility commander,

Defendant Raya was responsible for the management, supervision, training, and discipline of all subordinates under

his command to ensure their compliance with all statutes, ordinances, regulations, policies, customs, and usages of

_____

[3] In 2020, the old Indio Jail was demolished and replaced by the newly-opened John Benoit Detention
Center.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 10

the County of Riverside and the State of California. At all relevant times herein, Defendant Raya acted under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights.

42.   Defendant RAYMOND GREGORY is a former Captain for the Riverside County Sheriff's Department who was previously assigned as the commander of the old Indio Jail. As a facility commander, Defendant Gregory was responsible for the management, supervision, training, and discipline of all subordinates under his command to ensure their compliance with all statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. At all relevant times herein, Defendant Gregory acted under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights.

43.   Defendant DANIEL EAGLIN is a former Captain for the Riverside County Sheriff's Department who was previously assigned as the commander of the old Indio Jail. As a facility commander, Defendant Eaglin was responsible for the management, supervision, training, and discipline of all subordinates under his command to ensure their compliance with all statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. At all relevant times herein, Defendant Eaglin acted under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights.

44.   Defendant SERGIO MAGDALENO is a former Classification Sergeant for the Riverside County Sheriff's Department, a position he held until his retirement in approximately 2013. At all relevant times herein, Defendant Magdaleno was a duly appointed and acting supervisor in the Sheriff's Department assigned to the old Indio Jail, who was acting under color of state law and in his individual capacity under the scope of his employment pursuant to the statutes, ordinances, regulations, policies, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Magdaleno is a resident of the State of California and of this judicial district.

45.   Defendant PAUL TESINSKY is a former Classification Sergeant for the Riverside County Sheriff's Department, a position he held until his retirement in approximately 2017. At all relevant times herein, Defendant Tesinsky was a duly appointed and acting supervisor in the Sheriff's Department assigned to the old Indio Jail, who was acting under color of state law and in his individual capacity under the scope of his employment

1  pursuant to the statutes, ordinances, regulations, polices, and usages of the County of Riverside and the State of

2  California. Upon information and belief, Defendant Tesinsky is a resident of the State of California and of this

3  judicial district.

4       46.    Defendant GARETH LEWIS is, and at all relevant times herein was, a duly appointed and acting

5  supervisor for the Riverside County Sheriff's Department. Defendant Lewis is currently a Sergeant, and previously

6  a Corporal, assigned to the Indio Jail. At all relevant times herein, Defendant Lewis was acting under color of state

7  law and in his individual capacity under the scope of his employment pursuant to the statutes, ordinances,

8  regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information

9  and belief, Defendant Lewis is a resident of the State of California and of this judicial district.

10       47.    Defendant MARGARET BRANDES is a former Classification Senior Corporal for the Riverside

11  County Sheriff's Department. At all relevant times herein, Defendant Brandes was a duly appointed and acting

12  supervisor in the Sheriff's Department assigned to the old Indio Jail, who was acting under color of state law and in

13  her individual capacity under the scope of her employment pursuant to the statutes, ordinances, regulations, policies,

14  and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Brandes

15  is a resident of the State of California and of this judicial district.

16       48.    Defendant MATTHEW (MATT) DIAZ is, and at all relevant times herein was, an Investigator for

17  the Riverside County Sheriff's Department who, in 2009 while assigned to the old Indio Jail, assisted in the

18  investigation of Plaintiff's criminal case no. INF064492. At all relevant times herein, Defendant Diaz was acting

19  under color of state law and in his individual capacity under the scope of his employment pursuant to the statutes,

20  ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon

21  information and belief, Defendant Diaz is a resident of the State of California and of this judicial district.

22       49.    Upon information and belief, Defendant SARA HIGUERA is and/or was a Deputy for the

23  Riverside County Sheriff's Department, with badge number N3480, who was assigned to the old Indio Jail. At all

24  relevant times herein, Defendant Higuera was acting under color of state law and in her individual capacity under

25  the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the

26  County of Riverside and the State of California. Upon information and belief, Defendant Higuera is a resident of the

27  State of California and of this judicial district.

28

50.     Upon information and belief, Defendant MELISA NAVARRO is and/or was a Deputy for the Riverside County Sheriff's Department, with badge number N1944, who was assigned to the old Indio Jail. At all relevant times herein, Defendant Navarro was acting under color of state law and in her individual capacity under the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Navarro is a resident of the State of California and of this judicial district.

51.     Upon information and belief, Defendant KENNETH REICHLE is and/or was a Deputy for the Riverside County Sheriff's Department, with badge number N2875, who was assigned to the old Indio Jail. At all relevant times herein, Defendant Reichle was acting under color of state law and in her individual capacity under the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Reichle is a resident of the State of California and of this judicial district.

52.     Upon information and belief, Defendant SCOTT PHILLIPS, is and/or was a Deputy for the Riverside County Sheriff's Department, with badge number N3030, who was assigned to the old Indio Jail. At all relevant times herein, Defendant Phillips was acting under color of state law and in his individual capacity under the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Phillips is a resident of the State of California and of this judicial district.

53.     Defendant HOLLY BACKSTROM, was, at all relevant times herein, a Correctional Sergeant for the Riverside County Sheriff's Department, who was assigned to the Indio Jail. At all relevant times herein, Defendant Backstrom was acting under color of state law and in her individual capacity under the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Backstrom is a resident of the State of California and of this judicial district.

54.     Defendant ERIC SULTAN was, at all relevant times herein, a Deputy Sheriff for the County of Riverside, who was assigned as the courtroom bailiff in Department 1B of the old Indio Courthouse during Plaintiff's 2012 criminal trial in case no. INF064492.  At all relevant times herein, Defendant Sultan was a duly sworn peace officer acting under color of state law and in his individual capacity within the scope of employment

1  pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the

2  State of California.

3       55.    Defendant PAUL ANGULO is, and at relevant times herein was, the Riverside County Auditor-

4  Controller, a position he held during Plaintiff's first trial in 2012 and currently holds during Plaintiff's retrial

5  proceedings in 2020 in criminal case no. INF064492. As the County Auditor-Controller, Defendant Angulo has

6  ultimate responsibility for ensuring the timely and orderly payment from the county treasury of all ancillary defense

7  funds, as ordered by the Superior court, to assist indigent criminal defendants charged in Riverside County to

8  investigate and defend their cases. At all relevant times herein, Defendant Angulo was and is acting under color of

9  state law and is being sued in his individual capacity for damages associated with violations of clearly established

10  federal and state rights, and in his official capacity for injunctive and declaratory relief. Upon information and

11  belief, Defendant Angulo is a resident of the State of California and of this judicial district.

12       56.    Defendant RON MILLER II is currently the Chief Probation Officer for the County of Riverside.

13  As Chief, Defendant Miller has ultimate responsibility for the promulgation and implementation of the policies,

14  procedures, and practices of his office and is responsible for the management, supervision, training, and discipline

15  of all employees of the Riverside County Probation Department and has a duty to ensure that all subordinate

16  officers act in a fair, ethical, and legal manner. As to all claims presented herein against him, Defendant Miller is

17  being sued in his individual capacity for damages associated with violations of clearly established federal and state

18  rights, and in his official capacity for injunction and declaratory relief. At all relevant times, Defendant Miller acted

19  under color of state law.

20       57.    Defendant CAITLIN CAMILO is, and at all relevant times here in was, a Deputy Probation

21  Officer for the County of Riverside. At all relevant times herein, Defendant Camilo was acting under color of state

22  law and in her individual capacity within the scope of her employment pursuant to the statutes, ordinances,

23  regulations, policies, customs, and usages of the County of Riverside in the State of California. Upon information

24  and belief, Defendant Camilo is a resident of the state of California enough this judicial district.

25       58.    Defendant the STATE OF CALIFORNIA is, and at all relevant times herein was, a sovereign

26  state and part of the United States of America. At all times relevant to this action, the Judicial Counsel of

27  California, the Commission on Judicial Performance, the Superior Court for the County of Riverside, and the

28  Office of the Attorney General are and were a part of the State of California. Pursuant to the Eleventh Amendment

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 14

to the United States Constitution, the State of California and its agencies, departments, and officials are sued for damages only as authorized by state law, and for injunctive and declaratory relief as authorized by state and federal law.

59.     Defendant JOHN W. VINEYARD is the current Presiding Judge of the Superior Court of the State of California for the County of Riverside, a position he has held since approximately January 2019 and will hold until approximately December 2020. As the Presiding Judge, Defendant Vineyard is the duly appointed and acting supervisor of the Superior Court of Riverside County and has ultimate responsibility for the promulgation and implementation of the Superior Court's policies, procedures, and practices, and for the management of the Superior Court and its schedule, employees, and budget. As to all claims presented herein against him, Defendant Vineyard is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights, and in his official capacity for injunctive and declaratory relief. At all relevant times, Defendant Vineyard has acted under color of state law.

60.     Defendant REBECCA (BECKY) DUGAN is, and at all relevant times herein was, a sitting judge of the Superior Court of the State of California for the County of Riverside. Defendant Dugan previously served as the Presiding Judge of the Superior Court, a position she held from approximately January 2017 through December 2018. During her tenure as Presiding Judge, Defendant Dugan was the duly appointed and acting supervisor of the Superior Court of Riverside County and had ultimate responsibility for the promulgation and implementation of the Superior Court's policies, procedures, and practices, and for the management of the Superior Court and its schedule, employees, and budget. At all relevant times herein, Defendant Dugan acted under color of state law and is being sued in her individual capacity for damages associated with violations of clearly established federal and state rights.

61.     Defendant DAVID BRYAN DOWNING is a former judge of the Superior Court of the State of California for the County of Riverside, a position he held from approximately July 2006 until his retirement in approximately June 2013. During his tenure as a judge of the Superior Court, Defendant Downing presided over the 2012 trial of Plaintiff in criminal case no. INF064492. At all relevant times herein, Defendant Downing acted under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights. Upon information and belief, Defendant Downing is now a resident of the State of Illinois.

62.     Defendant MICHELE D. LEVINE is a former judge of the Superior Court of the State of California for the County of Riverside, a position she held from approximately March 2003 until her retirement in approximately 2017. At all relevant times herein, Defendant Levine acted under color of state law during her tenure as a judge of the Superior Court and is being sued in her individual capacity for damages associated with violations of clearly established federal and state rights. Upon information and belief, Defendant Levine is a resident of the State of California and of this judicial district.

63.     Defendant DAVID A. GUNN is, and at all relevant times herein, was a sitting judge of the Superior Court of the State of California for the County of Riverside, a position that he has held since approximately 2009.  From 2017 to 2020, Defendant Gunn presided over the consolidated habeas corpus proceedings of Plaintiff and his co-petitioner Kaushal Niroula in case nos. RIC1720070 and RIC1604066. At all relevant times herein, Defendant Gunn acted under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights. Upon information and belief, Defendant Gunn is a resident of the State of California and of this judicial district.

64.     Defendant DEAN BENJAMINI is currently a sitting judge of the Superior Court of the State of California for the County of Riverside, a position he has held since approximately December 2013. Defendant Benjamini was formerly a criminal defense attorney licensed to practice law in the State of California. At all relevant times herein, while working as a private attorney, Defendant Benjamini acted as a private individual, and while serving as a Superior Court judge, acted under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights. Upon information and belief, Defendant Benjamini is a resident of the State of California and of this judicial district.

65.     Defendant ANTHONY R. VILLALOBOS is, and at all relevant times herein was, a sitting judge of the Superior Court of the State of California for the County of Riverside, a position that he has held since approximately January 2008. Defendant Villalobos is currently assigned to preside over the 2020 retrial proceedings of Plaintiff in criminal case no. INF064492. At all relevant times herein, Defendant Villalobos was and is acting under color of state law and is being sued in his individual capacity for damages associated with violations of clearly established federal and state rights, and in his official capacity for injunctive and declaratory relief. Upon information and belief, Defendant Villalobos is a resident of the State of California and of this judicial district.

66.     Defendant KRISTINE HINOS is a former judicial/courtroom clerk of the Superior Court of the State of California for the County of Riverside who, from approximately 2009 to 2013 during the pendency of Plaintiff's proceedings in criminal case no. INF064492, was assigned to Department 1B of the old Indio Courthouse presided over by Judge David Bryan Downing. At all relevant times herein, Defendant Hinos acted under color of state law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Hinos is now a resident of the State of Oregon.

67.     Defendant TERRI ELIZABETH RUNYON is a former court reporter/stenographer for the Superior Court of the State of California for the County of Riverside, and who served as the lead court reporter during the 2012 trial of Plaintiff in criminal case no. INF064492.  At all relevant times herein, Defendant Runyon acted under color of state law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Runyon is now a resident of the State of Nebraska.

68.     Defendant BRENAMAN JASMINE is, and at all relevant times herein was, a Systems and Network Administrator and Information Technology staff member of the Superior Court of the State of California for  the County of Riverside, whose official duties include managing and maintaining the safe, secure, and regular operation of the Superior Court's computer systems and providing technical assistance to other staff members. At all relevant times herein, Defendant Jasmine acted under color of state law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the County of Riverside and the State of California. Upon information and belief, Defendant Jasmine is a resident of the State of California and of this judicial district.

69.     Defendant CITY OF PALM SPRINGS is, and at all relevant times herein was, a municipality in the County of Riverside and the State of California. At all times relevant to this action, the Palm Springs Police Department is and was part of the City of Palm Springs.

70.     Defendant BRYAN REYES is the current Chief of Police for the City of Palm Springs, a position he has held from approximately December 2015 through the present. As Chief, Defendant Reyes has ultimate responsibility for the promulgation and implementation of the Police Department's policies, procedures, and practices and for the management, supervision, training, and discipline of all subordinates and employees of the

1  Palm Springs Police Department to ensure their compliance with all statutes, ordinances, regulations, policies,

2  customs, and usages of the City of Palm Springs, the County of Riverside, and the State of California. At all

3  relevant times herein, Defendant Reyes has acted under color of state law and is being sued in his individual

4  capacity for damages associated with violations of clearly established federal and state rights, and in his official

5  capacity for injunctive and declaratory relief. Upon information and belief, Defendant Reyes is a resident of the

6  State of California and of this judicial district.

7      71.    Defendant AL FRANZ is a former Chief of Police for the City of Palm Springs, a position he

8  held from approximately January 2011 through December 2015. During his tenure as Police Chief, Defendant

9  Franz had ultimate responsibility for the promulgation and implementation of the Palm Springs Police

10 Department's policies, procedures, and practices and for the management, supervision, training, and discipline of

11 all subordinates and employees of the Palm Springs Police Department to ensure their compliance with all statutes,

12 ordinances, regulations, policies, customs, and usages of the City of Palm Springs, the County of Riverside, and the

13 State of California. At all relevant times herein, Defendant Dominguez acted under color of state law and is being

14 sued in his individual capacity for damages associated with violations of clearly established federal and state rights.

15 Upon information and belief, Defendant Franz is a resident of the State of California and of this judicial district.

16     72.    Defendant DAVID DOMINGUEZ is a former Chief of Police for the City of Palm Springs, a

17 position he held from approximately 2008 through January 2011. During his tenure as Police Chief, Defendant

18 Dominguez had ultimate responsibility for the promulgation and implementation of the Palm Springs Police

19 Department's policies, procedures, and practices and for the management, supervision, training, and discipline of all

20 subordinates and employees of the Palm Springs Police Department to ensure their compliance with all statutes,

21 ordinances, regulations, policies, customs, and usages of the City of Palm Springs, the County of Riverside, and the

22 State of California. At all relevant times herein, Defendant Dominguez acted under color of state law and is being

23 sued in his individual capacity for damages associated with violations of clearly established federal and state rights.

24 Upon information and belief, Defendant Reyes is a resident of the State of California and of this judicial district.

25     73.    Defendant FRANK BROWNING is, and at all relevant times herein was, a duly appointed and

26 acting supervisor in the Palm Springs Police Department. Defendant Browning is currently the Lieutenant of

27 Investigations  and previously a Sergeant and Lead Detective assigned to supervise and manage the investigation in

28 Plaintiff's criminal case no. INF064492. At all relevant times herein, Defendant Browning was acting under color

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 18

1  of state law and in his individual capacity under the scope of his employment pursuant to the statutes, ordinances,

2  regulations, policies, customs, and usages of the City of Palm Springs, the County of Riverside, and the State of

3  California. Upon information and belief, Defendant Browning is a resident of the State of California and of this

4  judicial district.

5       74.    Defendant SIMON MIN was, at all relevant times herein, a Detective of the Palm Springs Police

6  Department, who was designated as the primary investigative officer in Plaintiff's criminal case no. INF064492. At

7  all relevant times herein, Defendant Min was acting under color of state law and in his individual capacity within

8  the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the

9  City of Palm Springs, the County of Riverside, and the State of California. Upon information and belief, Defendant

10  Min is a resident of the State of California and of this judicial district.

11       75.    Defendant GLOBAL TEL LINK (GTL) is, and at all relevant times herein was, a corporation

12  doing business in the State of California, and maintaining its principal address in the City of Reston, in the

13  Commonwealth of Virginia. Upon information and belief, Defendant GTL was, from 2009 through 2012, under

14  contract with the County of Riverside as the sole and exclusive service provider for all inmate telephone calls

15  placed from within the five county jails operated by the Riverside County Sheriff's Department. As a private

16  contractor for law enforcement, Defendant GTL was a state actor who, at all times mentioned herein, acted under

17  color of state law.

18       76.    Defendant JEFFREY HAIDINGER is the former President and Chief Executive Officer (CEO) of

19  Global Tel Link (GTL), a position he has held from approximately 2018 to present. During his tenure as CEO,

20  Defendant Haidinger was ultimately responsibility ensuring GTL's business operations were in full compliance with

21  all applicable federal and state laws and regulations. Upon information and belief, Defendant Haidinger is a resident

22  of the Commonwealth of Virginia.

23       77.    Defendant BRIAN OLIVER is the former President and Chief Executive Officer (CEO) of

24  Global Tel Link (GTL), a position he held from approximately 2012 to 2018. During his tenure as CEO, Defendant

25  Oliver was ultimately responsibility ensuring GTL's business operations were in full compliance with all

26  applicable federal and state laws and regulations. Upon information and belief, Defendant Oliver is a resident of the

27  Commonwealth of Virginia.

28

78.     Defendant CRAIG ANTHONY MCCARTHY was a jointly-charged codefendant in Mr. Garcia's underlying criminal case no. INF064492. In 2010, Defendant McCarthy entered into a plea bargain and witness contract with the Riverside County District Attorney's Office whereby he agreed to testify on their behalf in exchange for substantial benefits. Accordingly, at all relevant times herein, Defendant McCarthy was acting as an agent of the State and in his individual capacity pursuant to the terms and conditions of his contractual agreement with the Riverside District Attorney's Office. Upon information and belief, Defendant McCarthy is a resident of the State of California.

79.     The true names and capacities whether individual, official, corporate, associate, or otherwise, of the Defendants named herein as JOHN/JANE DOES 1 through 50, inclusive, and each of them, are presently unknown to Plaintiff who therefore sues them by fictious names. Plaintiff is informed and believes, and therein alleges, that each of the Doe Defendants is in some manner responsible for actions and damages alleged in this verified complaint. When Plaintiff ascertains the true names and capacities of the Doe Defendants, he will seek leave of Court to amend this complaint to identify them by their true names and capacities. Doe Defendants are believed to have been employed by the County of Riverside, including the Riverside County District Attorney's Office, Riverside County Sheriff's Department or by the State of California, the Riverside County Superior Court.

80.     Plaintiff is informed and believes, and therein alleges, that at all times mentioned herein, the Defendants named herein, and each of them, were the agents, servants, co-conspirators, or employees of the other Defendants and that all of the acts alleged to have been done by each Defendant were done in that Defendant's capacity as agent of the other Defendants, within the scope of the Defendant's authority as agent, servant, co-conspirator, or employee and with the permission and consent of the other Defendants.

## PLAINTIFF'S MAILING ADDRESS FOR SERVICE

81.     Plaintiff wishes to make it clear to the Court that he is currently in the custody of the Riverside County Sheriff's Department and is currently housed and in custody at:

DANIEL CARLOS GARCIA
Booking No. 202001501
Robert Presley Detention Center
P.O. Box 710
Riverside, CA 92501-0710

82.     However, given Plaintiff's on-going problems with receiving mail at the jail while in the custody of the Riverside County Sheriff's Department, his inability to store only a limited amount of paperwork in his cell, and the illegal search of his legal paperwork, Plaintiff wishes to have all legal documents be mailed to his home address listed on the first page of this Petition and emailed to his email address at: DanielCarlosGarcia@comcast.net so that his parents and Durable Legal Power of Attorney can provide those documents to his investigator and/or legal runner who can print the documents that he needs and bring them to Plaintiff within one or two days, which will allow his parents to maintain the complete record of all court filings and documents associated with this case as Plaintiff has no ability to store the court filings and other legal documents in his cell.

83.     This will expedite Plaintiff's ability to respond to the Court in a timely fashion and avoid potential problems of the Riverside County Sheriff who is a Defendant in this case from interfering with Plaintiff's lawsuit against them.

### LACK OF QUALIFIED IMMUNITY

84.     It is anticipated that the Defendants will likely claim that they enjoy qualified immunity from suit for each of the causes of action stated in this verified complaint—however, they do not.

85.      The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (*Pearson v. Callahan* (2009) 555 U.S. 223, 231.)

86.     A clearly established right is one that is "'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" (*Reichle v. Howards* (2012) 566 U.S. 658.)

87.     "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" (*Ashcroft v. al-Kidd* (2011) 563 U.S. 731, 743.)

88.     The Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions would be understood by any reasonable official to be in violation of the clearly established rights of Plaintiff as secured by the laws and Constitutions of the United States and the State of California. As such, they have forfeited any claim of qualified immunity protection.

89.     Attorneys are not immune from 42 U.S.C. §1985 actions pursuant to the attorney immunity doctrine. (*Acosta v. Brain* (9th Cir. 2018) 910 F.3d 502.)

90.     Qualified immunity applies to private individuals contracted by the government, but may be overcome if a defendant should have known that his conduct violated a particular right. (*Campbell-Ewald Co. v. Gomez* (2015) 136 S. Ct. 663.) To the extent that any private individuals or corporations contracted by the various governmental Defendants attempt to claim they are shielded by qualified immunity from suit—they are mistaken. The actions of each and every individual Defendant was intentional and under color of state law. Any reasonable person would have understood that their actions violated clearly established and protected rights. Therefore, through their deliberate misconduct, Defendants, and each of them, have forfeited any claim to qualified immunity.

91.     As to the judicial officials, in *Regan v. Price* Justice Kathleen Butz wrote "A judge's robe is not a king's crown,". "[Judicial immunity] was never intended to protect acts of thuggery against litigants merely because the assailant happens to be a judge" (*Regan v. Price* (2005) 131 Cal.App.4th 1491). Judicial officials lack absolute judicial immunity when they know that their actions exceed the scope of official duties, constitute a crime, or are known to intentionally violate the rights of a person protected under clearly established constitutional law.

<div style="text-align:center"><strong>TIMELINESS OF ACTION</strong></div>

92.     It may be argued that the acts and omissions that give rise to the causes of action described herein are beyond the applicable statute of limitations; however, they are not. It has been well established by the Supreme Court that Section 1983 relief is unavailable for recovering damages on claims that necessarily imply the invalidity of the plaintiff's underlying criminal conviction or sentence unless the plaintiff can demonstrate that the "conviction or sentence has been reversed on direct appeal, expunged by executive order, [invalidated by an authorized state tribunal], or called into question by a federal court's issuance of a writ of habeas corpus." (Heck v. Humphrey (1994) 512 U.S. 477, 487; see also Guerrero v. Gates (9th Cir. 2006) 442 F.3d 697, 703-04 (no cognizable §1983 claim for wrongful arrest, malicious prosecution, and conspiracy to bring false charges because claim challenged sentence, but conviction never invalidated.).)

93.     If a Section 1983 action would necessarily challenge the legality of a conviction or sentence on a criminal charge, the statute of limitations for the Section 1983 action may be temporarily tolled until a disposition is reached in the criminal proceedings. (See, e.g., *Johnson v. Winstead* (7th Cir.. 2018) 900 F.3d 428, 435 (§1983 claim for violation of Fifth Amendment right against self-incrimination would not accrue until after conviction

reversed); *Jackson v. Barnes* (9th Cir. 2014) 749 F.3d 755, 760.)

94.     Plaintiff was convicted in the underlying criminal case and sentenced to life imprisonment. Plaintiff's malicious prosecution, wrongful conviction, and unlawful imprisonment was a direct and proximate result of the egregious conduct of the Defendants as described herein. A favorable judgment on Plaintiff's Section 1983 claims would therefore have conflicted with the validity of Plaintiff's criminal conviction. Therefore, the statute of limitations was necessarily tolled during the pendency of Plaintiff's unlawful incarceration and the claims raised herein did not accrue until his conviction was reversed and sentence vacated.

95.     On June 8, 2020, Plaintiffs conviction in case no. INF-064492, before the Superior Court for Riverside County was reversed in full upon the granting of his *unopposed* petition for a writ of habeas corpus. On July 23, 2020, Superior Court Judge David A. Gunn issued an order vacating Plaintiff's judgment of conviction and sentence in full. Therefore, each of the causes of action as raised herein did not accrue until Plaintiff's criminal conviction and sentence were vacated. This lawsuit was timely filed within the applicable statute of limitations as tolled.

## FACTUAL ALLEGATIONS

### I.     Background of Plaintiff Daniel Carlos Garcia

96.     Plaintiff Daniel Carlos Garcia was born and raised in Northern California. Mr. Garcia is a lifelong resident of California and a citizen of the United States.

97.     In 2001, Mr. Garcia moved to San Francisco to pursue his career in the computer technology sector. After working for several years for various biomedical and technology companies, Mr. Garcia began to develop his own innovative software applications and technology platforms.

98.     Mr. Garcia had no criminal convictions on his record prior to his arrest by Sacramento Police in 2009 and the resulting conviction following a lengthy jury trial in Riverside County in 2012.

### II.     The Thomas White Affair

99.     Mr. Garcia was at all times represented by counsel.  In October 2002, Mr. Garcia retained attorneys John Edward Hill and David Replogle (hereafter "Replogle") to represent him in a civil lawsuit against a man who had molested Mr. Garcia as an adolescent. The defendant in that case was wealthy San Francisco businessman Thomas Frank White (hereafter "White") who fled the United States becoming an international fugitive. In July 2005, Mr. Garcia's civil lawsuit against White was settled and Mr. Garcia received a seven-figure

1    settlement.[4] Both attorneys John Hill and David Replogle continued to represent Mr. Garcia in various capacities in

2    several other matters and were available to Mr. Garcia should any new legal matters arise. The fact that Mr. Garcia

3    was represented at all times by counsel was well-known to law enforcement.

4           100.    Mr. Garcia assisted several law enforcement agencies, including the Federal Bureau of

5    Investigation, Interpol, Thai Royal Police, Mexican Federal Police, and the San Francisco Police Department, in

6    investigating and apprehending White. With the help of Mr. Garcia, on February 13, 2003, White was arrested in

7    Thailand. White fought extradition to the United States where he was wanted on federal crimes under a federal

8    grand jury indictment for production of child pornography and sexual tourism (U.S. Protection of Children from

9    Sexual Predators Act (PROTECT Act) of 2003). White renounced his U.S. citizenship in an attempt to avoid

10   extradition back to the United States. White was eventually extradited to Mexico in 2005, convicted on several

11   counts of child molestation, and subsequently died in prison in Mexico in 2013.

12          101.    Mr. Garcia provided information to San Francisco Police Inspector Gregory Ovanessian

13   (hereafter "Inspector Ovanessian") to assist law enforcement in investigating White. Inspector Ovanessian was also

14   investigating an exchange student from Nepal named Kaushal Niroula (hereinafter "Mr. Niroula") for various

15   crimes in the San Francisco Bay Area and met with Mr. Garcia numerous times as a witness against Niroula. Mr.

16   Garcia had been a valuable witness for Inspector Ovanessian for several years helping him in the investigation and

17   prosecution of Niroula and others for several crimes. Mr. Garcia had always provided reliable information to law

18   enforcement. Inspector Ovanessian was aware that Mr. Garcia was represented by counsel.

19   **III.    The Hydra Project**

20          102.    As a survivor of childhood sexual abuse, Mr. Garcia was passionate about protecting children

21   from sexual predators. Mr. Garcia worked with his attorney David Replogle to found a non-profit organization

22   called Campaign Against Child Exploitation (CACE) to help bring awareness to and combat child sexual abuse in

23   the United States and abroad.

24          103.    Mr. Garcia, together with Mr. Replogle,  built upon the relationships with various law

25   enforcement and government agencies around the world that they had forged while helping to apprehend and

26   _____

27

28          [4] Thomas White also voluntarily settled two lawsuits on behalf of twenty-one other victims that he had
     sexually abused.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 24

1  prosecute Thomas Frank White. They advocated for stricter laws and greater penalties against those who sexually

2  abuse children, and better enforcement of existing laws. Mr. Garcia and Mr. Replogle also provided direct aid to

3  victims of child sexual assault and assisted survivors to seek appropriate legal action against their abusers.

4  104.   Mr. Garcia desired to use his computer savvy and technical expertise to help combat child sexual

5  abuse by targeting those who produce and distribute child pornography. In 2003, he teamed up with his best friend

6  and computer security expert Alexander Shahbazian to develop an innovative system that could detect and track the

7  spread of child pornography (and later expanded the search for other kinds of illicit content), over then-popular

8  peer-to-peer (P2P) file sharing networks. They named their efforts *The Hydra Project*.

9  105.   By late 2005, Messrs. Garcia and Shahbazian had developed a working prototype of *The Hydra

10  Project* to prove their concept. They had designed the system as a scalable hive-network based on Microsoft xBox

11  gaming systems. Each of the xBox units functioned as a kind of "worker bee" or "drone" to share the workload of

12  the "hive" as a whole. The system would then "swarm" the P2P networks in a coordinated effort to search for and

13  detect illicit files such as child pornography and terrorist materials. If a match was found, the individual drone would

14  report the results back to the control unit or "queen" and an incident report would be generated detailing the date,

15  time, location, system configuration, and match found.

16  106.   Mr. Garcia's innovative design proved to be incredibly effective, and during initial testing,

17  successfully detected and identified over 200,000 individual computer systems around the world that possessed

18  child pornography. Mr. Garcia then began sharing the results with various law enforcement agencies around the

19  world and seeking their input on additional features and functions they would find useful. A system similar to *The

20  Hydra Project* was developed by technology entrepreneur Hank Asher and Seisint Technologies and reportedly

21  was sold in 2004 for a reported $775 million dollars to Reed Elsevier.

22  107.   Mr. Garcia completely self-funded the development of *The Hydra Project* using his own savings

23  and financial resources he had received in the White settlement. By early 2008, Mr. Garcia began to plan the

24  development and release of a commercially viable version of *The Hydra Project* and sought additional partners and

25  venture capital funding necessary to finance the expansion and costly acquisition of new equipment.

26  **IV.    Mr. Garcia's Friendship with Clifford Lambert**

27  108.   In late 2005, Mr. Garcia travelled to Beverly Hills to attend a charity gala to raise money for

28  various causes pertaining to HIV/AIDS awareness, research, and palliative care. While at the event, Mr. Garcia met

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 25

a man named Travis Hobbs Lambert and his partner Clifford Lambert. Following the gala, Mr. Garcia remained in contact with Travis Hobbs Lambert over social media until he suddenly stopped receiving replies.

109.    In March 2008, Mr. Garcia received an on-line message from Clifford Lambert who informed Mr. Garcia that Travis had died in a tragic swimming pool accident the year before. Mr. Lambert offered to fly Mr. Garcia down to visit at his home in Palm Springs and Mr. Garcia accepted. The two struck up a friendship and found many common interests.

110.    Following Mr. Garcia's first trip to Palm Springs in April 2008, he traveled several more times throughout the year to visit with Mr. Lambert. During the visits, Mr. Garcia brought Mr. Lambert flowers, went grocery shopping, cooked meals, helped with household repairs, solved technical problems, and generally assisted Mr. Lambert with keeping his affairs in order. The men also discussed Mr. Garcia's business venture *The Hydra Project* and a separate effort to take over a struggling waste conversion and alternative energy company called Startech. Mr. Lambert offered to introduce Mr. Garcia to some of his wealthy and celebrity friends who might be interested in investing in either venture.

111.    Mr. Garcia last spoke to Mr. Lambert on the telephone in early December 2008, at which time Mr. Lambert stated he would be traveling abroad to Mexico and Austria for the holidays but would return in January 2009 in time for his birthday. Mr. Lambert claimed he was about to inherit millions of dollars from an old friend and would soon be rich again.

**V.    Mr. Garcia's Relocation to Sacramento**

112.    In September 2008, Mr. Garcia relocated to the City of Sacramento and leased a luxury loft located at 1530 J Street, Unit 310. Mr. Garcia chose the location—only two blocks from the State Capitol—to be close to lawmakers and other government officials as he prepared to demonstrate *The Hydra Project*'s capabilities.

113.    Mr. Garcia updated his address with the California Department of Motor Vehicles to his new Sacramento address.

**VI.    The Disappearance of Clifford Lambert**

114.    On December 7, 2008, Palm Springs resident, Clifford Lambert, was reported missing to police. Mr. Lambert's personal attorney, Martina Kang-Ravicz obtained an emergency conservatorship over Mr. Lambert's estate and the Superior Court appointed Kenneth Jenkins as the conservator. Suspicious activity in some of Mr. Lambert's financial accounts during the month of December 2008 was discovered by Mr. Jenkins.

115.    On January 7, 2009, Miguel Bustamante was arrested on suspicion of burglary while attempting to remove items from Mr. Lambert's home. Mr. Bustamante reportedly made statements to police allegedly implicating a "Danny Garcia" and several others in various financial crimes against Mr. Lambert; however, he told detectives he did not know Danny Garcia, nor had he ever met him or communicated with him in any way.

116.    There was no credible evidence implicating Mr. Garcia in the commission of any crimes against Mr. Lambert or in having any involvement in his disappearance. At no time did police attempt to contact Mr. Garcia to question him before seeking criminal charges against him.

**VII.    Arrest Warrant Issued for Mr. Garcia**

117.    On March 2, 2009, Palm Springs Police Detective Simon Min (hereafter "Detective Min") submitted a declaration in support of an arrest warrant for Mr. Garcia and several others, in the case of *People v. Daniel Carlos Garcia, et al.,* case number INF064492, Superior Court of California, County of Riverside, Indio Branch.

118.    Detective Min declared he was "assigned to investigate allegations that the above named defendant did commit the offense of PC 182(a)(4)-Conspiracy to commit theft and/or defraud, PC 368(D)-Elder abuse for theft over $400.00, PC 484g-Unlawful use of access/debit card, PC 532(a)-Obtain money by false pretense, in the City of Palm Springs, County of Riverside, on December 6, 2008."

119.    Detective Min declared that he and Palm Springs Police Detective Frank Browning (hereafter "Detective Browning"), were the primary detectives investigating the case involving the disappearance of Palm Springs resident Clifford Edward Lambert (hereafter "Mr. Lambert") and possible conspiracy to commit financial crimes against Mr. Lambert.

**VIII.    Felony Complaint Filed by Riverside County**

120.    On March 2, 2009, the Riverside County District Attorney filed a Felony Complaint in Case No. INF064492 against Mr. Garcia and others for various fraud and theft-based offenses against Mr. Lambert. Murder was not charged or alleged at that time. The Court issued an arrest warrant for Mr. Garcia and others, at the specific request of Detective Min, and set bail at one million dollars—two hundred times the amount specified in the Riverside County Bail Schedule for a non-serious, non-violent felony. Detectives from the Palm Springs Police Department actively began searching for each of the named Defendants to take them into custody pursuant to the arrest warrants.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 27

121.    The filing of the felony complaint by the Riverside County District Attorney's Office, and the issuance of an arrest warrant, initiated a criminal action against Mr. Garcia on March 2, 2009 in Case No. INF064492.

122.    Formal charges were filed against Mr. Garcia by way of a felony complaint, triggering Mr. Garcia's Sixth Amendment right to counsel, which he exercised by retaining private counsel to represent him. Both law enforcement and the Riverside County District Attorney were aware that Mr. Garcia had been charged and was represented by private counsel and had expressed his desire to interface with the government through his attorneys which legally precluded any efforts to interview him.

IX.    **Arrest of Mr. Garcia's Attorney David Replogle**

123.    On March 2, 2009, codefendants David Replogle and Kaushal Niroula were arrested while attending court in San Francisco. When Mr. Replogle was interviewed by Detective Browning, he stated that he represented Mr. Garcia as his attorney.

124.    Inspector Ovanessian and Detective Browning executed search warrants at Mr. Replogle's home and law offices, and knowing he was an attorney, used a special master to collect the evidence in order to preserve any attorney-client privileges.

125.    Mr. Garcia learned of the charges filed against him and the existence of the felony arrest warrant when he called the Riverside Superior Court to inquire about Replogle's arrest.

X.    **Mr. Garcia Sought the Assistance of Counsel**

126.    Upon learning of the arrest warrant, Mr. Garcia called and spoke to his attorney John Edward Hill and sought legal advice. Attorney Hill advised Mr. Garcia not to speak to the police without counsel present. Attorney Hill referred Mr. Garcia to San Francisco criminal defense attorney Tim Palm for assistance in dealing with the Riverside criminal charges. Mr. Garcia's mother privately retained attorney Tim Palm on Mr. Garcia's behalf to provide legal advice regarding the pending criminal charges in Riverside County.

127.    Attorney Palm also recommended that Mr. Garcia retain local counsel Mario Rodriguez (hereafter Mr. Rodriguez), who was a specialist in criminal law located in Indio, California, to represent Mr. Garcia in the criminal case pending in Riverside County.

XI.    **Mr. Garcia Privately Retained Attorney Mario Rodriguez**

128.    On March 6, 2009, Mr. Garcia called and spoke to criminal defense attorney Mario Rodriguez,

who agreed to represent Mr. Garcia in the criminal case. Mr. Rodriguez advised Mr. Garcia not to speak to law enforcement outside of his presence and to allow him to interface with law enforcement on his behalf.

129.    Attorney Mario Rodriguez advised Mr. Garcia not to turn himself in at that time.  He advised Mr. Garcia to allow his attorneys to contact the Riverside County District Attorney's Office to attempt to rescind the arrest warrant in exchange for Mr. Garcia's voluntary cooperation, or in the alternative to arrange for a voluntary surrender after pre-posting the bail to minimize the length of time Mr. Garcia would have to spend in jail.

130.    On March 9, 2009, prior to Mr. Garcia's arrest in Sacramento, Mr. Garcia again called attorney Mario Rodriguez and officially hired him to defend him on all charges in this case by telephone agreement. Mr. Garcia spoke to Mr. Rodriguez to confirm the terms of the retainer agreement, and to discuss the case. Mr. Rodriguez again advised Mr. Garcia not to speak with law enforcement. Mr. Rodriguez confirmed that charges had been filed against Mr. Garcia by means of a felony complaint, and that he would be calling the District Attorney to discuss the case. Mr. Rodriguez also told Mr. Garcia that he would be attending Court at the Larson Justice Center for the arraignment of codefendants Replogle and Niroula later that day to talk to the assigned prosecutor.

**XII.    Mr. Garcia Informed Police that He Had Retained Counsel**

131.    On March 4, 2009, Mr. Garcia called and spoke to San Francisco Police Inspector Gregory Ovanessian. During the recorded phone call, Mr. Garcia explained to Inspector Ovanessian that there must be a misunderstanding and that the charges against him were without merit. Inspector Ovanessian put Detective Frank Browning of the Palm Springs Police Department on the call. Mr. Garcia asked if Detective Browning could contact the Riverside County District Attorney to recall the arrest warrant to allow Mr. Garcia to come in for questioning without arrest. Detective Browning told Mr. Garcia that he would try to contact the assigned prosecutor.

132.    Mr. Garcia repeatedly called and spoke to Inspector Ovanessian and Detective Browning to keep up-to-date on any developments and to ensure them that he would not flee and that he intended to voluntarily surrender with the assistance of counsel.

133.    Detective Browning prepared a "Supplemental Report" on his investigation of Mr. Garcia in Palm Springs Police Department case number 0812P-1307, in which he states that Mr. Garcia informed him and Inspector Ovanessian in a recorded conversation that Mr. Garcia was attempting to obtain bail money and was making arrangements with his attorney to voluntarily surrender to law enforcement:

3/4/09

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 29

Daniel Garcia called San Francisco Inspector Greg Ovanessien (sic) on his office phone stating that he was aware of Niroula's arrest and that there was currently a warrant out for his arrest.  During his conversation with Inspector Ovanessien (sic) Garcia told him that he and Lambert were good friends and that Lambert was going to help him with his Startek business.  He stated that Russell Manning was being held in a jail in Porta Vallarta (sic) Mexico. Garcia did not want to turn himself in and stated he would attempt to collect the bail needed before making arraignments (sic) with his **attorney** so he could surrender to law enforcement. During these conversations Inspector Ovanessien (sic) handed me the phone and allowed me to speak with Garcia. Garcia told me that Replogle and Niroula were the ones responsible for Lambert's disappearance and that he would not put it past Niroula and Replogle in having Lambert placed in jail in "a third world country." These phone calls were **recorded** with the recording being placed into evidence.
(Supplemental Report dated 3/23/2009, emphasis added)

### XIII.    Detective Browning Acknowledged He Could Not Speak to Mr. Garcia Who Was Represented by Counsel

134.    On March 6, 2009, Mr. Garcia again telephoned Inspector Ovanessian to inform him that he had retained counsel to defend the charges. Inspector Ovanessian informed Mr. Garcia that he was hooking up the conversation he was recording to include Detective Browning, and Mr. Garcia informed the officers that he had retained counsel who would be making arrangements with the Riverside County District Attorney's Office to arrange for a voluntary surrender on Monday, March 9, 2009. Detective Browning became hostile towards Mr. Garcia and stated that he would have a "man hunt" for Mr. Garcia if he did not turn himself in immediately.

135.    Mr. Garcia informed Detective Browning that his retained counsel would be handling the case moving forward and had advised Mr. Garcia not to talk to the police. Detective Browning acknowledged that he could not speak to Mr. Garcia if he was represented by an attorney and hung up the phone. That was the last call between Mr. Garcia and Detective Browning.

### XIV.    Palm Springs Police Department Requested the Assistance of the Sacramento Police Department

136.    Palm Springs Police Detective Simon Min requested the assistance of the Sacramento Police Department in apprehending Mr. Garcia. Detective Min had received a response from AT&T to a search warrant for phone records associated with Mr. Garcia that indicated the phone was registered to Matthew Herip who resided in Sacramento. The phone had last "pinged" in the city of Sacramento.

137.    On March 5, 2009, Sergeant Rick Gautier contacted Detective Steve Glen who was assigned to the Sacramento Police Department's (SPD) Career Criminal Apprehension Team (CCAT) and requested that the CCAT assist Detective Min of the Palm Springs Police Department (PSPD) in his efforts to apprehend Mr. Garcia. The primary objective of the CCAT is to help locate and apprehend wanted fugitives. Detective Glen was told that Mr. Garcia was "wanted for a 487 PC [grand theft] and was a possible homicide suspect in an ongoing

investigation out of Palm Springs." (Report of Detective Glen, pg. 1, para 1-2.)

138.     It is evident that Detective Glen and the CCAT did not have a copy of the arrest warrant for Mr. Garcia. There was nothing to suggest that, prior to their entry and search, the SPD/CCAT knew that the Palm Springs Police Department was looking for any kind of evidence or contraband, nor that SPD/CCAT was supposed to be looking for any kind of evidence. The SPD/CCAT were only supposed to be searching for Daniel Garcia's person—a body.

139.     There is no evidence that the SPD/CCAT obtained, or was aware of, any search warrants pertaining to search for Mr. Garcia that authorized the search of any residence or the seizure of any property or evidence.

**XV.     Sacramento Police Detectives Searched for Mr. Garcia**

140.     Sergeant Gautier requested that Detective Glen respond to the residence of Matthew Herip located at 1390 Response Road, Apartment No. 432 in the City of Sacramento to see if Mr. Garcia was inside. The report states that Mr. Herip and Mr. Garcia were "friends." Detective Glen surveilled the house from 18:30 hours until 20:00 hours, at which time he and Sergeant Gautier and Detective Hansen and a K-9 unit approached the house and knocked. Detective Glen reported that, due to the length of time it took Mr. Herip to answer the door, they suspected Mr. Garcia was hiding inside. Mr. Herip informed the detectives that Mr. Garcia was his former boyfriend and they had not been together in several weeks. The detectives searched the apartment, and they did not find Mr. Garcia.

141.     While Searching Mr. Herip's small one-bedroom apartment for Mr. Garcia, detectives found a suspicious amount of brand new property—most still in their original packaging or with price tags still attached—Including a large Sony LED flat screen television, a tanning bed by the front door, copious amounts of designer clothing, and numerous Apple electronic devices including several laptop computers. All of these items had been identified by investigators as having been **purchased with Mr. Lambert's credit cards** after his disappearance—allegedly by Mr. Garcia. The Detectives made no attempts to seize or photograph any of the property or check any serial numbers.

142.     Also inside of Mr. Herip's apartment, Detectives found three fur coats with the name "Cliff Lambert" embroidered inside, several pieces of structured luggage from Louis Vuitton's Monogram Collection, and an ornate Tiffany & Co. clock. All of the aforementioned items were alleged by prosecutors to have gone missing

1   from Mr. Lambert's Palm Springs residence—over 500 miles away—after his mysterious disappearance in early

2   December 2008. There was no sensical reason why Mr. Herip would be in possession of valuable personal property

3   of a man he claims to have never met.

4   143.   Detectives failed to document in their reports any of the property they found inside Mr. Herip's

5   apartment in plain view.

6   144.   According to Detective Glen, Mr. Herip told the detectives that Mr. Garcia was living in a loft

7   apartment downtown at 1530 J Street, Unit 310, Sacramento. During the thirty minute conversation, Mr. Herip also

8   "mentioned" that Mr. Garcia had a friend named "Nick Sities" [sic] who lived "somewhere downtown." (Report of

9   Detective Glen, p. 12 of 22, para 5).

10   145.   The detectives then went to 1530 J Street and gained entry to the apartment building and spoke

11   with a neighbor of Unit 310 who said he was familiar with Mr. Garcia but had not seen him in about a month. The

12   detectives did not attempt to enter Unit 310 which was Mr. Garcia's listed address with the Department of Motor

13   Vehicles on his California Driver's License.

14   **XVI.   Mr. Garcia Prepared to Voluntarily Surrender**

15   146.   On March 7, 2009, Mr. Garcia and his roommate Alexander Shahbazian prepared for a trip to

16   Palm Springs to meet with Mr. Garcia's local criminal defense attorney Mario Rodriguez to arrange for a voluntary

17   surrender. They stayed at the home of Mr. Garcia's friend Nick Seitze as his guest while they made travel

18   arrangements and took care of his dog.

19   147.   On March 9, 2009, prior to Mr. Garcia's arrest in Sacramento, Mr. Garcia again called attorney

20   Mario Rodriguez and officially hired him to defend him on all charges in this case by telephone agreement. Mr.

21   Garcia spoke to Mr. Rodriguez to confirm the terms of the retainer agreement, and to discuss the case.

22   Mr. Rodriguez again advised Mr. Garcia not to speak with law enforcement. Mr. Rodriguez confirmed that charges

23   had been filed against Mr. Garcia by means of a felony complaint, and that he would be calling the District

24   Attorney to discuss the case. Mr. Rodriguez also told Mr. Garcia that he would be attending Court at the Larson

25   Justice Center for the arraignment of codefendants Replogle and Niroula later that day to talk to the assigned

26   prosecutor.

27   **XVII.   Mr. Garcia Was Arrested by Sacramento Police Department**

28   148.   On March 9, 2009, at approximately 12:00 hours, Detectives Glen, Hitchcock and Hansen

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 32

responded to a location at 623 19th Street, Sacramento, California, which, based on their "further investigation," belonged to Mr. Garcia's friend, Nick Seitze. Detective Hitchcock indicated they had "developed information" that Mr. Garcia might be staying there. (Report of Detective Hitchcock, p. 9 of 22, para 2). It is not clear if the source of this "information" was Mr. Herip's statement that Mr. Garcia had a friend "Nick Sites" [sic] who lived somewhere downtown or if there was additional source of information. The truth and accuracy of these detectives' reports of consent and the manner in which the entry and search were made is disputed.

149.    Mr. Garcia and his friend, Alexander Shahbazian, where staying as guests at Nicholas Seitze's apartment, which occupies the first floor of a large Victorian home located at 623 19th Street in Sacramento. The property is fenced on all sides, with the only entrance being a black iron gate which leads into the yard. The gate has a double cylinder deadbolt, both sides of which require a key and there is no method of unlocking the deadbolt without a key.

150.    On or about March 7, 2009, Mr. Seitze left on a business trip to Reno, Nevada and he asked Mr. Shahbazian to watch his apartment and administer medication to his English Bull Dog. Mr. Seitze expected to return from Reno later that week.

151.    According to Detective Glen's report, the officers conducted surveillance of 623 19th Street, for approximately an hour and a half  "to try to see if Mr. Garcia would enter or leave the premises." Apparently, they did not observe Mr. Garcia, as there was no mention of seeing him in any report. There was no reason given in any of their reports for why they believed Mr. Garcia might be at Mr. Seitze's home at that particular time other than their belief that Mr. Seitze was a "friend" of Mr. Garcia's and so Mr. Garcia "might" be staying there. (Report of Detective Glen, pg. 13, para. 2.)

152.    On Monday, March 9, 2009, at approximately 13:15 hours there was an unexpected knock on the front door. Mr. Shahbazian and Mr. Newcomb answered the door and there was a man (later identified as a law enforcement officer) holding a photocopied "reward if found"/"lost dog" flyer, depicting a St. Bernard. As they spoke to the man, Mr. Shahbazian walked into the front yard and smoked a cigarette. The man stated that he had lost his dog in the neighborhood and that "some lady" thought she had seen the dog in the apartment's yard. Mr. Shahbazian said that he had not seen any St. Bernard. The gentleman asked their names and Mr. Shahbazian stated, "my name is Alex." The man thanked them for their time and Mr. Shahbazian shook his hand.

153.    The man then went upstairs to the apartment on the second floor and spoke briefly to the women

that lived up there. The upstairs neighbor stated that no St. Bernard had been seen in the area. Mr. Shahbazian walked with the man to the front gate and locked the gate behind the man as he left. No mention of this encounter appears in any of the police reports provided in discovery.

154.    After securing the front gate, Mr. Shahbazian re-entered the residence and told Mr. Garcia about the encounter. Having extensive experience in assisting law enforcement, Mr. Garcia quickly recognized the encounter as a possible police tactic and suspected that the man was a police officer who would likely return.

155.    A few minutes later, there was a loud and persistent knock on the door which was disconcerting as Mr. Shahbazian had just locked the front gate minutes earlier which was the only point of legal entry onto the property. Mr. Shahbazian quickly ushered Mr. Garcia to a hall closet and Mr. Garcia proceeded to call his attorney Mario Rodriguez. When Mr. Shahbazian opened the front door, the officers pushed their way in without asking permission, and without invitation. Detectives Glen, Hitchcock and Hansen were in plain clothes and wearing tactical vests that said "police" on the back. They stated that they were involved with an investigation and asked if Mr. Shahbazian and Mr. Newcomb if they had identification, which they both provided. They asked for permission to search which was repeatedly denied by Mr. Shahbazian. One of the officers was actively looking around the apartment. Mr. Shahbazian ushered the officers outside and repeatedly asked them to leave. The officers asked if either of the occupants had any outstanding warrants and Mr. Shahbazian stated that he did not. They continued to question the men separately.

156.    Detective Hitchcock asked who lived there and whether there was anyone else inside. Both men denied anyone else was there. Mr. Shahbazian told Detective Hitchcock he had been house-sitting for the past few days while Mr. Seitze was in Reno on business. (Report of Detective Hitchcock, p. 9 of 22 para 4). Mr. Newcomb said he had just moved in and was paying rent to Mr. Seitze for the "back [northeast] bedroom." Detective Glen reports he asked if they could search "to make sure no one was inside of the house" which he characterized in his report as a "protective sweep" and Mr. Shahbazian said no, because the owner was not at home. (Report of Detective Glen, p. 13 of 22, para 3).

157.    Detective Hitchcock asked Mr. Shahbazian and Mr. Newcomb for Mr. Seitze's cell phone number and they both said they did not know it or how to reach him. Detective Hitchcock ordered Mr. Newcomb and Mr. Shahbazian to search their phones for Mr. Seitze's cell phone number. Mr. Shahbazian reportedly complied but gave him the number with two digits reversed, so the detectives were unable to reach Mr. Seitze.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 34

158.     Detective Glen then asked if either of the men were on probation or parole. Detective Glen reported that Mr. Newcomb said he was on informal probation for possession of brass knuckles. Detective Glen reported that he searched but <u>was unable to locate</u> Mr. Newcomb's or Mr. Shahbazian's names in the system by portable radio. Mr. Shahbazian supposedly remained in the living room with Detectives Glen and Hitchcock who reported that Mr. Shahbazian continued to tell them there was no one else there and they did not have permission to search. (Report of Detective Glen, p. 13 of 22, para 4-5).

159.     Detective Hansen reported that Mr. Newcomb gave him permission to search his bedroom and the common areas. Mr. Newcomb supposedly "led" Detective Hansen to the kitchen, the northeast bedroom, and the bathroom. Mr. Garcia was not in any of those rooms. Detective Hansen reported that when he walked toward what Detective Glen described as a 3'x4' water heater closet, in the hallway, Mr. Shahbazian blocked his entry and told him again he did not have a right to search the house. (Report of Detective Hansen, p. 5 of 22, para 2).

160.     Detective Hitchcock told Mr. Shahbazian "that we were only looking for a body and that we weren't going to be searching through any drawers or anything. (It is asserted that the officers ultimately searched the entire house, including closed drawers and cabinets.) "At that point, he hadn't asked me who we were looking for and we hadn't told him. Mr. Shahbazian told me he was in charge while Mr. Seitze was in Reno and he insisted we weren't permitted to search any rooms of the house." Detective Hitchcock stated that Mr. Shahbazian "remained adamantly opposed" to them searching the rest of the house. (Report of Detective Hitchcock, p. 9 of 22, para 4, p. 10 of 22, para 2).

161.     Detective Hansen said he and Mr. Newcomb returned to the living room, at which point Detective Hitchcock took Mr. Newcomb outside so he could question him away from Mr. Shahbazian. Mr. Newcomb then gave him Mr. Seitze's phone number. Detective Hitchcock then showed him a photo of Mr. Garcia and asked if he knew him. Mr. Newcomb said yes he was a friend of Mr. Seitze but said he had not seen him for a couple of months and had never seen him at this residence. About that time Detective Hitchcock heard shouting from inside the house, looked in and saw Detective Hansen handcuffing Mr. Shahbazian.

162.     Detective Glen had told Mr. Shahbazian that Mr. Newcomb was on probation and that gave him the right to search the residence even though he had no evidence of a search clause. (Report of Detective Glen, p. 13 of 22, para 6). He told Mr. Shahbazian that if in fact he found someone hiding in the house Mr. Shahbazian would go to jail. At that point, Detective Glen reported that he walked past Mr. Shahbazian and opened the closet door,

apparently revealing Mr. Garcia inside. Mr. Garcia reportedly had a "throwaway" cell phone in his possession when he was located.[5] Detective Glen pulled Mr. Garcia out of the hallway and handcuffed him on the living room floor without incident or resistance. Mr. Garcia was then sat on an ottoman in the living room by the front door. The detectives then conducted a "protective sweep" of the entire residence.

163.    Mr. Garcia asked to know the cause of his arrest or to see a copy of the arrest warrant. He was told to "shut up." Mr. Garcia stated he wanted to speak to his attorney.

164.    After he arrested Mr. Garcia, Detective Glen had Officer Hoverston re-run the search for Mr. Newcomb's probation records from his car. The search revealed that Mr. Newcomb had been arrested for PC §12020 but there was no search clause attributed to his arrest as had been falsely told Mr. Shahbazian, which he claimed gave him authority to conduct a warrantless search of the entire residence. (Report of Detective Glen, p. 14 of 22, para 2).

### XVIII.   Detectives Proceeded to Conduct a Warrantless Search of the Entire Residence

165.    Despite having achieved their sole objective of arresting Mr. Garcia, the detectives, nevertheless, proceeded to conduct an extensive warrantless search of the entire home and its contents.

166.    Detectives returned to question Mr. Garcia about the ownership and contents of several pieces of luggage found in the master bedroom. The detectives failed to administer *Miranda* advisements, but Mr. Garcia nonetheless invoked his right to remain silent and his right to counsel. Detectives proceeded to attempt to interview Mr. Garcia anyway and threatened to damage Mr. Garcia's valuable property if he did not speak to them. During the interrogation, Mr. Garcia identified which items belonged to him and did not give his consent for detectives to search any of his property. Mr. Garcia's short responses to the detectives' questions were used by the Riverside County District Attorney to justify a warrantless search and seizure of voluminous personal property that was derivative evidence of the unlawfully obtained statement.

167.    The officers then proceeded to search through the luggage in the west [master] bedroom anyway. Detective Hansen located several laptop computers supposedly in plain view and indicia of Mr. Garcia **inside**

---

[5] It is not clear why detectives referred to Mr. Garcia's cellular phone as a "throwaway" as it was a regular Nokia cellular phone with service through AT&T Wireless. At no time did Mr. Garcia attempt to throw away or discard his cellular phone.

several black duffle style bags that he found in the master bedroom. Whether the computers were in plain view or inside the closed luggage is disputed. It is asserted that the officers removed the laptops from the luggage and turned one on and examined it **at the scene**.[6] Detective Hansen also located an Apple iPhone inside of one of the black Louis Vuitton bags. (See Seized Property Report, pg. 20-22 indicating that the iPhone was taken out of item #11 which is described as "black Louis Vuitton handbag").

168.   According to Detective Glen's report, he then contacted Detective Min of PSPD and advised him they had located several Apple laptops and other computer-related items. (Report of Detective Glen, p. 14 of 22, para 4). At that time Detective Min told him there was a white Apple laptop missing which belonged to his victim Clifford Lambert. Mr. Garcia had already been arrested. Detective Min then asked if Detective Glen could write a search warrant. Detective Glen informed Sergeant Gautier, who had already left the scene of Detective Min's request. Sergeant Gautier told Detective Glen to seize whatever items he thought might have evidentiary value for the PSPD and the PSPD could get their own warrant at a later time to search the items post-seizure. Detective Glen then told Detective Hansen that they needed to seize all of the items for the PSPD **(even though they had no search warrant)**.

169.   Detective Glen reported that he asked Mr. Shahbazian if he could search some bags that had Mr. Shahbazian's name on them. Mr. Shahbazian said no. (Report of Detective Glen. p. 14 of 22. para 6). Then Detective Glen reported that he told Mr. Shahbazian he <u>would not take them</u> if they did not have anything in them that he should not have. Mr. Shahbazian then allegedly gave consent but no computers and no items belonging to Mr. Garcia were found inside. Nevertheless, Detective Glen arrested Mr. Shahbazian and <u>seized all of the bags</u> in the master bedroom and a blue bag from the living room after Mr. Shahbazian declined to give a statement and <u>asked for a lawyer</u>. Mr. Shahbazian was later released on March 10, 2009, and no charges were filed against him.

170.   After Mr. Garcia and Mr. Shahbazian were arrested and the house "cleared" by "protective sweep", Detective Hitchcock obtained a "more detailed statement" from Mr. Newcomb. Mr. Seitze had given him a key and he moved in before Mr. Seitze went to Reno on Saturday (March 7). Messrs. Garcia and Shahbazian were

---

[6] A forensic examination proved that one of the Apple MacBook Pro laptop computers was in fact turned on after Mr. Garcia's arrest and connected to the internet, thereby demonstrating that Detective Hansen conducted a warrantless search of the contents of the laptop computer prior to its seizure.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 37

1  already staying there. Mr. Newcomb's bedroom is in the back of the house. Mr. Garcia and Mr. Shahbazian were

2  staying in Mr. Seitze's master bedroom at the front of the house. The middle room is a guest room.

3       171.    After Mr. Garcia was arrested, Detective Hitchcock called Mr. Seitze, who confirmed that

4  Messrs. Garcia and Shahbazian were guests in his home. (Report of Detective Hitchcock, p. 10-11 of 22).

5  Mr. Seitze further stated that Mr. Garcia is his friend and had slept on the couch one evening and let Messrs. Garcia

6  and Shahbazian use the master bedroom before he left for Reno. After that, Messrs. Garcia and Shahbazian

7  continued to stay in the master bedroom. Mr. Seitze had slept on the couch to let them use the master bedroom

8  before he went to Reno. Mr. Seitze at no time indicated that he wished to have Messrs. Garcia and Shahbazian

9  removed from his residence, nor did he consent to the seizure of their property.

10       172.    Mr. Seitze told Detective Hitchcock that the only luggage that he owned was with him in Reno.

11  All the other luggage, the black bags and the computers belonged to Messrs. Garcia and Shahbazian. (Report of

12  Detective Hitchcock, p. 11 of 22) Mr. Newcomb also informed Detective Hansen that none of the luggage or

13  computers were his. Although Detective Hansen originally reported that Mr. Garcia told him none of the bags were

14  his, he later said Mr. Garcia told him that the Louis Vuitton bags were all his. Mr. Shahbazian said that some of the

15  black bags and <u>two of the computers were his</u> and the remaining bags and computer belonged to Mr. Garcia.

16  (Report of Detective Hansen, p. 4-5 of 22).

17       173.    Detective Hansen wrote: "We knew the bags and computers did not belong to the residents so we

18  collected them for safekeeping. We believed the bags and computers belonged to both Garcia and Shahbazian so

19  they were also collected as personal items collected incident to arrest." (Report of Detective Hansen, p. 5 of 22)

20  Detective Hansen said they had "prior" knowledge that Mr. Garcia might be in possession of an Apple computer

21  and/or accessories so they recognized the Apple laptop computers and computer accessories <u>as possibly being</u>

22  <u>contraband</u>. Officers seized voluminous pieces of luggage containing dozens of electronic devices, without a search

23  warrant or probable cause. They stated that Palm Springs Police could obtain their own search warrant after-the-fact.

24  All of the property was booked into the Sacramento Police Department Evidence Locker. No receipt for the property

25  was left. Mr. Shahbazian later attempted to collect his belongings and was not permitted to per the District

26  Attorney's instructions. All of the booked items were listed as property of Daniel Garcia, according to Ofc. Kimoto.

27  (Report of Ofc. Kimoto)

28       174.    At no time was an arrest warrant or search warrant mentioned or displayed at the residence prior

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 38

to the unwarranted search and seizure.

**XIX.   Sacramento Police Department Released Mr. Garcia's Unlawfully Seized Property to Palm Springs Police**

175.     On March 12, 2009, Detective Min obtained search warrant PSSW0004 **post-seizure** from the Honorable James A. Cox requesting a search warrant for the voluminous property **already seized** from Mr. Garcia by the SPD detectives **without a warrant**. Detective Min in his affidavit in support of the issuance of the search warrant, made materially false statements deceiving the magistrate. Detective Min falsely claimed that the SPD detectives could not determine the ownership of the seized property. By all accounts, the SPD detectives had in fact determined ownership of the property and Mr. Garcia specifically objected to the search and seizure of his property. At all times, Mr. Garcia asserted his right to privacy as to his personal property.

176.     On March 17, 2009, Detective Steve Hansen authorized the property unlawfully seized from Mr. Mr. Garcia to be released to the Palm Springs Police Department by sending the following command to Officer Poirier by stating, "I have concluded the investigation documented on the above-referenced GO number. I authorize the disposal of all associated property/evidence as follows: . . .". He authorized all property to be released to Palm Springs Police Department Detective Browning. At no time did Detective Hansen attempt to verify if Detective Browning had legal authority to take possession of Mr. Garcia's property or request to review the search warrant.

177.     On or about March 17, 2009, Sacramento Police Department property room Officer A. Richardson released all of Mr. Garcia's personal property to Palm Springs Police Department Detective Browning.

**XX.   Mr. Garcia Was Booked Into Sacramento County Jail**

178.     Mr. Garcia was taken to the Sacramento County Jail and booked into custody.  He again asked to see a copy of the arrest warrant but was told one was not available as it was issued from a different county. Detective Glen again attempted to question Mr. Garcia about the case, but Mr. Garcia stated he wanted to call his attorney. Mr. Garcia's requests to call his attorney were denied.

179.     Mr. Garcia was booked into the Sacramento County jail and moved repeatedly to different cells over the course of four days and to a separate facility in Elk Grove. This made it impossible for his attorneys to locate and visit Mr. Garcia.

180.     Mr. Garcia requested medical attention as he started to suffer from withdrawal symptoms from his prescription medications as a result of the jail not providing him with his prescription medications. The jail refused to provide Mr. Garcia with his antidepressant and antianxiety medications that had been prescribed by his

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 39

psychiatrist. Mr. Garcia was extremely sleep deprived and began to suffer panic attacks and symptoms of withdrawals from his prescription medications.

181.    Mr. Garcia's mother called the Sacramento County Jail several times to attempt to have them provide Mr. Garcia with his prescription medications but was told that the jail would not provide them.

182.    Mr. Garcia was not arraigned within 48 hours or taken before a local magistrate for arraignment. Mr. Garcia was not allowed to post bail. Mr. Garcia was not advised of these rights as required by Penal Code §821.

183.    Mr. Garcia was not permitted to call his attorneys or have them contacted on his behalf.

**XXI.    Mr. Garcia Was Transferred to The Riverside County Jail In The Middle of The Night**

184.    Mr. Garcia was placed on a bus in the middle of the night and transported to Riverside without notice.

185.    Palm Springs Police Detective Browning testified that when he learned of Mr. Garcia's arrest in Sacramento, he asked to be notified when Mr. Garcia was transported to Riverside lockup so he could interview Mr. Garcia:

> A. [By Detective Browning] Well, when I learned of his arrest in Sacramento and then the Riverside County Sheriffs were going to pick him up from Northern California and transport him to Southern California, I asked that I be notified when they got into town so I could interview him, and as he was -- I believe they called me when he was an hour out away from the Robert Presley Detention Center in Riverside. I was notified that they were going to be there within the hour.
> (Reporter's Transcripts of Suppression Motion in Trial Court Proceedings)

186.    Mr. Garcia arrived at the Robert Presley Detention Center in downtown Riverside on the morning of March 13, 2009—a Friday. Although court was in session, Mr. Garcia was not taken before a magistrate for arraignment as required. He was placed barefoot into a cold holding cell and not provided medical attention. The jail's medical staff refused to provide Mr. Garcia with his antidepressant and antianxiety medications. Mr. Garcia was extremely sleep deprived and still suffering from symptoms of withdrawals from his prescription medications.

187.    Detective Browning drove to the jail, where he was told Mr. Garcia was in a holding tank. Detective Browning was alone.  He concealed his digital recorder in an office across from the holding tank.  He turned on the recorder, then asked deputies to bring Mr. Garcia without restraints to the office.

188.    A Hispanic Senior Deputy told Mr. Garcia that someone was there to speak with him.  Mr. Garcia asked to call his attorney, but his requests were denied.  The Senior Deputy assured Mr. Garcia that it was just an "informal interview" and "off the record" and that Mr. Garcia could go home afterwards.

**XXII.   Detective Browning Conducted a Two-Hour Interview of Mr. Garcia Without Counsel Present**

189.   Mr. Garcia was taken across the hall to an office.  Detective Browning was in civilian clothes. There were no visible audio or video recording devices, and he was not told the conversation would be recorded.

190.   Detective Browning stood in the office door and asked Mr. Garcia how he was doing while Mr. Garcia remained outside of the office.  Detective Browning stated, "How are you doing Danny?  Detective Browning.  Let me—want to come in here? I'm here to discuss about what's going on man. I'm sure you have a lot of questions."

191.   Detective Browning then proceeded to give the following partial *Miranda* advisement, leaving out the part where a suspect is asked whether or not he wished to waive his *Miranda* rights:

BROWNING:     Here, have a seat.  Off the bat, I'm going to tell you, you have the right to remain silent. Anything you say may be used against you in court. You have the right to the presence of an attorney before and during any questioning.  If you cannot afford an attorney, one will be appointed for you free of charge before any questioning if you wish, if you want.  Do you understand that?
GARCIA:          Yes, I do.

192.   Detective Browning's tone was kind of matter-of-fact, and he was talking to another officer at the door with his back turned towards Mr. Garcia.

193.   Mr. Garcia was confused because although he understood his rights and had already exercised them repeatedly when he asked for his lawyer at the time of his arrest, repeatedly at the Sacramento Jail, and again just minutes before to the Riverside County Senior Deputy, clearly, he was not being provided his attorney. Detective Browning did not ask if Mr. Garcia waived his rights.

194.   Detective Browning was fully aware that Mr. Garcia was represented by retained counsel and that formal charges had been filed against Mr. Garcia prior to the interview.

195.   At the time of the police-initiated custodial interrogation, the United States Supreme Court's decision in *Michigan v. Jackson* was still controlling legal precedent which should have been known to a seasoned detective such as Detective Browning. (*Michigan v. Jackson* (1986) 475 U.S. 625, 632.)  Under the holding in *Jackson*, once a defendant's Sixth Amendment right to counsel attaches, police were strictly inhibited from questioning a defendant and any waiver of a right to counsel in response to an otherwise valid *Miranda* warning is automatically considered as involuntary, and thus invalid.

196.   Detective Browning acknowledged that Mr. Garcia was already charged with fraud against Clifford Lambert, as well as using Mr. Lambert's ATM debit card without his permission and told Mr. Garcia he

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 41

1  wanted to talk about those charges.

2  197.    A few minutes after the interrogation began, Mr. Garcia, after already informing Detective

3  Browning that he had retained an attorney over the phone on March 6th, again reminded Detective Browning that he

4  had retained counsel:

5  BROWNING:    Okay.    Um, how many times have you gone to his [Lambert's] house within that year?
   GARCIA:        Probably -- I was trying to figure this out because **I was going to send it to my**

6  **lawyer**—probably around like eight or nine times.
   [emphasis added]

7  198.    During the interview Detective Browning promised Mr. Garcia that he would be "golden" and

8  become a witness for the prosecution. Detective Browning promised leniency and said Mr. Garcia would receive a

9  "slap on the wrist" and probably probation.

10  199.    Detective Browning obtained a lengthy statement from Mr. Garcia that implicated him in various

11  financial crimes against Mr. Lambert, but not murder.

12  200.    Mr. Garcia was not released as promised, nor was he arraigned or allowed to post bail.  He was

13  still not permitted to contact his attorney.

14  201.    On March 19, 2009, six days after Mr. Garcia's March 13, 2009, interview with Detective

15  Browning, Palm Springs Detectives Min and Browning requested the Riverside County District Attorney's Office

16  charge Mr. Garcia with the murder of Clifford Lambert.

17  202.    Mr. Garcia had been held incommunicado for four days without being brought before a local

18  magistrate or arraigned within 48 hours as required by law, thereby converting his otherwise lawful arrest into an

19  unlawful detention. It was during this intentional and unconstitutional delay in arraignment that Palm Springs

20  Police Detective Browning initiated another custodial interrogation of Mr. Garcia despite Detective Browning's

21  knowledge that Mr. Garcia was represented by counsel, and that he had repeatedly invoked his right to counsel

22  with Sacramento Police Detectives. The resulting unlawfully obtained statement was used to form the basis of

23  additional charges, including murder and criminal conspiracy, that were later filed against Mr. Garcia. The

24  statement was introduced against Mr. Garcia at the first trial as the primary evidence to establish guilt on all the

25  charges.

26  **XXIII.  Mr. Garcia Was Finally Arraigned Seven Days After His Arrest**

27  203.    On March 16, 2009, Mr. Garcia was finally arraigned on the felony complaint, seven days after

28  his arrest.  No explanation was provided for the delay, and court had been in session every day of the previous

1   week, including the day that Detective Browning interrogated Mr. Garcia.

2   204.   Mr. Garcia was finally able to contact his attorney Mario Rodriguez who formally appeared in

3   the case on March 19, 2009.

4   205.   Mr. Rodriguez was outraged to hear that Mr. Garcia had been interviewed by Detective Browning

5   despite Mr. Garcia being represented by counsel. Mr. Rodriguez told Mr. Garcia that he had called the jail and

6   District Attorney's Office to tell them Mr. Garcia was represented by counsel.

7   206.   Mr. Rodriguez told Mr. Garcia that he would move to suppress the statement at the preliminary

8   hearing on the basis it had been obtained in violation of Mr. Garcia's Sixth Amendment right to the assistance of

9   counsel.

10   **XXIV.   Mr. Garcia Repeatedly Moved to Suppress His Statement**

11   207.   Mr. Garcia repeatedly moved to suppress the unlawfully obtained statements and derivative

12   evidence; however, the first trial court erred in its application of United States Supreme Court precedent and failed

13   to suppress the statements. The prosecution could not have met their evidentiary burden without the use of

14   Mr. Garcia's statements and derivative evidence and a different result would have been likely.

15   208.   Mr. Garcia filed a motion to suppress evidence, including his statement pursuant to Penal Code

16   §1538.5; however, the first trial court denied the motion.

17   209.   On June 21, 2012, Mr. Garcia again moved to have his statement to Detective Browning

18   excluded. Mr. Garcia argued at the hearing that his statement was obtained in violation of the United States

19   Supreme Court decisions in *Edwards v. Arizona* (1981) 451 U.S. 477 and *Minnick v. Mississippi* (1990) 498 U.S.

20   146.

21   210.   Detective Browning testified at the hearing on Mr. Garcia's motion to exclude his statement.

22   Detective Browning testified that during the March 6, 2009 recorded conversation, Mr. Garcia informed him that he

23   had counsel.

24   211.   Detective Browning testified that a warrant had been issued for Mr. Garcia's arrest and that Mr.

25   Garcia had been charged with felony financial crimes, prior to Mr. Garcia's arrest and subsequent interview.

26   212.   Detective Browning testified that he initiated the in-custody March 13, 2009, interview of Mr.

27   Garcia.

28   213.   The Court found, and the prosecution conceded, that Mr. Garcia had counsel prior to Detective

1   Browning initiating the interview:

2       THE COURT:    You need to concede, too, at some point, [Garcia] had talked to a lawyer?
    DiMARIA:    I'm sorry?
3       THE COURT:    We need to concede that he did.
    DiMARIA:    I have no problem with that. What I won't concede --
4       THE COURT:    He was going to have a lawyer show up and surrender him or whatever.
    DiMARIA:    And according to Patterson versus Illinois, it is irrelevant, though. That is the point.
5                      Unless he asks, during questioning, that he wants that lawyer present . . . .
    (Reporter's Transcripts of Suppression Motion in Trial Court Proceedings)

6

7       214.    Prosecutor DDA Lisa DiMaria was referring to *Patterson v. Illinois* (1988) 487 U.S. 285, where

8   the defendant **never invoked** his right to counsel, then later a deputy initiated a post-indictment interview. *Patterson*

9   waived his right to counsel after being *Mirandized*, and the court found the statement was voluntarily made.

10   (*Patterson* 487 U.S. at 288-291).

11       215.    The Court denied Mr. Garcia's motion to exclude his statement to Detective Browning, finding

12   that the partial *Miranda* advisement was sufficient. The Court failed to consider the US Supreme Court cases cited

13   by Mr. Garcia. In addition, the trial court failed to rule on the delay in arraignment claim that Mr. Garcia raised.

14       DEFENDANT GARCIA:  Your Honor, can I just, for the record, there was another issues that I had
                            addressed regarding – actually there are several issues I addressed. One was
                            Penal Code section I believe 821 and 825, delay in arraignment.
15       THE COURT:    I know, but that is what it is. You were arrested in another county and brought
                            back here.
16       DEFENDANT GARCIA:  But I was not brought before a local magistrate within 48 hours, as required by
                            statute I cited --
17       THE COURT:    I know that. That is agreed. The problem is, is that you have no remedy.
    (Reporter's Transcripts of Suppression Motion in Trial Court Proceedings)

18

19       DEFENDANT GARCIA:  Actually I was citing People versus Pettingill, P-e-t-t-i-n-g-i-l-l, 1978, 21
                            Cal.3d 231, where it says "an unreasonable delay between an arrest and
20                               arraignment converts a lawful arrest into an unlawful detention and a
                            confession obtained as a result of a[n un]lawful detention may be subject to
21                               suppression."
    (Reporter's Transcripts of Suppression Motion in Trial Court Proceedings)

22       216.    A second hearing on excluding Mr. Garcia's statement was held on July 6, 2012, but the trial

23   court made no ruling on Mr. Garcia's second motion to exclude. Instead, the judge held he did not "like making

24   decisions out of my back pocket. I don't like shooting from the hip. . . . We shouldn't be shooting from the hip. I

25   don't like it." (Reporter's Transcript.)

26       217.    On August 26, 2020, Judge Anthony R. Villalobos finally ordered Mr. Garcia's statement to

27   Detective Browning partially suppressed on the basis it was obtained in violation of Mr. Garcia's Sixth Amendment

28   right to counsel.

## XXV.   Law Enforcement Failed to Properly Investigate the Case

218.    The Palm Springs Police Department relied on hearsay and false allegations made by codefendant Kaushal Niroula to inculpate Daniel Garcia in crimes he did not commit. Despite Palm Springs Police Detectives knowing that Mr. Garcia was a prosecution witness against Mr. Niroula for crimes Mr. Niroula had committed in the Bay Area, Palm Springs Detectives took Mr. Niroula at his word to falsely implicated Mr. Garcia.

## XXVI.  Spoilation of Evidence by the Prosecution

219.    DDA Lisa DiMaria authorized the victim's car to be released from impound back to the victim's estate without any notice to the defense. The vehicle was subsequently sold to an unknown buyer before the defense was informed thus resulting in the defense's inability to have forensic experts perform an analysis of the vehicle for blood or DNA evidence. As a result, the prosecution deprived the defense of the ability to perform their own analysis and resulted in bad faith spoilation of evidence.

220.    DDA Lisa DiMaria also authorized the sale of the victim's home and lifting of the crime scene hold without any prior notice to the defense after having already been previously informed by the defense that defense experts intended to perform their own forensic analysis of the alleged crime scene by the defense's blood expert. As a result, the prosecution deprived the defense of the ability to perform their own analysis and resulted in bad faith spoilation of evidence.

## XXVII.  Recording of Privileged Telephone Calls

221.    The Riverside County jails recorded defendant Garcia's privileged telephone calls and provided copies to prosecutor DDA DiMaria. Many of these privileged telephone calls were subsequently released by the prosecution to Plaintiff's codefendants in discovery prior to trial.

## XXVIII.Riverside County Jail's Interference with Pro Per Rights

222.    The Riverside County Sheriff's Department interfered with and recorded attorney-client legal visits, denied legal visits, intentionally moved and transferred Mr. Garcia between jails to interfere with his attorney visits, recorded privileged telephone calls, denied Mr. Garcia's access to telephones, opened and photocopied his privileged legal mail, searched his property box, copied his privileged documents and communications and delayed attorney visits.

## XXIX.  Attorney Contracts with Robin Sax and Mario Rodriguez

223.    The Riverside County Sheriff's Department intentionally interfered with Mr. Garcia's attorney-

1  client contracts with his criminal defense attorneys Mario Rodriguez and Robin Sax, as well as his civil attorneys

2  David Wright, John Russo, Mark Pahor, Michael Goldstein and legal assistants, paralegal Scott Karpf, paralegal

3  Chuck Spiteri, and legal runner Amanda Rivera.

**XXX.    The Riverside County District Attorney Has Refused to Return Daniel Garcia's Property**

4

5      224.    The Riverside County District Attorney has refused to release and return any of Daniel Garcia's

6  personal property despite much of his seized property not being relevant or used as evidence.

7  **XXXI.  Riverside Sheriff's Use of Jailhouse Informants**

8      225.    The Riverside County District Attorney's Office and Riverside County Sheriff's Department,

9  have a pattern of using undercover jail house informants to solicit incriminating evidence in the absence of the

10  criminal defendants' attorneys. Jail house informants used by the Prosecution who were intentionally housed with

11  Mr. Garcia and/or his codefendants in order to attempt to obtain incriminating statements in violation of the Sixth

12  Amendment Right to Counsel are: Juan Tagle, Arthur Soliz Jimenez, John Childs, Albert Farrar, Anthony

13  Coleman, and Daniel Omar Henderson.

14  **XXXII.  Excessive Bail**

15      226.    On March 2, 2009, a felony arrest warrant was issued for Mr. Garcia for charges of grand theft

16  and identity theft. The warrant fixed Mr. Garcia's bail at **one million dollars**. (*Garcia I* at 12 CT 3053.) The bail

17  amount was two-hundred times the statutory bail of $5,000 as listed on the Riverside County Felony Bail Schedule

18  for such non-violent and non-serious felonies.

19      227.    The bail increase was obtained pursuant to a request by Detective Min. In support of his request,

20  Min intentionally and knowingly made serious factual misstatements in an effort to deceive the magistrate. He

21  falsely claimed Mr. Garcia was a flight risk because he had ties in Mexico—when in fact—Mr. Garcia was born

22  and raised in California, is a United States citizen by birth, has never lived in Mexico, does not have Mexican

23  citizenship, nor did he have any property or family in Mexico.

24  **XXXIII.Failure of Riverside County to Timely and Completely Pay for Ancillary Defense Funds**

25      228.    Upon information and belief, during defendant's first trial, it took approximately three to five

26  months for defense investigators and expert witnesses to be paid. Computer forensic expert Chris Pavan was never

27  paid for over $100K worth of work that he had performed pursuant to orders that had been issued by Judge

28  Downing specifically authorizing Pavan's work.

229.     Upon information and belief, during the retrial proceedings in 2020 and 2021, it has taken anywhere from six to twelve weeks to obtain **approval** for ancillary defense funds from the three-judge Pay Panel. Then even after approval, it is taking several months for defense investigators and experts to receive payment from Riverside County.

**XXXIV.Discrimination Against Gay Defendants**

230.     DDA Lisa DiMaria repeatedly used slurs against the homosexual defendants as evidenced by her comments throughout the trial calling them "a gang of gay grifters" and other derogatory terms.

231.     The Riverside County District Attorney's Office made a plea bargain agreement with the one heterosexual individual, Craig Anthony McCarthy, charged in the case, but failed to approach or make an offer to any of the homosexual defendants charged in the case.

**XXXV.   Prosecution Witness Arthur Soliz Jimenez' False Testimony**

232.     The prosecution knowingly used false testimony from jailhouse informant Arthur Soliz Jimenez despite knowing that his testimony was false and contradicted by both his earlier statements as well as other witness statements. Mr. Jimenez testified that Mr. Garcia had placed a "hit" on him and that he was attacked as a result in inmate Albert Farrar. However, the prosecution at the time of Mr. Jimenez' testimony knew this information to be blatantly false even before they made these allegations in open court, based on both Mr. Jimenez' statements made to Riverside County Sheriff's Department Investigators and documented in their reports as to the cause of his altercation with Mr. Farrar, as well as from earlier interview conducted by DDA DiMaria of Mr. Farrar who was the assailant who told them that the altercation between the two of them was a "personal matter" over a stolen jar of coffee and had nothing to do with Mr. Garcia or this case.

**XXXVI. Prosecution Witness Craig Anthony McCarthy's False Testimony and Re-Enactment Video**

233.     The prosecution knowingly used codefendant Craig Anthony McCarthy's testimony which was known by the Prosecution to be false in Mr. Garcia's first trial. Numerous witnesses have come forward both before and after the trial stating that Mr. McCarthy told them that he had lied during the first trial and that his trial testimony is inconsistent with the facts of what actually occurred the night that Mr. McCarthy, Mr. Bustamante, and Mr. Niroula were in Mr. Lambert's home and the circumstances surround Mr. Lambert's alleged death.

**XXXVII.     False Text Message Evidence**

234.     The prosecution knowingly used false text messages and electronic evidence taken from the seized Apple laptop computer that they knew to be forged, false or altered and still sought to introduce these items

1   into evidence despite their lack of foundation and lack of veracity.

2   **XXXVIII.   The 2012 Trial and Conviction of Daniel Garcia**

3       235.   During Mr. Garcia's 2012 criminal trial, the prosecution relied almost exclusively on false

4   evidence that had been obtained from the property unlawfully seized without a warrant by Detectives of the

5   Sacramento Police Department following Mr. Garcia's arrest. The prosecutor argued that text messages

6   downloaded from an Apple iPhone found within Mr. Garcia's property demonstrated that he was part of a criminal

7   conspiracy. In reality, there was no evidence that the text messages had ever actually been sent or received, and the

8   alleged text messages were in fact all uploaded *en masse* onto the iPhone months later in an intentional effort to

9   falsely implicate Mr. Garcia in criminal conduct.

10       236.   The prosecution further alleged that an Apple MacBook Pro laptop computer seized by

11   Sacramento Police belonged to Mr. Garcia. That computer had been identified by investigators as having been

12   purchased with one of Mr. Lambert's credit cards after his mysterious disappearance and thus appeared to link

13   Mr. Garcia to a potential fraud against Mr. Lambert. This was unfortunately due to the fact that all of the property

14   seized was booked by Detectives into evidence at the Sacramento Police Department under the name of Mr. Garcia

15   only. At that time, it had not been disclosed that Mr. Shahbazian—not Mr. Garcia—had claimed ownership of that

16   laptop computer and had called the Sacramento Police Department seeking its release. Such evidence would have

17   exonerated Mr. Garcia had it been presented to the jury and a different outcome would have been likely. No

18   witnesses testified that Mr. Garcia was involved in any criminal conduct and no credible evidence was introduced

19   inculpating Mr. Garcia into the disappearance or alleged murder of Mr. Lambert—his friend. The prosecution's

20   entire case against Mr. Garcia rests solely on the unlawfully obtained evidence seized by Sacramento Police.

21       237.   On September 7, 2012, Daniel Carlos Garcia, was convicted by a jury of, *inter alia*, first degree

22   murder, with a special circumstance that the murder was carried out for financial gain (count 1), and conspiracy to

23   commit murder and various theft based crimes (count 2). It was uncontested that Mr. Garcia was not the actual

24   killer, was not present for the alleged murder, nor had he ever communicated with the actual killers. Mr. Garcia's

25   guilt was based on the prosecution's theory of vicarious culpability as an accomplice and imputed malice under the

26   now legally invalid natural and probable consequences doctrine.

27       238.   On October 5, 2012, Mr. Garcia was sentenced to life without the possibility of parole plus six

28   years. His conviction was affirmed on appeal, with the Court of Appeal finding that the violation of Mr. Garcia's

Sixth Amendment right to confrontation was harmless error in light of circumstantial evidence to support that Mr. Garcia conspired with people he had never met or communicated with to murder the victim Mr. Lambert. Throughout their opinion, the Court of Appeal referenced the unlawfully seized evidence **exclusively** as the basis for their decision.

**XXXIX. Defamation of Character in the Court Recess Recordings and Comments Made to the Media**

239.    Slanderous comments were made by the trial judge David B. Downing, DDA Lisa DiMaria, and other courtroom staff whose comments were captured on the court recess recordings. In addition DDA DiMaria made numerous comments to the local television media, and provided commentary for the publication of a book, entitled Until Someone Gets Hurt, by Tyson Wrensch and Sherrie Lueder.

**XL.    Dissuasion of Defense Witnesses by DDA Lisa DiMaria**

240.    DDA Lisa DiMaria dissuaded two key defense witnesses from testifying on behalf of the defense. The Riverside District Attorney's Office filed perjury charges against Bryant Guerrero thereby preventing him from testifying on behalf of the defense that prosecution witness Craig Anthony McCarthy had lied about the events involving the alleged murder of Clifford Lambert and that Mr. McCarthy had recounted information about his lies to Mr. Guerrero.

241.    DDA DiMaria also dissuaded key defense prosecution witness retired San Francisco Police Department Inspector Gregory Ovanessian from testifying in Mr. Garcia's trial by calling him and falsely telling him that he had been recused by the court and that he had been relieved from testifying and no longer needed to appear. Mr. Ovanessian prepared and signed a notarized declaration that was filed with Plaintiff's habeas corpus petition which included a claim of prosecutorial misconduct for witness dissuasion which was ignored and not ruled upon by Judge Gunn in the Riverside County Superior Court.

242.    During jury selection in Mr. Garcia's 2012 trial, he discovered that his court-issued Apple laptop computer had made audio recordings anytime it was turned on. A review of those audio recordings revealed that conversations had been recorded in the courtroom during court recesses and court lunch breaks. A review of the recordings revealed that the trial Judge David B. Downing had engaged in serious judicial misconduct.[7] Substantial

_____

[7] See defendant Kaushal Niroula's petition filed in the California Court of Appeal (case no. E064352), Order to Show Cause issued April 6, 2016, returnable to the Superior Court of Riverside County (case no. RIC-

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 49

evidence has been presented in the form of audio recordings demonstrating that Judge Downing made rude and disparaging remarks about the defendants during courtroom breaks, indicating his undeniable bias against the defendants.[8] The recordings also reveal that the assigned prosecutor DDA Lisa DiMaria joined in the lunchtime banter making highly inflammatory comments about the defendants to Judge Downing and his courtroom staff. Within numerous recordings, Judge Downing, his courtroom staff, and DDA Lisa DiMaria referred to the defendants as assholes, scumbags, sociopaths, clowns, con men, idiots, liars, vultures, snot-nosed brats, punks, and other slanderous terms. In addition to calling the defendants distasteful names, the parties further disparaged the defendants by making fun of their physical appearance, health status, weight, character, religious beliefs, and sexuality.

243.     As troubling as the court's and prosecution's inflammatory comments are, they pale in comparison to the other misconduct brought to light by the recordings. The evidence demonstrates that the court and prosecution engaged in a concerted effort—constituting a criminal conspiracy—to violate the civil rights of the defendants by rigging the trial in favor of the prosecution.[9] Unbeknownst to the defendants, prosecutor DDA Lisa DiMaria engaged in *ex parte* talks with Judge Downing and his courtroom staff to discuss the merits of the case.[10] Judge Downing secretly told his courtroom clerk Kristine Hinos that he intended to rule against the defendants on critical motions—not based on the merits, but solely for the purpose of giving the prosecution an unfair and unlawful advantage during the trial to ensure that the defendants would be convicted.[11] One such example involved Judge Downing's denial of codefendant Niroula's motion to sever from the trial of Mr. Garcia. On June 8, 2012, Judge Downing and his clerk, Kristina Hinos, had the following exchange:

_____

1604066); and defendant Daniel Carlos Garcia's habeas corpus petition claims 7 and 8 filed in the Superior Court (case no. RIC-1720070), Order to Show Cause issued December 5, 2017. (Hereafter cited as *Garcia Habeas*.)

[8] The recordings were recovered from the laptop computers issued by the court to defendants Garcia and Niroula that had been set by default to record audio any time the computers were turned on.

[9] See Penal Code §182 (criminal conspiracy), §§422.55-422.6 (hate crimes) and California Civil Code §52.1 to violate civil rights (known as the Tom Bane Civil Rights Act), and conspiracy to interfere with civil rights under 42 U.S.C. §1985.

[10] *Ex parte* conversations took place during court recesses when the courtroom was closed to the public and the defendants were in holding cells at the jail. It is improper for an attorney, in the absence of opposing counsel, to communicate directly or indirectly with a judge or judicial officer on the merits of a contested matter before that judicial officer except with opposing counsel's consent. Cal. Rules of Prof. Cond. §3.5 (previously §5-300(B)); Code of Judicial Ethics, Cannon 3(B)(7)(d); see *People v. Hundal* (2008) 168 Cal.App.4th 965, 970.

[11] See audio recording file recording  File 024, June 8 2012 at 1:23 p.m. at approximately 23 minutes into the recording and associated transcript of the recording.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 50

| | | |
|---|---|---|
| 1 | Downing: | This is a freaking nightmare. |
| 2 | Hinos: | Oh yeah. When I heard it going down, I was like, "Oh shit. Oh shit." |
| 3 | Downing: | You know what I was going to do. Screw it. I was going to go to trial. I don't give a shit. The Cal[ifornia] Supreme [Court] can reverse it down here. |
| 4 | Hinos: | That's right. [stapler sounds in the background] |
| | Downing: | So what do you want me to do? Besides, what's the remedy? |
| 5 | Hinos: | Yeah. La la la la. Even if you separate it, then what would be the remedy? |
| 6 | Downing: | There is no remedy. They are going to go to trial anyway. |
| 7 | Hinos: | Yeah. They rang the bell. The bell has been rung. |
| 8 | Downing: | What's the remedy? Yeah, its improper but are we going to dismiss the case against Garcia? No. Are we going to dismiss the case against Niroula? No. Why separate them? Why sever them?. . .Yes, but there is no remedy. Why? The fact is that if I sever them, then it means that we have to try this twice. If I don't sever them and we go to trial, then one could be reversed and they have to try it twice. So what's the downside to us? There is none. Try the case anyway, then the Appellate Court goes 'Oh my God.' The problem with these two guys, they have made such a mess of the record with all these civil motions. What happens with the writs and shit they get. . . |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | Hinos: | I know. Yeah. |
| 13 | Downing: | . . .look what he says they are doing. . . |
| | Hinos: | Yeah. |
| 14 | Downing: | That's what happens. They go, "These two clowns again?" |
| 15 | Hinos: | Uh-huh. |
| 16 | Downing: | You know that's what they're saying up there. |
| | Hinos: | Yeah. |
| 17 | Downing: | (unintelligible). . . |
| 18 | Hinos: | One of (unintelligible). . . |
| 19 | Downing: | . . .it's this ass hole again (unintelligible). You know what they think? "Look what he says. Come on." You know that's what they want, just like you. |
| 20 | Hinos: | Have you talked to [Judge] Haynes? |
| 21 | Downing: | No. I can't get ahold of the guy. |
| 22 | Hinos: | Okay. My dad says that he is going to be finished with his murder trial down in Orange County, but he says he will be available in August to start. I said, 'No, you will not start in August; you will not start in September; maybe in November or December' He said okay, because they got some main Marine murder trial. He said Oh, we're going to be tied up in that in January. So I told him to shoot for November or December. He said he finally got money for the investigators. |
| 23 | | |
| 24 | | |
| 25 | Downing: | This is a mess. Unless you want to … |
| 26 | Downing: | I don't know. What do you want me to do about it? Okay? So, what? Like, (unintelligible) that? What do you want me to do about it? Am I going to sever you? . . . |
| 27 | Hinos: | (Unintelligible) the evidence (unintelligible). |
| 28 | Downing: | On June 4 (unintelligible). What's this about? Are we going to continue it? I'm not severing. Screw you. Too bad. |

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 51

| | | |
|---|---|---|
| Hinos: | (Unintelligible). . . filing writs to motion to reconsider your Honor, so your Honor may hear the testimony. | |
| Downing: | Why is it in camera? | |
| Hinos: | Everything is in camera. Because the whole world is listening to everything. | |
| Downing: | But she knows about it anyway. She's the one that has the tapes. What work product? What's the secret?[12] | |
| Hinos: | He likes licking envelopes. | |
| Downing: | Oh, gross. And he's HIV positive.[13] | |
| Hinos: | He is HIV positive. | |
| Downing: | Yeah. God knows where his tongue has been. Never mind. Sorry. It's a cruel world folks. | |
| Hinos: | Yeah. But he's put on some weight though. He's gonna be a little chubby. It's all them hotdogs they're feeding him. [laughter] | |
| Downing: | These guys are scum bags. Garcia is going to testify against Niroula in several other cases or is it the other way around? I don't know which. | |
| Hinos: | Yeah. I mean, they're both gonna go at each other [Niroula and Garcia]. So, I mean, that's gonna be fun. | |
| Downing: | It's every prosecutor's dream. | |
| Hinos: | Yeah. | |
| Downing: | They take the stand and say, "It wasn't me. It was him." | |
| Hinos: | It was him. | |
| Downing: | And then the other one takes the stand and says, "It wasn't me. It was him." and the jury gets to convict them both. That's great. That's why I won't sever anything. Screw that. | |

Audio File 024, June 8, 2012 at 1:23 pm

244.    Not only did Judge Downing acknowledge that his ruling was improper but boasted that there was no downside because the worst that could happen was that the Court of Appeals or California Supreme Court might reverse his decision. This was merely par for the course as Judge Downing had already ruled against the defense on every substantive motion with nonsensical rulings that blatantly defied controlling legal precedents. He refused to suppress evidence that was unlawfully seized by police inside of a private residence without a warrant.[14]  He refused

---

[12] This is in reference to prosecutor DDA DiMaria being in possession of audio recordings of privileged phone conversations made between Niroula and his various attorneys which DDA DiMaria obtained from the Riverside County Jail.

[13] Defendant Niroula is HIV positive.

[14] See record on appeal in *People v. Garcia, et al.* (August 3, 2016, E057519)[nonpub.opn.] 2016 Cal.App.unpub. LEXIS 5726 (*Garcia I*), at Suppl. Transcripts on Appeal (Bustamante/Replogle prior to severance), case no. INF064492, 6 CT 1650 [Motion to suppress minute order]. Had the evidence been suppressed, the charges against Garcia would have likely been dismissed.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 52

1    to suppress Mr. Garcia's coerced statement to police obtained in violation of his right to counsel.[15] He refused to

2    sanction the prosecution for failing to preserve vital evidence by allowing the alleged crime scenes (the victim's

3    house and car) to be sold and destroyed.[16]  He refused to recuse the prosecutor DDA Lisa DiMaria for her

4    intentional and pervasive intrusion into the defendants' privileged communications.[17] And perhaps the *coup de*

5    *grâce* was when Judge Downing relieved Mr. Garcia's privately retained attorney, Robin Sax, over fervent

6    objections[18]  and thereafter forced Mr. Garcia to represent himself at trial.[19]  Heavy was Judge Downing's thumb on

7    the scale of justice—tipping the balance in favor of the prosecution.

8           245.    Every time Mr. Garcia pressed Judge Downing for the legal basis supporting a ruling, Judge

9    Downing became defiant and combative stating that if the Court of Appeals believed he was wrong, they would say

10   so.[20] Judge Downing further taunted Mr. Garcia by claiming that even if Mr. Garcia eventually prevailed on appeal,

11   he would spend years in prison waiting for relief.[21] Unfortunately, Mr. Garcia was unaware that Judge Downing had

12   taken extraordinary steps to ensure that his rulings would survive scrutiny by a reviewing court. The audio

13   recordings reveal that Judge Downing solicited case law from the District Attorney's Writs and Appeals Division

---

[15] See *Garcia I* at 12 CT 3008-3247 [suppression motion on June 15, 2012] and 13 CT 3467 [hearing on suppression motion on June 21, 2012]. Detective Browning initiated a custodial interrogation after charges had been filed and Mr. Garcia had exercised his right to counsel. The prosecution relied heavily upon Garcia's coerced admissions at trial. See, e.g. People's Trial Exhibit No. 87a [CD recording of redacted interview of Garcia by Browning], and People's Trial Exhibit No. 87B [Transcript of redacted interview of Garcia by Browning]; see Court's Exhibit 1 [CD of unredacted interview of Garcia by Browning]; 13 CT 3467.

[16] See *Garcia I* at 10 CT 2589 [Request for sanctions against the DA for destruction of evidence (house and the car which were alleged to be the two crime scenes) contained in the Opposition to PC1050 Request for Continuance of the Trial and/or Severance on May 2, 2012].  See *Arizona v. Youngblood* (1988) 488 US 51, 58; *California v. Trombetta* (1984) 467 US 479, 488.

[17] DDA Lisa DiMaria repeatedly requested unlawful recordings of defendants' privileged phone calls from the Riverside County Jail and instructed her investigator Bruce Blanck to surreptitiously photocopy Mr. Garcia's legal documents from his property box inside his jail cell. See Penal Code §636; *Barber v. Municipal Court* (1979) 24 Cal.3d. 742, 751. *Garcia I* at 2 CT 297-441 [Motion to recuse the DA for prosecutorial misconduct] – December 27, 2010.

[18] See *Garcia I* at 3 RT 743-762; and 3 RT 760, lines 1-4 [Transcripts] 6 CT 1477-1496 (sealed) [Motion and Minute Order].

[19] See *Garcia I* at 3A RT 785-810 (sealed); and 6 CT 1536 [Marsden Hearing with Cameron Quinn October 21, 2011]. Judge Downing refused to reinstate privately-retained attorney Robin Sax, and gave Garcia the option to either accept court-appointed counsel, Cameron Quinn, who asked to be relieved and stated that he was unwilling to accept the appointment due to his existing case load, or for Garcia to represent himself.

[20] See *Garcia I* at 3 RT 815.

[21] See *Garcia I* at 17 RT 4605-4607 [sentencing transcripts] – October 5, 2012.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 53

that he could then cite on the record to give the *appearance* that his rulings were supported by legal precedent.[22]

Judge Downing also consulted fellow Judge Michele Levine (now retired) to strategize on how he could justify his meritless rulings against the defendants.[23] However, even these efforts could provide no guarantee that Judge Downing's rulings would not be overturned on appeal. To achieve that goal, required even more extreme measures.

## XLI.   The Audio Recordings Reveal That Judge Downing Ordered the Alteration of the Official Court Record

246.     The audio recordings reveal that Judge Downing instructed his court reporters to sanitize the record by altering the official transcripts to later change any portions that he did not like.[24] The recordings reveal glaring differences from what was actually said at the hearings versus what was reported in the stenographers' official transcripts. The audio recordings also corroborate the claims raised by Mr. Garcia's codefendant David Replogle in his petition for a federal writ of habeas corpus that entire portions of the transcripts in his 2010 trial were omitted and witness responses redacted.[25] Such evidence presents a potential "Pandora's Box" for the Riverside County Superior Court by instantly calling into question the validity of numerous convictions. Obviously, if Judge Downing convinced the court reporters to alter the record in Mr. Garcia's case, those same reporters could have tampered with transcripts in thousands of other cases.[26] A finding of misconduct in one case could lead to a torrent of appeals in countless others.

## XLII.   The Audio Recordings Reveal That Judge Downing Committed Misconduct In Other Cases

247.     In particular, Judge Downing presided over the trials of several high-profile murder cases resulting in convictions and sentences of death, and life without the possibility of parole. Judge Downing can be heard on the audio recordings discussing his bias and misconduct in those matters.

---

[22] See audio recording file recording  File 024, June 8 2012 at 1:23 p.m. and associated transcript of the recording. See also Niroula Petition for Writ of Habeas Corpus, case no. E064352, p. 56.

[23] Judge Downing referred to her as having the "biggest brain" of all the Riverside judges and asked his clerk Kristine Hinos for the direct phone extension 13763 of Judge Michele Levine. See audio recording file recording  File 024, June 8 2012 at 1:23 p.m. at approximately 44 minutes into the recording and associated transcript of the recording.

[24] Judge Downing can be heard instructing court reporter, Terri Elizabeth Runyon, to read back the record and delete entire sections. See audio recording file transcript "2012 06 14 file 040.mp3" and associated transcript of the recording.

[25] *Replogle v. Sherman*, Federal case no. FDCV-15-597-RSWL.

[26] Many of the court reporters all worked for the Superior Court of Riverside County for decades and handled numerous cases. Terri Elizabeth Runyon was the lead court reporter for the Indio branch of the Riverside Superior Court responsible for certifying numerous records on appeal.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 54

248.     In one case Judge Downing can be heard discussing the case of Joseph Duncan who was accused of kidnapping and murdering a 12-year old boy.[27] Judge Downing expressed his disappointment in the then-Supervising District Attorney Otis Sterling III (now a Superior Court Judge) for settling the case with a sentence of life without the possibility of parole rather than taking the case to trial and seeking the death penalty. Judge Downing referred to Duncan as "the one that got away" as Judge Downing had hoped to give him the death penalty.

249.     Judge Downing went on to criticize the honorable Justices of the United States Court of Appeal for the Ninth Circuit who had been appointed by Democratic Presidents Bill Clinton and Barrack Obama. He referred to them as a "bunch of liberal hippies" with "bleeding hearts" who he believed would overturn Joseph Duncan's death sentences in a separate case in another state. Judge Downing told his court clerk, Kristine Hinos, that if he had tried Duncan, he would have made sure that the death sentence that he would have imposed "stuck" and couldn't be overturned.

250.     In a separate matter, Judge Downing can be heard discussing the case against David John Reed with his clerk, Kristine Hinos, in which Judge Downing expressed his delight that Reed was sentenced to death.[28] Downing stated that while he didn't think the present case against Reed deserved the death penalty, he nonetheless felt it was "karma" and "payback" for another murder that Judge Downing believed defendant Reed had "gotten away with" years earlier in a different case. Incidentally, Mr. Reed died while in the custody of the California Department Corrections and Rehabilitation on July 7, 2020 of complications stemming from a COVID-19 infection while on death row at San Quentin State Prison. Mr. Reed's direct appeal was still pending before the California Supreme Court and he was never able to address Judge Downing's inappropriate comments.

251.     Perhaps the most troubling remarks made by Judge Downing pertained to a multi-defendant murder case in which a Canadian tourist was lured back to a woman's apartment where her brother and friends brutally killed the man in an apparent robbery.[29] Judge Downing told his clerk that his wife was growing impatient with him for putting off his retirement and plans to move to Illinois. Judge Downing said he wanted to hang on long enough to try the case because he wanted to be the judge to sentence Robert Dunson to death. He further

---

[27] See *People v. Joseph Duncan*, Case Nos. S171037, INF057178.
[28] See *People v. David Reed*, Case Nos. E052766, S191115, S197781, INF051437.
[29] See *People v. Jackie Dunson, Handwerk, Benavidez, and Zuniga*, Case Nos. E056565, INF065236; *People v. Robert Dunson*, case no. S226653, INF065236.

disparaged the looks of defendant Jackie Dunson and shockingly joked that the victim <u>deserved</u> to die for having such poor taste in women.

### XLIII.   Judge Downing Reacts to the Discovery of the Recess Recordings

252.     On June 20, 2012, the Court was informed of the existence of the recordings.[30] When Judge Downing realized that he had been caught red-handed, he responded by ordering his courtroom bailiff, Eric Sultan, to seize all the computers and electronic storage devices from the defendants.[31] Judge Downing then ordered that the microphones and cameras be disabled and that all the recordings be removed and the only copy given to him personally.[32] Judge Downing believed that he had the only copy of the audio recordings that demonstrated evidence of his misconduct safely under his control. He was mistaken.

253.     Messrs. Garcia and Niroula confronted Judge Downing regarding the recordings of his comments. He did not deny making them and became defensive. As quoted from the unpublished opinion in *People v. Garcia, et al.,* case no. E057519, Court of Appeal, Fourth District, Division Two:

> "The following day, on June 21, the trial court had an in camera meeting with Garcia. During the meeting, when discussing the recordings, the following exchange occurred:
>
> Garcia: [S]ome comments . . . may have been made by this Court which imply bias or may have been inappropriate towards me and Mr. Niroula that I—
>
> The Court: So the first amendment doesn't apply to anything? I can't say what I think?
>
> Garcia: Yes, but I am saying if it implied how rulings were going to be made and showing any reason other than factors based on the law, that was just my concern is I know there were some comments made that I personally was very offended by it, felt very—were very inappropriate.
>
> The Court: Mr. Garcia, the First Amendment protects judges. The Commission on Judicial Performance doesn't say that, but in my view, it does. I can say what I want and the First Amendment, and you can say what you want off the record, and Mr. Reed can say what he wants off the record. Everyone is free to say what they want.
>
> Garcia: Absolutely.
>
> The Court: And in this case, you were treated and everybody will continue to be appropriately treated, and

---

[30] See *Garcia I* at 13 CT 3418-3423 [June 20, 2012 Minute order]. Codefendant Niroula's private investigator Enrique Tira informed Judge Downing *ex parte* in chambers about the existence of the recordings. No transcripts of that exchange have ever been produced or provided to the defendants.

[31] See *Garcia I* at 13 CT 3419 [minute order of June 20, 2012 showing Judge Downing ordered seizure of laptop].

[32] See *Garcia I* at 20C RT 4829-4845 (sealed), [Hearing on June 21, 2012 where Judge Downing orders recordings to be removed from the laptop by computer forensic expert Chris Pavan and provided to only him on a CD].

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 56

you can't deny it because it is true. I have given you more breaks than any judges would give you in years, so let's not go down that road. I probably will not listen to them. I don't know what was said. I probably won't listen to them because I don't have time to. I have other things. I have never listened to tapes when I was a D.A. I just don't do it. Who cares[?] I am only interested in getting your laptop back. That is all I care about. So what[?]

Garcia: And I agree. Just I am very concerned especially with comments made—

The Court: The problem is, is that they're inadmissible because you can't record, so you're stuck. It is like a privilege, talking to your wife. It is privileged. You might not like it, but you can't use it, so what is your point?[33]

Garcia: It is difficult to proceed in a trial where I am facing life without the possibility of parole knowing—

The Court: That is the outside.

Garcia: Huh?

The Court: That is true. That is what you're facing.

Garcia: But knowing that this Court has made fun of Mr. Niroula's HIV status, and Miss Hinos [the court clerk] has indicated that you were going to deny all the motions. I mean those are hard things to just ignore. Grant it [sic], they may be your private and personal feelings, but—

The Court: What do you care what I said about Mr. Niroula? He is not here. Worry about yourself right now. We are not talking about him. We are ta[l]king about you. You have yourself to worry about, Mr. Garcia. Worry about yourself, please."

254.    On July 2, the trial court was given two discs of recordings from Garcia's laptop. The trial court said it would not listen to the recordings because the recordings could contain privileged attorney-client communications, such as conversations between Garcia and his advisory counsel.[34]

255.    On July 16, Niroula said, "Your Honor, I have to alert the Court that I have received evidence and information regarding a matter that concerns me regarding this Court's ability to give me a fair trial, and I

---

[33] There is no such privilege under the California Evidence Code or under any provision of the law. As approved by California voters on June 8, 1982, Proposition 8, the so-called Truth in Evidence law, limited the exclusion of evidence in criminal proceedings to provide that any evidence that is relevant is admissible unless it was obtained in violation of the Fourth Amendment to the U.S. Constitution or falls under an express statutory exemption or privilege. *Ex parte* communications between court room staff and judges do not fall under any such exceptions. See also *Evens v. Superior Court (Los Angeles Unified School District et al.)* (1999) 77 Cal.App.4th 321; Penal Code §632(c); and *Garcetti v. Ceballos* (2006) 547 US 410.

[34] The Superior Court subsequently ordered the release of the recordings to all parties including the prosecution over Mr. Garcia's objections and after the Special Master found them to contain attorney-client privileged conversations between Garcia and his advisory counsel, attorney Mark Pahor. See Court Minute Order dated December 20, 2018 in Riverside Superior Court case no. RIC1720070, *In Re: Daniel Carlos Garcia*, petition for habeas corpus, Hon. Judge David A. Gunn presiding.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 57

believe that this Court, based on the evidence provided to me and alerted to me, is biased against me based on a commentary that the Court made with another individual, so I am going to have to have some kind of explanation from the Court in an in camera hearing this afternoon, Your Honor."

256.    The trial court responded, "No." Niroula said he might report the issue to the Judicial Council. The court responded, "Mr. Niroula, you can do what you want." Niroula explained that the comments at issue "could have been taken out of context," which was why Niroula wanted clarification. The court replied, "Mr. Niroula, I don't have to explain myself. The record in this trial is replete with how I bent over backwards for you and Mr. Garcia."

The following exchange occurred:

Defendant Niroula: It is a commentary regarding my health status and not reading my given motions because you are concerned about where my tongue has been are inappropriate, Your Honor.

The Court: I don't care what you think. I can say what I want. The first amendment protects me. I can say what I want. The question is, in this trial, if I have discriminated against you. If anything, I have gone out of my way to help you out, and you know it. Quit taking stuff out of context. In the big picture, I have bent over backwards to help you.
[Redacted text]."

See record on appeal in *People v. Garcia*, et al. (August 3, 2016, E057519) [nonpub. opn.] 2016 Cal.App.unpub. LEXIS 5726 (*Garcia I*), as quoted from pgs. 45-48.

257.    After the hearings, Judge Downing ordered that the transcripts be sealed and then proceeded to threaten Mr. Garcia and his advisory counsel, attorney Mark Pahor with his "wrath" if any recordings got leaked to the media.[35] Mr. Garcia had previously sought to recuse Judge Downing by exercising a preemptive challenge in February 2012 under Code of Civil Procedure §170.6.[36] Codefendant Niroula opposed the challenge and Judge Downing refused to recuse himself under §170.6 stating that the motion was untimely.[37] Immediately following the discovery of the recordings on the laptop computers, Mr. Garcia had planned to move to recuse Judge Downing for cause under Code of Civil Procedure §170.1, but was unable to do so once he was no longer in possession of the

---

[35] See Declaration of attorney Mark Pahor lodged as Exhibit 3 in Riverside Superior Court case no. RIC1720070, *In re: Daniel Carlos Garcia*, petition for habeas corpus, Hon. David A. Gunn presiding.
[36] See *Garcia I* at 8 CT 1984-1985, 2066 on February 24, 2012 [Preemptive challenge to recuse Judge David B. Downing under Code of Civil Procedure §170.6] and 8 RT 1800-1803.
[37] See *Garcia I* at 8 CT 2070, on February 24, 2012 [Notice of opposition to preemptive challenge].

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 58

recordings to substantiate the claim of judicial bias and misconduct.[38] Judge Downing stated on the record that he would not "give this up only because I don't want to dump it on somebody."[39] Mr. Garcia also expressed concern at the hearing regarding Judge Downing's biased comments that he had overheard on the recordings.[40] With Judge Downing's plan in place and the recordings contained, jury selection was completed and the trial began.[41]

**XLIV. The 2012 Trial Proceedings Commence Against Mr. Garcia**

258. The trial was an absolute farce with a predetermined outcome. Judge Downing allowed the prosecutor to run roughshod over the defense by introducing voluminous amounts of inadmissible hearsay.[42] When the defendants attempted to object, Judge Downing overruled them, told them not to interrupt the prosecutor, and berated them in front of the jury telling them that they did not have a right to object and told them to be quiet. Judge Downing also provided instructions prior to closing arguments stating that he wouldn't allow objections from the other side during closing arguments.[43] Trial quickly descended into chaos with codefendant Kaushal Niroula and DDA DiMaria engaging in shouting matches with each accusing the other of misconduct. During these outbursts, the court reporters stopped transcribing and threw their hands in the air stating that none of this was making it into the record. Judge Downing took no action. Even after a diligent search, no references by the court reporters could be located stating that transcription had temporarily ceased and subsequently resumed, nor any references to yelling, shouting, or talking over one another. Judge Downing's admonishments to the parties following these shouting episodes also could not be located and don't appear anywhere in the transcripts. However, numerous occurrences of the court reporters and Judge Downing asking Mr. Niroula to slow down his rate of speech occur throughout the transcripts. Because Mr. Niroula spoke faster than the court reporters were able to transcribe, significant sections of

---

[38] See Exhibit 1, *In re: Daniel Carlos Garcia,* item #248 – Declaration of Daniel Carlos Garcia in Riverside Superior Court case no. RIC1720070, *In re: Daniel Carlos Garcia*, petition for habeas corpus, Hon. David A. Gunn presiding which states "I would not be able to support a motion to recuse Judge Downing as I would not be able to show his actual bias against me. I did mention on the record my concern and Judge Downing replied he had a right to freedom of speech and could say whatever he wanted."

[39] See *Garcia I* at 8 RT 1830 lines 17-19.

[40] See *Garcia I* at 20C RT 4841 (confidential and sealed transcript) on June 21, 2012 for Judge Downing's statements.

[41] See *Garcia I* at 13 CT 3476-3478 [ minute order] and 21 RT 4933 [District Attorney's opening statement not transcribed in the record on appeal on June 25, 2012].

[42] See e.g. People's Trial Exhibit Nos. 26a, 26b, 27a, 27b, 27c, 27d, 27e which are electronic text messages and computer printouts that lacked foundation and were not properly authenticated as required by the CA Evidence Code.

[43] See *Garcia I* at 55 RT 11586-11590.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL PAGE 59

1   Mr. Niroula's statements failed to make it into the record and there are about 125 occurrences located in the

2   transcripts using a key word search where Mr. Niroula was told to "slow down".

3        259.    Judge Downing allowed the prosecutor to dissuade two crucial defense witnesses from testifying

4   thereby gutting Mr. Garcia's defense.[44] After Mr. Niroula testified for three days and then refused to answer Mr.

5   Garcia's questions on cross-examination, Judge Downing refused to strike the testimony or to grant a mistrial.[45] To

6   add to the confusion, Judge Downing allowed the jury to ask an unprecedented 765 questions of witnesses thereby

7   converting them from neutral fact finders into *de facto* second prosecutors who prejudged the Mr. Garcia's guilt

8   before deliberations as evidenced by their open hostility.[46] Judge Downing gave the jury erroneous instructions on

9   applicable law[47] and told the jury that Mr. Garcia was "guilty, guilty, guilty", and "up to his eyeballs in this

10  conspiracy."[48]

11       **XLV.    Prosecutor DDA Lisa DiMaria's Closing Arguments**

12       260.    During closing arguments, DDA DiMaria further proceeded to disparage Mr. Garcia and told the

13  jury that they were his latest victims. DDA DiMaria in her closing statements said:

14       Now you've heard the charges in this case, and you've listened to the evidence. You know because you are
         here because these two defendants conspired to kill Mr. Lambert, the victim. And their goal, what they
15       wished to attain, the whole purpose was to get his estate, to get his money, to take over everything he
         owned. Now what I'm not sure you've all picked up on, what I'm not sure you're all aware of is the other
16       scam that you have witnessed being committed right here in this courtroom, only this time they are trying
         to pull one over on you, the members of the jury. And their goal is not money, but this time their goal is
17       freedom. This time the goal is to have you, the members of the jury, fill out the not guilty forms and acquit

18

19

20       [44] See *In re Daniel Carlos Garcia* on Habeas Corpus (Riverside Superior Case Court No. RIC-1720070),
         Claim 4, and Exhibits 32 and 56. (DDA DiMaria prevented Bryant Guerrero and San Francisco Police Department
21       Inspector Gregory Ovanessian from testifying in Garcia's defense at trial.)
         [45] See Court of Appeal unpublished opinion in *Garcia I* at p.28. in *People v. Garcia, et al.* (August 3, 2016,
22       E057519)[nonpub.opn.] 2016 Cal.App.unpub. and *Garcia I* at 55 RT 11582-11585.
         [46] See Claim 6 of Garcia's Habeas Petition and Exhibit 33 (detailed table of the 765 jury questions
23       including all citations from the record) in support thereof in Riverside Superior Court case no. RIC1720070, *In Re:
         Daniel Carlos Garcia*, petition for habeas corpus, Hon. David A. Gunn presiding. See also *Garcia I* at 14 CT 3710-
24       3713-3721, 3736-3738, 3745-3746, 3784-3790, 3804-3813, 3818-3827, 3835-3845; 15 CT 3851-3864, 3904-3933-
         4036; 16 CT 4153-4265, 4288, 4290-4333, 4346-4348 [juror notes submitted to the judge during trial]. Citations to
25       the RT are included in the same table and omitted here for brevity.
         [47] The court committed instructional error by referring generically to "a defendant" throughout the jury
26       instructions which allowed the jury to infer it could mean any of the six jointly charged codefendants and not just
         defendants Garcia or Niroula who were on trial. See *People v. Chiu* (2014) 59 Cal.4th.195; and *In Re Cesar Loza*
27       (2018) 27 Cal.App.5th.797.
         [48] A key word search in the entire appellate record in *Garcia I* and a manual review of the transcripts failed
28       to locate these outbursts by Judge Downing despite multiple witnesses recalling the comments, which further
         demonstrates that the certified transcripts were altered and are inaccurate.  See Exhibit 3 of Tseme Garcia *In re
         Daniel Carlos Garcia* on Habeas Corpus (Riverside Superior Case Court No. RIC-1720070).

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 60

these defendants. Now Mr. Lambert is dead because he was unknowing, he was lonely, he was vulnerable, and he naively put his trust in them. Therefore, their goal to take over his estate was achieved. However, in the case of the scam that they pulled right here before your very eyes in this trial, members of the jury, you are not unknowing. You are not lonely. You are not vulnerable. You are not naive. You have met these men. You have seen what they've done. You've heard all the evidence of who they are and what they're capable of, and you've sat here with eyes wide open. The choice rests with you. You have the choice to either fall prey to their scheming defense, for their quest for freedom, for their quest for you to find them not guilty; or you can utilize your power as jurors and put a stop to these two sociopathic con artists by finding them guilty of each and every charge charged because the evidence has proven that they are, in fact, guilty beyond a reasonable doubt.[49]

261.    Of course Judge Downing defended DDA DiMaria stating that he didn't feel she had gone too far, because the names she used to describe the defendants fit.[50]

### XLVI.   Mr. Garcia's 2012 Conviction and Sentencing

262.    It was no surprise when the jury returned guilty verdicts on all counts.[51] Mr. Garcia stood convicted of first degree murder with special circumstances despite no crime scene, no weapon, no blood, no DNA, and no body. The prosecution conceded that Mr. Garcia was hundreds of miles away during the alleged murder and had never met or communicated with the actual killers.[52] Yet,  the jury was led to believe that Mr. Garcia was part of a criminal conspiracy with people he didn't know to commit a murder he wasn't present for. With Judge Downing's unbridled support, the prosecution pulled off the unthinkable—the conviction of an innocent man. DDA DiMaria emerged from the courtroom to a standing ovation by her fellow prosecutors who subsequently awarded her the Bulldog Prosecutor of the Year Award.

263.    Judge Downing sentenced Mr. Garcia to six years in prison plus life without the possibility of parole.[53] To add insult to injury, Judge Downing seized both the court-issued laptop computers and Mr. Garcia's privately purchased hard drives (purchased by Mr. Garcia's mother) containing his entire client file, trial notes,

---

[49] See *Garcia I* at 55 RT 11653-11654, [excerpt of closing arguments of DDA DiMaria].
[50] See *Garcia I* at 62 RT 12197-12201, [Judge Downing's comments during sentencing on October 5, 2012 and Garcia's motion for a new trial]. This was not the last time DDA Lisa DiMaria would commit misconduct during closing arguments—she again made inappropriate remarks during the retrial of Fred Weatherton in 2017 in case no. INF030802. As a result of her misconduct in the Weatherton case, the case was subsequently settled, yet despite repeated misconduct, the Riverside County District Attorney continues to protect, employ, and reward DDA DiMaria. DDA DiMaria has failed to self-report to the California State Bar Association for any misconduct.
[51] See *Garcia II*, 2 Suppl.CT 155-157 [jury verdicts].
[52] See *Garcia I* at lines 11-15, 55 RT 11656 [DDA DiMaria's closing argument].
[53] See *Garcia I* at 18 CT 4908-4911 [abstract of judgement]; and Garcia II, 2 Suppl.CT 162-165 [minutes of sentencing hearing].

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 61

discovery, and defense evidence.[54] Judge Downing denied motions seeking the return of Mr. Garcia's client file or to at least permit counsel to copy the data for use in a post-conviction appeal.[55] ***Never in the history of the State of California has a trial judge seized a criminal defendant's entire client file and refused to return it***.[56]

### XLVII.  The Court's Illegal Seizure of Garcia's Electronic Client File and Privately-Owned External Hard Drives

264.     Judge Downing unlawfully ordered the seizure of Petitioner's privately-purchased external hard drives and electronic client file without a search warrant, then subsequently claimed that the external hard drives purchased by Petitioner's mother were the property of the court—when they were not. These unlawful acts by Judge Downing prevented Petitioner from being able to access or use them during his criminal appeal.

265.     Plaintiff's privately-purchased hard drives and electronic file have still not been returned to Mr. Garcia and continue to be held unlawfully by the Riverside Superior Court who still refuses to return them to Petitioner.

### XLVIII. Alteration of Official Court Transcripts

266.     Throughout the trial proceedings, Judge Downing secretly instructed the court reporters/stenographers to sanitize the record by deleting and altering select portions of the transcripts. On several of the now infamous court recess recordings, Judge Downing can be heard instructing lead court reporter Terri Elizabeth Runyon to delete parts of the transcripts containing his inappropriate outbursts to remove any indication of judicial bias from the trial record.

### XLIX.  Destruction of Defense Subpoenaed Evidence by the Court

267.     On or about February 8, 2013, Judge Downing ordered his courtroom clerk, Kristine Hinos, to destroy all of the records received from third-parties in response to subpoena duces tecum. No notice was provided to any of the parties—including Mr. Garcia—and both Judge Downing and Ms. Hinos were well aware that Mr.

---

[54] See *Garcia I* at 16 CT 4342-4343.[Minute order from Sept 5, 2012 which reads "Court orders the immediate return of all computer equipment purchased by the Court."] However, it should be noted that the Court not only seized the computer equipment purchased by the Court, but also all computer equipment purchased by Mr. Garcia's mother for his use and owned by Mr. Garcia which included external hard drives containing Mr. Garcia's subpoenaed documents, trial notes, motions, and electronic evidence.

[55] See *Garcia I* at 17 CT 4636-4639 [Oct. 5, 2012 minute order].

[56] Garcia was the first inmate in California to receive a laptop computer in the county jail so the issue is one of first impression in California courts. See petition for Writ of Mandate in *County of Riverside v. The Superior Court; Daniel Garcia et al.* (Petition denied 02/15/2011 Case No E052851, Cal.App.4th.Div2.) Petition for review denied 03/16/2011 in case no. S190884.

1   Garcia's direct appeal was pending in case no. E057519. No efforts were made to return the original records to the

2   person or entity from whom they were received as required by Evidence Code §1560(d).

3   **L.      Judge Downing's Efforts to Scuttle Mr. Garcia's Appeal**

4   268.      The consequences were catastrophic. Without access to his client file and trial notes, Mr. Garcia

5   was unable to retain private counsel to prepare an appeal and collateral habeas petition.[57] Judge Downing

6   effectively scuttled Mr. Garcia's appeal by depriving him of access to his own records, electronic client file, and

7   ensuring that the court reporters sanitized the record of any potentially reversible errors. As Judge Downing told his

8   clerk, his goal was to ensure that "when the Court of Appeals sees these two assholes [Garcia and Niroula] coming,

9   they will deny everything."[58] Sadly, Judge Downing's prediction came true. The Court of Appeal—unaware that

10  the record reviewed was inaccurate—found insufficient evidence that Judge Downing was biased.[59] Judge

11  Downing had succeeded in depriving the defendants and the Court of Appeal of evidence of his own misconduct.

12  The Court of Appeals denied relief and affirmed the convictions in full.[60] However, the Court of Appeal left a

13  sliver of hope when they issued an order to show cause in codefendant Niroula's collateral habeas corpus petition.[61]

14  269.      Unfortunately, the Court of Appeal remanded Niroula's habeas corpus petition back to the

15  Superior Court of Riverside—the very court that committed the misconduct.[62] The conflict of interest was obvious.

16  It took over four years since the issuance of the order to show cause before the District Attorney finally filed an

17  answer to the petitions whereby they did not oppose relief, but insisted on a retrial.[63] To date, neither the Riverside

18

19

20  [57] See Declarations of Daniel Carlos Garcia and Tseme Garcia as Exhibits 1 and 4 filed in Daniel Garcia's
    Habeas Corpus Petition in Riverside Superior Court case no. RIC1720070, *In Re: Daniel Carlos Garcia,* petition for
21  habeas corpus, Hon. Judge David A. Gunn presiding. Private attorneys wanted to review the client/case file before
    accepting the case to represent Petitioner on appeal; since client/case file had been seized by Judge Downing,
22  prospective attorneys had nothing to review.
        [58] See recording File 040 June 14, 2012 at 1:26 pm at approximately 56 minutes into the recording; see
23  associated transcription of the recording.
        [59] See Court of Appeal Opinion in *Garcia I* at pg. 44-54. [finding on bias claim]
24      [60] See Court of Appeal Opinion in *Garcia I* at pg. 83-84. [disposition]
        [61] See *Niroula v. Lizarraga* (Order to Show Cause issued April 6, 2016, case no. E064352).
25      [62] See Order to Show Cause, *supra,* returnable to the Superior Court of Riverside County as case no.
    RIC1604066, Hon. David A. Gunn, presiding.
26      [63] See court docket in case no. RIC1604066 and Petition for a Writ of Mandate filed in the Court of Appeal
    (case no. E073774) to compel the Riverside Superior Court to order the People to file a Return and to perform
27  discovery. On 03/26/2020, the Court of Appeal issued an order directing Presiding Judge, John W. Vineyard and
    Riverside County District Attorney Mike Hestrin to appear at an evidentiary hearing on April 1, 2020 and show
28  cause as to why they should not be adjudged in contempt of court and punished accordingly for willfully disobeying
    the order of the court issued on April 6, 2016.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 63

1    Superior Court nor the District Attorney's Office has even acknowledged that the *ex parte* conversations between

2    Judge Downing and DDA DiMaria ever took place despite numerous discovery requests by the defendants.[64] When

3    the defendants attempted to obtain the recordings, Judge Downing responded by placing them under seal with the

4    court.[65] There is obvious irony that the same judge who committed the misconduct would be permitted to conceal

5    the evidence that would prove his unlawful actions. Yet, the coverup extended far beyond Judge Downing.

6    **LI.    The Superior Court's Effort to Conceal the Recess Recordings**

7         270.    As he began preparing his own expansive habeas petition, Mr. Garcia obtained a federal

8    subpoena from United States District Judge Susan Illston commanding the Riverside Superior Court to permit Mr.

9    Garcia's digital forensic expert to copy the electronic evidence and client file contained on the laptop computer and

10   hard drive seized by Judge Downing.[66] The Riverside Superior Court refused to comply and instead hired a high-

11   powered law firm in San Francisco to lodge an objection to the subpoena presenting false facts and disingenuous

12   arguments.[67] It was clear the Riverside Superior Court did not want the recordings falling into the hands of the

13   defendants—it was a risk they were not willing to take. In four years, the Riverside Superior Court has only

14   allowed a few of the recordings to be released to the parties in the habeas proceedings with approximately 141

15   more to go.[68] The court also did not allow the defendants to conduct depositions of the relevant witnesses.[69] It is no

16   coincidence that Judge Downing has since retired to Illinois, his clerk Kristine Hinos retired and moved to Oregon,

17   and other witnesses cannot be found.[70]

18

19   _____

20

21   [64] See Sixth Request for Discovery filed by Defendant Daniel Garcia, Superior Court Docket in INF064492 filed on May 3, 2019.

22   [65] See *Garcia I* at 1 Suppl.CT 001 [Order of May 8, 2013 by Judge Downing ordering storage and lodging of all laptops, storage devices, and recordings under seal].

23   [66] See United States District Court for Northern District of California, case no. 10-CV-02424-SI, Docket Item 70.

24   [67] *I.d.,* Document Item 70 filed 07/30/2013 by Attorney Michael Fox of Sedgwick LLP filing on behalf of the Superior Court of California, the County of Riverside that they should not be required to give Garcia access to his own electronic data and client file.

25   [68] On February 11, 2020, Judge David A. Gunn stated that he believed he could rule impartially on the judicial bias and misconduct claim raised in Niroula and Garcia's respective habeas petitions without considering the other recordings.

26   [69] Judge Gunn would not allow or authorize depositions, and said that the parties could interview witnesses on their own.

27   [70] A background check of Judge Downing, clerk Kristine Hinos, and lead court reporter Terri Elizabeth

28   Runyon revealed property records showing that they had moved out of state. Attempting to compel the appearance of out-of-state witnesses is a time consuming and complicated process.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 64

271.     Some of the most important recordings relevant to demonstrating the full scope of the judicial and prosecutorial misconduct remain in the possession of the Riverside Superior Court. In addition to the audio recordings provided by Mr. Garcia, there are more recordings that were created by the court reporters during court proceedings.[71] These additional recordings as well as the stenographers' notes, and raw transcripts are critical to determining the full extent of the conspiracy between the Superior Court and the prosecution and proving the inconsistencies in the official transcripts. The court has already purged virtually all of the defense evidence when Judge Downing ordered his clerk, Kristine Hinos to destroy all the subpoenaed records lodged with the court without notice to the parties and while the direct appeals were still pending.[72] Furthermore, the clerk of the exhibits department has sent repeated notices of its intent to destroy all of the trial exhibits, and to which when the Public Defender lodged an objection, the Court took "no action."[73] While Judge Villalobos issued protective orders in July 2020,  no affirmative action to ensure that this critical evidence be preserved has taken place.

## LII.     Habeas Proceedings

272.     On April 6, 2016, Mr. Garcia's codefendant Kaushal Niroula filed a writ of habeas corpus with only a single claim with the Riverside Superior Court.[74]

273.     On May 5, 2016, Judge David A. Gunn issued an order to show cause in Mr. Niroula's habeas petition.

274.     On October 23, 2017, Mr. Garcia filed a writ of habeas corpus with ten claims with the Riverside Superior Court.[75] The ten grounds raised in Mr. Garcia's habeas petition are:

Ground 1: The trial court committed reversible error when it allowed into evidence Petitioner's statement to Detective Browning that was obtained in violation of Petitioner's Sixth Amendment right to counsel, after formal criminal proceedings had commenced, and Petitioner had exercised his right to counsel. Petitioner's statement was further taken during an unconstitutional delay in his arraignment and after Petitioner had previously and repeatedly invoked his Miranda rights to other officers.

Ground 2: The government's pervasive intrusion into privileged attorney-client communications denied

---

[71] Many of the court reporters used laptop computers and digital recording devices during the proceedings to assist them in reviewing the transcripts for accuracy.

[72] *Garcia I* - See Court Clerk Docket of Actions for order by Judge Downing on 02/08/2013 commanding the clerk to destroy all defense-subpoenaed documents.

[73] See court docket in case no. INF064492 on 5/14/2018 of letter from Public Defender and corresponding minute order.

[74] Case No. RIC1604066.

[75] Case No. RIC1720070 was later consolidated with codefendant Kaushal Niroula's writ of habeas corpus in Case No. RIC1604066.

Petitioner his Sixth Amendment right to retained counsel of choice. The trial court erred in permitting the withdrawal of privately retained counsel over Petitioner's objections. A violation of retained counsel of choice for any reason requires automatic reversal. Appellate counsel was ineffective for failing to raise a claim of denial of counsel of choice on direct appeal, further prejudicing Petitioner.

Ground 3: Petitioner was denied his Sixth Amendment right to effective assistance of trial counsel, when substantial evidence of innocence was requested to be sealed by Petitioner's attorney at an en camera hearing that Petitioner was not transported to attend. The evidence was exculpatory and no reasonable trier of fact would have found Petitioner guilty beyond a reasonable doubt of murder and conspiracy had counsel introduced the evidence instead of requesting it be sealed. The error was prejudicial requiring reversal.

Ground 4: Prosecutor DDA Lisa DiMaria engaged in outrageous misconduct when she intentionally withheld exculpatory evidence from Petitioner, and prevented two key witnesses from testifying in petitioner's defense by misusing her office. She furthermore, permitted the destruction of vital evidence in the case knowing Petitioner intended to examine it, and she conspired in *ex parte* conversations with the judge to deprive the petitioner of a fair trial in violation of Petitioner's Fifth, Sixth, and Fourteenth Amendment rights.

Ground 5: The trial court committed reversible error when it permitted the Prosecution to introduce into evidence text messages and other electronic evidence without authenticating their hearsay content. The court allowed the jury to consider hundreds of pages of inflammatory hearsay documents that prejudiced Petitioner, over his fervent objections. Had the court not permitted the hearsay evidence a different result would have been likely. Petitioner was denied his Sixth Amendment right to a fair trial.

Ground 6: Petitioner was denied his Sixth Amendment right to effective assistance of appellate counsel for his failure to raise in the direct appeal a claim that the trial judge abused his discretion for encouraging and permitting the jurors to ask 765 questions of witnesses, placing the jurors in an adversarial role and denying the Petitioner his Sixth Amendment right to an impartial jury and his Fourteenth Amendment due process right to a fair trial. The error requires reversal in full.

Ground 7: Petitioner was denied his right to a fair trial by an impartial judge and due process under the Fourteenth Amendment. The trial judge's comments about Petitioner showed actual bias and/or a probability of bias so great as to be constitutionally intolerable. The trial judge did not refute that he made the comments or that he was biased, but rather stated he had a First Amendment right to say whatever he wanted, clearly demonstrating a risk of bias was too great. Petitioner was denied a fair trial requiring reversal.

Ground 8: Petitioner was denied his Sixth Amendment right to a fair trial by an impartial judge and his Fifth and Fourteenth Amendment right to due process, as a result of trial judge David B. Downing's outrageous judicial misconduct. Petitioner was also denied the ability to pursue post-conviction relief on direct appeal and collateral attack as a direct result of the judge's actions, thereby depriving him of access to the courts, his right to appeal, and due process of law.

Ground 9: Petitioner was denied his Sixth Amendment right to effective assistance of appellate counsel when attorney Eric Larson failed to raise on direct appeal, the meritorious claims found in Grounds 1, 2, 5, 6, and 8. Petitioner was prejudiced by counsel's categorical refusal to raise the claims and for misadvising Petitioner that he could raise them on his own in a subsequent habeas petition. Larson's performance fell below constitutionally acceptable standards and has subjected Petitioner to prolonged incarceration.

Ground 10: The cumulative effect of the errors alleged in Grounds 1 through 9 was so prejudicial and struck at the heart of the trial process, thereby depriving Petitioner of his Constitutional rights under the 5th, 6th, and 14th Amendments. Some of the claims such as the denial of the right to retained counsel of choice is a clear and fundamental constitutional error that requires per se reversal. The combined effect of the errors was so egregious that the trial was unfair and reversal is required.

275.     On December 5, 2017, Judge David A. Gunn issued an order to show cause in Mr. Garcia's habeas petition.

276.     On January 3, 2018, the respondent Riverside District Attorney's Office requested to stay the proceedings.

277.     On September 30, 2019, Mr. Garcia's codefendant Mr. Niroula filed a Writ of Mandate in the California Court of Appeal, Fourth Appellate District, Division 2 asking the DCA to order the Riverside Superior Court to rule on the habeas proceedings.

278.     On March 26, 2020, the Court of Appeal issued an order to show cause as to why the Presiding Judge John Vineyard of the Riverside Superior Court and the Riverside County District Attorney Michael Hestrin should not be held in contempt of court and punished for their failure to rule on Mr. Niroula's habeas petition after almost four years.

279.     On April 8, 2020, Presiding Judge John Vineyard of the Riverside Superior Court requested a time extension citing the COVID-19 public health emergency as the reason for needing additional time.

280.     On April 8, 2020, Michael Hestrin and the Riverside District Attorney's Office filed a response to Mr. Niroula's writ of mandate in the Court of Appeal.

281.     On May 15, 2020, the Riverside District Attorney's Office filed a *non-opposition* to the order to show cause in Mr. Garcia's and codefendant Niroula's habeas petitions in the Riverside County Superior Court. In the *non-opposition* the District Attorney suggested remand and retrial as the remedy—not dismissal of the case with prejudice as requested by Mr. Garcia.

282.     On June 8, 2020, Judge David A. Gunn granted habeas relief on only one of the ten issues raised by Mr. Garcia and remanded the case for retrial. No evidentiary hearing was held by the Court to allow Mr. Garcia to argue or state what type of relief would be appropriate or to allow Mr. Garcia to request that any of the other claims raised by Mr. Garcia in his habeas petition which could result in dismissal of the case with prejudice be addressed by the Court—and the Court merely accepted the recommendation of the District Attorney for a new trial as suggested by the District Attorney—and the Court stated in its ruling that all of Mr. Garcia's remaining nine claims were moot. As a result, the Court denied Mr. Garcia his Due Process rights by failing to hold an evidentiary hearing on the matter before issuing its ruling.

283.     On June 11, 2020, Presiding Judge John Vineyard filed a response to Mr. Niroula's writ of

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 67

mandate in the Court of Appeal stating that Judge Gunn had ruled on the habeas petitions pending before the Riverside Superior Court and that the issue was now moot.

284.    On June 12, 2020, the Court of Appeals discharged the order to show cause.

285.    At all times, both the state defendants and the county prosecutors were aware of the facts that warranted reversal. However, they intentionally delayed the proceedings and obstructed the discovery of the audio recess recordings in order to cause Mr. Garcia to suffer prolonged incarceration and to intentionally violate his civil rights.

**LIII.    The 2020 Reversal of Mr. Garcia's Wrongful Conviction**

286.    On June 8, 2020, Judge David A. Gunn of the Superior Court of Riverside County granted Mr. Garcia's *unopposed* petition for a writ of habeas corpus and vacated his criminal conviction in its entirety. Unfortunately, it had taken over seven and a half years from the wrongful conviction to correct this miscarriage of justice.

287.    On July 31, 2020, Mr. Garcia filed a motion for a hearing and reconsideration to grant the relief prayed for in an unopposed petition for a writ of habeas corpus. The motion was denied by Judge Gunn who refused to hold a hearing.

**LIV.    Retrial Proceedings**

288.    The matter was remanded for retrial and assigned on June 25, 2020 by the Master Calendar Judge to Judge Anthony R. Villalobos at the Indio courthouse for all matters including the retrial proceedings.

289.    On July 4, 2020, Mr. Garcia filed an ex parte request for a calendar add-on for July 10, 2020 to determine if defendant will exercise a peremptory challenge pursuant to CCP 170.6.

290.    On July 6, 2020, Mr. Garcia filed an ex parte request for a minute order authorizing a paralegal and legal runner.

291.    On July 9, 2020, Mr. Garcia filed an ex parte motion for an order commanding the clerk of the court to release to defendant all records subpoenaed from third parties and to provide a full accounting of all subpoenaed records destroyed by the court clerk.

292.    On July 13, 2020, Mr. Garcia filed an ex parte motion for the court to order the production of all electronic devices seized from defendants and place under seal in the exhibits department of the Indio branch.

293.    On July 22, 2020, Mr. Garcia filed an motion for the return of his client file and electronic

1   evidence and a motion for the return of his seized property.

2       294.    On July 26, 2020, Mr. Garcia filed a request for hearing for the court and parties to discuss trial

3   logistics to provide for appropriate social distancing precautions.

4       295.    On July 26, 2020, Mr. Garcia filed an ex parte motion for the court to order the preparation of an

5   O.R. report to assist the court in evaluating defendant's motion for release on O.R. or reasonable bail.

6       296.    On July 26, 2020, Mr. Garcia filed an ex parte motion for an in camera hearing regarding

7   evidentiary and witness issues.

8       297.    On July 26, 2020, Mr. Garcia filed an ex parte motion for an in camera hearing for defendant to

9   make an offer of proof for issuance of court orders to compel compliance with defense-issued subpoenas duces

10  tecum.

11      298.    On July 26, 2020, Mr. Garcia filed an ex parte motion to request that the court permit the

12  defendants to meet and confer and order the courtroom bailiffs/deputies to stop interfering.

13      299.    On July 26, 2020, Mr. Garcia filed a notice of withdrawal of not guilty pleas previously entered

14  on August 13, 2010.

15      300.    On July 26, 2020, Mr. Garcia filed a notice of defendant's objection to any request made by the

16  prosecution or codefendants to continue the trial past the statutory time limit and assertion of his right to a speedy

17  trial.

18      301.    On July 27, 2020, Mr. Garcia filed a motion to appoint defense expert witness Anita Zannin,

19  Blood Stain Pattern Analysis Expert.

20      302.    On July 28, 2020, Judge Villalobos granted prosecutors DDA Rob Hightower and DDA Kristi

21  Kirk's unnoticed request for a four-way severance of the criminal trial of Mr. Garcia and his codefendants without

22  legal justification or proper notice to the defense. In granting the severance, Mr. Garcia was denied the opportunity

23  of favorable testimony from his codefendant David Replogle.

24      303.    On July 29, 2002, Mr. Garcia filed an ex parte motion for an order to compel the production of

25  all property seized pursuant to search warrant PSSW004 for use at the hearing and trial.

26      304.    On August 4, 2020, Mr. Garcia filed an ex parte order requesting transcripts of all prior

27  proceedings be provided in electronic format.

28      305.    On August 7, 2020, Mr. Garcia filed a conditional Faretta waiver.

306.     On August 10, 2020, Mr. Garcia filed a demurrer to the Second Amended Felony Information.

307.     On August 11, 2020, Mr. Garcia filed a motion to suppress evidence.

308.     On or about August 14, 2020, after refusing to return Mr. Garcia's privately purchased hard drives to him, Judge Anthony Villalobos provided personal direction to the Riverside County Superior Court's IT Systems Administrator, Brenaman Jasmine, who attempted to gain access to the contents of the court-issued Apple laptop computer and Mr. Garcia's privately-purchased external hard drives which were to both recover the electronic client file and evidence, as well as to search for the presence of any additional audio recordings of the prior trial judge that could further embarrass the court and its judicial officers. It appears that following those instructions, Mr. Jasmine "initialized" the drive thus erasing Mr. Garcia's electronic client file and electronic defense evidence contained on the drive.

309.     On August 18, 2020, Mr. Garcia filed a motion to suppress his statements to law enforcement.

310.     On August 18, 2020, the District Attorney filed an opposition to Mr. Garcia's demurrer to the Second Amended Felony Information.

311.     On August 24, 2020, the prosecution ambushed Mr. Garcia with an oral request to the court to issue the proposed order, which Mr. Garcia had not yet received or reviewed. **No legal arguments or facts** were presented by the prosecution and Mr. Garcia was not provided an opportunity to file an opposition to the request or present any evidence.

312.     Judge Villalobos granted prosecutors DDA Rob Hightower and DDA Kristi Kirk's an unnoticed request for a gag order in of the criminal retrial of Mr. Garcia and his codefendants without legal justification or proper notice to the defense.

313.     On September 4, 2020, Mr. Garcia filed defendant's response to the Riverside County Sheriff's Department objection to the proposed order granting defendant usage of laptop computer within the county jail.

314.     On September 7, 2020, Mr. Garcia filed a lodgement of selected portions of the appellate transcripts in support of his motion for the usage of the laptop computer within the county jail.

315.     On September 8, 2020, Mr. Garcia filed a notice of the withdrawal of his time waiver and demand for a speedy trial within the statutory time period.

316.     On September 27, 2020, Mr. Garcia filed a motion asking for the appointment of computer forensic expert Wayne Norris.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 70

317.    On September 28, 2020, Mr. Garcia filed a supplemental brief in support of defendant's usage of the laptop computer within the county jail.

318.    On October 3, 2002, Mr. Garcia filed an ex parte motion for an order directing the Probation Department to correct the O.R. report they had prepared regarding Mr. Garcia and his eligibility to be released on his own recognizance.

319.    On October 3, 2002, Mr. Garcia filed an ex parte application for a calendar add-on for an in camera hearing to address returns to subpoena duces tecum.

320.    On October 6, 2020, Mr. Garcia filed a motion requesting that he be provided with the electronic transcripts from the previous trial that had already been prepared for the appellate record.

321.    On November 11, 2020, Mr. Garcia filed an ex parte request for specific exemptions to the court's protective order in order to allow him to prepare and submit motions to the Court of Appeal, U.S. District courts, and other court's outside of Riverside County's jurisdiction.

322.    On November 15, 2020, Mr. Garcia filed a notice of motion for an evidentiary hearing of jail safety and sheriff official's misconduct.

323.    On November 23, 2020, Mr. Garcia filed a motion to dismiss for violation of right to a speedy trial.

324.    On November 23, 2020, Mr. Garcia filed a motion to dismiss for lack of speedy trial within the statutory time limits.

325.    On or about August 2020, Mr. Garcia received a pretrial services report (Probation report) from Deputy Probation Office Caitlin Camilo. The report prepared by the Riverside County Probation Department was inaccurate, so Mr. Garcia asked the court to have it corrected. The revised Probation report contained even more mistakes and inaccuracies—and the Probation report did not contain any information about Mr. Garcia's serious underlying medical conditions, his high risk for COVID-19 infection, his educational status, his family or community support, or other relevant factors. Mr. Garcia was not allowed to challenge the inaccuracies contained within the Probation report. Shortly thereafter, Mr. Garcia filed a motion for release or on his own recognizance or reasonable bail. The Probation report failed to articulate any specific factors that would indicate why Mr. Garcia would be a flight risk and fail to make his court appearances, despite the Palm Springs Police Department still being in possession of Mr. Garcia's now expired passport and driver's license. In November 2020, Judge Villalobos

1    denied the motion for OR release and Mr. Garcia was denied release from custody and continues to be detained by

2    the Riverside County Sheriff's Department.

3        326.    When Mr. Garcia raised concerns about his on-going health issues to the Court, Judge Villalobos

4    showed callous disregard to Mr. Garcia's health and his personal well-being, despite being high risk for COVID-19

5    infection because of his underlying medical conditions, and responded that lots of individuals in custody have

6    significant health issues. In denying Mr. Garcia's release from custody, Judge Villalobos did not state that Mr.

7    Garcia was a risk to public safety however, he stated that he was not sure that he would have a guarantee that Mr.

8    Garcia would appear at all future court dates, but failed to provide any specific reasons or evidence supporting this

9    opinion. Judge Villalobos also applied the wrong standard for release on OR or reasonable bail and stated that he

10   had to presume that all the charges were true as opposed to under California Constitution Article I Section 12 that

11   states that the evidence should be weighed to see if there is a preponderance of evidence and the presumption of

12   guilt extremely high before denying OR release or bail. Mr. Garcia suggested house arrest with GPS monitoring or

13   any other electronic means to ensure his court appearance, posting bail, or any combination or series of factors, yet

14   the Judge failed to consider those options and denied Mr. Garcia's motion for release from custody.

15       327.    On December 6, 2020, Mr. Garcia filed an ex parte motion for transcripts of oral proceedings (this

16   was to request transcripts again a second time that had previously been requested, but had still not been received.)

17       328.    On December 6, 2020, Mr. Garcia filed his notice of objection to Riverside County Sheriff's

18   Department unjustified searches of defendant's legal papers and request for an evidentiary hearing.

19       329.    On December 9, 2020, Mr. Garcia filed defendant's reply to the People's opposition to his motion

20   to dismiss for lack of a speedy trial.

21       330.    On December 9, 2020, Mr. Garcia filed a request to set a briefing schedule and evidentiary hearing

22   on his motion to dismiss for the destruction of defendant's client file.

23       331.    On December 9, 2020, Mr. Garcia filed his 12th request for discovery.

24       332.    On December 9, 2020, Mr. Garcia filed his 13th request for discovery.

25       333.    On December 11, 2020, Mr. Garcia filed his 14th request for discovery.

26       334.    On December 13, 2020, Mr. Garcia filed an ex parte motion for an order commanding the

27   Sheriff's Department to provide defendant with a new phone PIN.

28       335.    On December 13, 2020, Mr. Garcia filed his 15th request for discovery.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 72

336.     On December 14, 2020, Mr. Garcia filed an ex parte request for calendar add-on to enter a general time waiver to defendant's statutory speedy trial rights.

337.     On December 17, 2020, Mr. Garcia filed defendant's objection to court's redactions of defense-subpoenaed records.

338.     On December 16, 2020, Mr. Garcia filed his 16th request for discovery.

339.     On December 17, 2020, Mr. Garcia filed his 17th request for discovery.

340.     On December 17, 2020, Mr. Garcia filed his 18th request for discovery.

341.     On December 24, 2020, Mr. Garcia filed an ex parte motion for transcripts of oral proceedings.

342.     On December 30, 2020, Mr. Garcia filed his 19th request for discovery.

343.     On January 5, 2021, Mr. Garcia filed a motion to appoint advisory and standby counsel for pro per defendant, Daniel Garcia.

344.     On January 8, 2021, Mr. Garcia filed a notice to the court of issues with the jail law library kiosks.

345.     On January 12, 2021, Mr. Garcia filed defendant Daniel Garcia's list of witnesses the defense intends to call at trial.

## STATEMENT OF DAMAGES

346.     Defendants' actions deprived Plaintiff Daniel Carlos Garcia of his civil rights as guaranteed under the United States Constitution and laws enacted by Congress, and the Constitution and laws of the State of California.

347.     This action seeks damages for the period from March 9, 2009 through each and every year to the present. Mr. Garcia's liberty was curtailed upon his arrest on March 9, 2009. He remains incarcerated and in the custody of Riverside County Sheriff's Department and is currently housed at the Robert Presley Detention Center. The damages suffered by Mr. Garcia began in 2009 and continue unabated to the present and for the foreseeable future.

348.     Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Mr. Garcia to be subjected to unlawful police interrogation, to have to his personal property unlawfully seized without a warrant, to remain in custody without bail or arraignment converting his otherwise lawful arrest into an unlawful detention, and to be denied the assistance of counsel—all of which had a direct and proximate result of Mr. Garcia being charged with additional offenses maliciously prosecuted, tried, wrongfully

1   convicted, and incarcerate for nearly twelve years for crimes he did not commit.

2   349.   Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts

3   and omissions caused Mr. Garcia to be falsely arrested, tried, wrongfully convicted, and incarcerated for nearly

4   twelve years for crimes he did not commit. Even after Mr. Garcia's unopposed habeas corpus petition was granted

5   and his entire conviction vacated, the Defendants now seek to maliciously and vindictively subject him to yet

6   another criminal trial continuing their unlawful and intentional misconduct.

7   350.   Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts

8   and omissions caused Mr. Garcia the following injuries and damages, which continue to date and will continue into

9   the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family

10  relationships and close friendships; severe psychological damage; damage to business and property; legal expenses;

11  loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment;

12  degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom

13  including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic

14  opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment,

15  and expression, for which he is entitled monetary relief.

16  351.   Mr. Garcia suffered a number of physical injuries while wrongfully incarcerated, including but

17  not limited to, being violently punched by another inmate that resulted in the permanent loss of a front incisor

18  tooth, the development of anxiety, and post-traumatic stress. Mr. Garcia has also been violently physically and

19  sexually assaulted by other inmates while in the custody of the Riverside County Sheriff.

20  352.   As a result of his wrongful incarceration, Mr. Garcia missed the opportunity to spend time with

21  his aging parents when he was arrested and prevented him from seeking companionship and marriage and the

22  ability to start a family and have children. Mr. Garcia's parents are now 76 years old and 57 years old respectively

23  and he has missed spending time with them over the last twelve years. Mr. Garcia has also missed spending time

24  with his extended family members including his grandmother who is 83 years old, family matriarch and great aunt

25  who is 100 years old, seven siblings, the birth of his first niece, and was unable to attend funeral services for the

26  death of numerous relatives. Mr. Garcia also has not been able to visit with his fiancée in over two years.

27  353.   Mr. Garcia has suffered substantial financial losses resulting from loss of income for nearly

28  twelve years, loss of investments and appreciated value, and over $350,000 in debt now owed to Mr. Garcia's

parents—plus interest—for his legal expenses and costs while in custody. Additionally, Mr. Garcia suffered the loss of the business value for his software application, the Hydra Project and the loss of over $200,000 in personal property.

354.    As a direct and proximate result of the Defendants' unlawful seizure, retention, and conversion of Mr. Garcia's personal property—including computer equipment and electronically stored information—he has suffered the loss of the busines value of his software application and technology, *The Hydra Project*. By Defendants denying Mr. Garcia access to the source-code and schematics for his proprietary technology, thus prevented him from pursuing lucrative contracts potentially worth tens of millions of dollars. The financial damages are in excess of $100,000,000 (one-hundred million dollars).

355.    Damage to Mr. Garcia's health, lack of medical treatment for his medical conditions, poor dental health, mental anguish, loss of hair, and weight gain all resulting directly from his illegal incarceration.

356.    These injuries and damages to Mr. Garcia were foreseeable to Defendants at the time of their acts and omissions.

357.    Pursuant to California Government Code §825(a), Defendants are entitled to indemnification because their individual liability and acts of misconduct arose from acts and omissions within the course and scope of their employment with the City of Palm Springs, County of Riverside and the State of California. The California Tort Claims Act, as codified in California Government Code, Article 4, §825, provides indemnification of public employees to defend him or her against any claim or action against him or her for an injury arising out of an act or omission occurring within the scope of his or her employment as an employee of the public entity.

358.    All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

**FIRST CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for Wrongful Arrest Pursuant to Warrant Issued Without Probable Cause and Obtained by**
**Judicial Deception in Violation of Fourth Amendment to the United States Constitution**

359.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

360.    The Fourth Amendment to the United States Constitution provides that: "The right of the people

to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (*U.S. Const. amend. IV.*)  The Fourth Amendment is applicable to state officials through the Due Process Clause of the Fourteenth Amendment. See *Wolf v. Colorado* (1949) 338 U.S. 25, 27-28, overruled on other grounds by *Mapp v. Ohio* (1961) 367 U.S. 643.

361.    "The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States* (2018) 585 U.S. 2206, 2213, (internal quotation marks omitted). An arrest warrant protects an individual from an unreasonable seizure and may only be issued upon a showing of probable cause to believe a suspect is committing or has committed an offense. An arrest warrant requires evidence of participation in crime and places the magistrate's "determination of probable cause" between officer and citizen. *Payton v. New York* (1980) 445 U.S. 573, 602.

362.    "For purposes of an arrest with or without a warrant, probable cause exists when police have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient in itself to justify a belief by a prudent person that an offense has been or is being committed by the suspect." *Beck v. Ohio* (1964) 379 U.S. 89, 91; see also *Wong Sun v. United States* (1963) 371 U.S. 471, 479. ("It is basic that an arrest. . . must stand upon firmer ground than mere suspicion.")

363.    On December 4, 2008, Palm Springs resident Clifford Lambert was last seen at the restaurant Dink's having dinner with alleged conman Kaushal Niroula.

364.    On December 5, 2008, Mr. Lambert called a friend and stated that he would be meeting with an attorney from New York later that evening to discuss a possible inheritance due to Mr. Lambert.

365.    On December 7, 2008, friends reported Mr. Lambert missing to police after he failed to appear at a holiday festival the night before. Palm Springs Police Detective Frank Browning entered Mr. Lambert's residence to perform a welfare check and found no signs of foul play. Only Mr. Lambert, his dog, and his convertible Mercedes were missing, and everything else appeared to be in order with no signs of a struggle or forced entry.

366.    In late December 2008, Mr. Lambert's personal attorney, Martina Kang Ravicz, obtained an emergency conservatorship over Mr. Lambert's estate and the Court appointed Kenneth Jenkins as the conservator. Suspicious activity in some of Mr. Lambert's financial accounts during the month of December was discovered by Mr. Jenkins.

367.     On January 7, 2009, Miguel Bustamante was arrested on suspicion of burglary while attempting to remove items from Mr. Lambert's home. While in custody, Mr. Bustamante made statements to police implicating a "Danny Garcia" and several others in both the disappearance of and various financial crimes against Mr. Lambert. The uncorroborated statements made by Mr. Bustamante were based on hearsay as he clearly told Detectives Min and Browning that he did not know Mr. Garcia, nor had he ever met him or communicated with him. Bustamante later told DDA Kirk during his August 2020 interview that the only reason he mentioned the name "Danny Garcia" was because Kaushal Niroula told him to mention the name if he was ever questioned by law enforcement.

368.     On March 2, 2009, Detective Simon Min of the Palm Springs Police Department submitted a sworn declaration in support of an arrest warrant for Mr. Garcia and several others in the case of *People v. Kaushal Niroula, et al.,* case no. INF064492 filed in the Superior Court for Riverside County (*Garcia I* at 12 CT 3055.)

369.     Detective Min declared that he and Detective Frank Browning were the primary detectives investigating the case involving the mysterious disappearance of Palm Springs resident Clifford Edward Lambert and a possible conspiracy to commit financial crimes against Mr. Lambert. Detectives Min and Browning discovered evidence that Russell Herbert Manning and Kaushal Niroula conspired to steal Mr. Lambert's identity by presented a forged durable power of attorney in an attempt to transfer title of Mr. Lambert's house in order to sell it and split the proceeds. (*Garcia I* at 12 CT 3055-3057.)

370.     Detective Min, having learned Mr. Niroula was a San Francisco resident, contacted San Francisco Police Inspector Gregory Ovanessian, who informed Detective Min that "he was very familiar with Niroula; there were in fact several active cases of Identity Theft, Grand Theft, Jewelry Theft, involving him [Niroula] in the Bay area. . ." (*Garcia I* at 12 CT 3056.) Ovanessian provided evidence that Niroula, Manning, and David Replogle were involved in forging the durable power of attorney in order to sell Mr. Lambert's residence. Ovanessian also provided a positive photo/video identification of Niroula and Manning from within the Pacific Western Bank transferring over $200,000 in funds from Mr. Lambert's account to Niroula's personal account. (*Garcia I* at 12 CT 3057, 3059.)

371.     Detective Min was unaware of any credible evidence implicating Mr. Garcia in the disappearance of Mr. Lambert. Witnesses identified Niroula as the last person to be seen with Mr. Lambert the night before he disappeared. The evidence available demonstrated David Replogle had impersonated Mr. Lambert in order to notarize a forged durable power of attorney in the presence of Niroula. It was Niroula and Manning who used the

forged POA to drain Mr. Lambert's account with the proceeds being split between Niroula, Manning, Replogle, and Bustamante. It was Manning who transferred title of Mr. Lambert's home into Niroula's name, and it was Bustamante who was caught burglarizing Mr. Lambert's residence at the direction of Niroula. None of the evidence connected Mr. Garcia to the criminal conduct of others as described above. By all accounts, Mr. Garcia <u>was hundreds of miles away</u> at his loft in Sacramento celebrating the holidays with his family.

372.    The only evidence linking Mr. Garcia to Mr. Lambert were charges on Mr. Lambert's access cards (debit/credit cards) for purchases purportedly shipped to Mr. Garcia's name and addresses with gift wrapping and a message from Mr. Lambert to Mr. Garcia. None of those charges were ever reported by the merchants, banks, or Mr. Lambert's conservator as being unauthorized or fraudulent. There was no evidence that anyone other than Mr. Lambert had made the purchases. None of the items were proven to have been delivered to, or signed for, by Mr. Garcia. And none of the items were found in Mr. Garcia's possession or at his loft. Furthermore, at no time did Detective Min ever attempt to contact Mr. Garcia to question him about the purchases or his relationship to Mr. Lambert and others.

373.    While there was ample evidence implicating **<u>others</u>** in blatant acts of fraud against Mr. Lambert, there was no reason to believe that Mr. Garcia had acted in any unlawful manner. In fact, Mr. Garcia had no record of criminal convictions and had been a valuable witness for the prosecution **<u>against</u>** Kaushal Niroula in several other cases in the San Francisco Bay Area—which had been told to Detective Min by San Francisco Police Inspector Gregory Ovanessian. Based on all the information available to Min at the time, no reasonable officer in his position would have believed there was probable cause to believe that a criminal offense had been or was being committed by Mr. Garcia. Nevertheless, rather than conducting a thorough investigation, Min sought a warrant for Mr. Garcia's arrest.

374.    On March 2, 2009, the Honorable Thomas N. Douglas, Jr. issued a felony arrest warrant for Mr. Garcia on charges of violating Penal Code §§487(a), grand theft; and 530.5(a) identity theft. (*Garcia I*, Supp. I CT 33-42.)  The warrant was issued without probable cause and based on numerous factual inaccuracies by Min.

375.    The foregoing acts and omissions were deliberate, wonton, callous, cruel, motivated by evil intent, done in bad faith, and with reckless disregard for the truth and deliberate indifference to Mr. Garcia's federally protected rights. These acts were perpetrated while Defendants were acting in their individual capacities as employees or agents of the City of Palm Springs and County of Riverside and under color of state law. No

1   reasonable officer in 2009 would have believed this conduct was lawful.

2       376.    As a direct and proximate result of Defendants' actions, Mr. Garcia was wrongly arrested,

3   detained, charged with murder, prosecuted, convicted, sentenced to life in prison, incarcerated for nearly twelve

4   years, and suffered the other grievous injuries and damages set forth above.

5                              **SECOND CAUSE OF ACTION**
                           **42 U.S.C. §1983 (Civil Rights Act)**
6       **Claim for Excessive Bail Due to Increase Obtained by Judicial Deception in**
              **Violation of the Eighth Amendment to the United States Constitution**
7

8       377.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

9   herein, and further alleges as follows:

10      378.    The Eighth Amendment states that "[e]xcessive bail shall not be required." *U.S. Const. amend*

11  *VIII*. The Eighth Amendment excessive bail safeguard also applies to the states through the Fourteenth Amendment.

12  See *Baze v. Rees* (2008) 553 U.S. 35, 47.

13      379.    "The only arguable substantive limitation of the Bail Clause is that the Government's proposed

14  conditions of release or detention may not be 'excessive' in light of the perceived evil." *United States v. Salerno*

15  (1987) 481 U.S. 739, 754; see also *Stack v. Boyle* (1951) 342 U.S. 1, 5 [Bail set at a figure higher than an amount

16  reasonably calculated to ensure the trial appearance of the accused is found to be excessive under the Eighth

17  Amendment.]

18      380.    Consistent with the Eighth Amendment, California Penal Code §1269(c) establishes in each

19  county a schedule of bail for all bailable offenses. The purpose of the countywide bail schedules is to promote

20  uniformity in the setting of bail and to prevent excessive bail from being arbitrarily set. The prosecution may

21  request additional amounts beyond the bail schedule upon a showing of good cause for aggravating or enhancing

22  factors that warrant an upward departure from the schedule.

23      381.    On March 2, 2009, a felony arrest warrant was issued for Mr. Garcia for charges of grand theft

24  and identity theft. The warrant fixed Mr. Garcia's bail at **one million dollars**. (*Garcia I* at 12 CT 3053.) The bail

25  amount was <u>two-hundred times</u> the statutory bail of $5,000 as listed on the Riverside County Felony Bail Schedule

26  for such non-violent and non-serious felonies.

27      382.    The bail increase was obtained pursuant to a request by Detective Min. In support of his request,

28  Min intentionally and knowingly made serious factual misstatements in an effort to deceive the magistrate. He

1  falsely claimed Mr. Garcia was a flight risk because he had ties in Mexico—when in fact—Mr. Garcia was born

2  and raised in California, is a United States citizen by birth, has never lived in Mexico, does not have Mexican

3  citizenship, nor did he have any property or family in Mexico.

383.    Detective Min further stated the increase was warranted because Mr. Garcia had over $130,000 in

ill-gotten funds, including from the sale of a clock belonging to Mr. Lambert for $80,000. No such clock was ever

sold—let alone worth such an absurd amount. Even if it was believed Mr. Garcia had access to feloniously obtained

funds, the proper procedure was not to increase the underline amount of bail, but rather to hold a "*Nebbia* hearing" to inquire

into the legitimacy of the source of any bail. (See Penal Code §1275.1; *United States v. Nebbia* (2d Cir. 1966) 357

F.2d 303.)

384.    Min also falsely claimed blood had been found in Mr. Lambert's kitchen, when in truth—none

was. He further stated that the bail increase was warranted because Mr. Lambert may have been kidnapped and his

life could be in danger. There was no evidence available that Mr. Lambert had been kidnapped or that Mr. Garcia

was involved or in any way posed a threat to Mr. Lambert's well-being.

385.    Lastly, Min stated that Mr. Garcia had no known address or phone number where he could be

reached. This was a blatant lie as Min was well aware of both Mr. Garcia's address and phone number. Mr. Garcia's

address was correctly listed on his California Driver's License—which Min had obtained from the California

Department of Motor Vehicles. Min also knew Mr. Garcia's cell phone number as he had authored a search warrant

for those records.

386.    Min knowingly and intentionally provided false information in an effort to deceive the judge into

increasing Mr. Garcia's bail to one-million dollars without good cause. Such judicial deception violated Mr.

Garcia's due process rights and led to a bail amount that was grossly excessive in violation of the Eighth

Amendment.

387.    After succeeding in obtaining an unwarranted increase in bail to $1,000,000 (one-million) dollars,

Min submitted yet another request to increase Mr. Garcia's bail. On March 16, 2009, at Mr. Garcia's long-overdue

arraignment, the prosecution requested and was granted an increase in Mr. Garcia's bail to **five-million dollars**.

Such an obscene amount was **one-thousand times** the statutory amount listed in the countywide bail schedule. The

bail was excessive under any standard.

388.    Neither the prosecution nor court ever cited any relevant factors justifying the increases in bail.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 80

No evidence was ever presented that Mr. Garcia was a flight risk or posed a serious threat to public safety. The only reason the bail increases were requested was for the prosecution to keep Mr. Garcia in unlawful custody while they continued to investigate the case. Had the judge been aware of the prosecution's nefarious intentions and Min's deception, he would have likely denied the requests to increase Mr. Garcia's bail past the statutory amounts.

389.   At Mr. Garcia's arraignment on March 16, 2009, the prosecution requested, and the court granted, an increase in bail to $5,000,000 (five million dollars)—1,000 (one thousand) times the statutory amount. There was no sensical explanation for such an extreme departure from the uniform bail schedule.

390.   Both the $1,000,000 bail an $5,000,000 bail were excessive and in violation of Mr. Garcia's right under the Eighth Amendment to be free from excessive bail.

391.   There was no justification for the requested increases as Mr. Garcia was not a flight risk, had no criminal record, was born and raised in California, had substantial ties to the community, and was not charged with a serious or violent felony. Good cause did not exist to believe an increase in bail was warranted to ensure Mr. Garcia's appearance at future court dates.

392.   The unconstitutionally excessive increase in bail caused extreme prejudice to Mr. Garcia and resulted in his prolonged pretrial detention under unconstitutional conditions of confinement, the loss of exculpatory evidence, subjected him to unlawful custodial interrogation, and the filing of additional charges.

### THIRD CAUSE OF ACTION
**Claim Under California State Law Pursuant to Civil Code §52.1 (Tom Bane Civil Rights Act) for Excessive Bail and Denial of Right to Bail in Violation of the Eighth Amendment to the United States Constitution; California Constitution Article I, Section 12**

393.   Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

394.   The California Constitution, like the Federal Constitution prohibits the imposition of excessive bail to be required for the release of a criminal defendant. (*Cal. Const. Art. I, §12.*) In addition, the California Constitution goes further than the Eighth Amendment and specifically establishes a state constitutional right for release on bail or on own recognizance at the discretion of the Court, except in limited circumstances. (*Id.*)

395.   Penal Code  §§1268 to 1289 specifies the requirements for release under one's own recognizance (OR release) and release with bail. Bail permits a defendant to be released from actual custody into the constructive custody of a surety on a bond given to procure the defendant's release. The California Constitution, like the Federal Constitution,  prohibits the imposition of excessive bail to be required for the release of a criminal defendant. (*Cal.*

*Const. art. I, §12.*) In addition, the California Constitution goes further than the Eighth Amendment and specifically establishes a state constitutional right to be released on bail, or on own recognizance at the discretion of the court. (*Id.*)

396.    When a court issues a warrant for the arrest of a criminal defendant, it must specify the amount of bail set on the warrant. (Penal Code §815a.)

397.    The officer in charge of a jail, a designated employee of the police or sheriff's department, the superior court clerk of the county of arrest, or the clerk in the county in which the warrant was issued may accept bail in the amount fixed by the complaint, warrant, or bail schedule; order the release of the arrestee; and issue a notice to appear. Penal Code §1259b(a). An officer's refusal to accept bail properly offered, or to intentionally interfere with a defendant's efforts to post bail to secure their release from custody, violates the defendant's constitutional and statutory rights to release on bail. An officer lacks qualified immunity from such actions and may be subject to suit.

398.    Mr. Garcia was arrested in the City and County of Sacramento on March 9, 2009, pursuant to a felony arrest warrant issued by the Superior Court for Riverside County in case no. INF064492. The warrant affixed Mr. Garcia's bail at $1,000,000 (one million dollars).

399.    After being arrested and booked into the Downtown Sacramento County Jail, Mr. Garcia was never shown a copy of the arrest warrant, nor was he informed of the nature of the charges or the amount of his bail. Mr. Garcia's was further denied his right to call his attorneys or a bail bondsman to attempt to post the bail and secure his release.

400.    Furthermore, Mr. Garcia was not taken before a local magistrate within 48 hours of arrest as required by law which prevented Mr. Garcia from requesting an examination of the bail in a "*Nebbia* hearing" as specified in Penal Code §1275.1. As a consequence, Mr. Garcia could not post bail to secure his release. (See *Nebbia v. United States* (2nd Cir. 1966) 357 F.2d 303.)

401.    Once Mr. Garcia was transferred to Riverside County, he was held in pretrial detention without bail as a result of prosecutors (Defendants) setting the bail at an unreasonable amount several times greater than the amount specified in the Riverside County Bail Schedule. Bail was clearly excessive given Mr. Garcia's lack of any prior criminal misconduct and non-violent history. It was not disputed that Mr. Garcia was over 500 miles away at the time of the alleged murder and that he was not present or involved in the overt act of murdering Mr. Lambert.

402.     Defendants performed the above-described acts under color of state law while acting in their capacities as employees or agents of the City of Palm Springs and/or the County of Riverside. The foregoing acts and omissions were deliberate, intentional, reckless, wanton, cruel, done in bad faith, and/or involved willful indifference to Mr. Garcia's legally protected rights. No reasonable officer in 2009 would have believed this conduct was lawful.

403.     As a direct and proximate result of Defendants' actions, Mr. Garcia was denied his right to be free from custody on bail, suffered prolonged detention, and the other grievous injuries and damages set forth above.

<div align="center">

**FOURTH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to Civil Code §52.1 (Tom Bane Civil Rights Act)**
**for Unlawful Delay in Arraignment in Violation of United States and California Constitutions,**
**Penal Code §§821 and 825; and California Code of Civil Procedure §§134 and 135**

</div>

404.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

405.     An individual accused of a public offense has the right under the U.S. Constitution to be informed of the "nature and cause of the accusation." (*U.S. Const. amend VI*.) Arraignment serves the purpose and gives the accused a fair opportunity to plead to the charges. (*Cal. Const. art. I, §14*; *In re Mitchell* (1961) 56 Cal.2d. 667.) In addition, both federal and state constitutions grant an accused the right to a speedy trial. (*U.S. Const. amend. VI*; *Cal. Const. art. I, §15*; Pen. Code §1382.) A prompt arraignment is a component of the right to a speedy trial.

406.     The filing of a felony complaint must be followed by a prompt arraignment "without unnecessary delay." (Pen. Code §§976, 860.) When an individual is arrested and held in custody, the term "without unnecessary delay" means no more than "48 hours after [the] arrest, excluding Sundays and holidays." (Pen. Code §825; Code Civ. Proc. §§134-135; *People v. Lee* (1970 ) 3 Cal.App.3d. 514, 521.)

407.     A defendant who is arrested on a felony charge in a county other than the one in which the alleged crime occurred has the right to be arraigned *without unnecessary delay* in the county in which the arrest occurred. (Pen. Code §821.) The arresting officer must inform the defendant of this right in writing. (*Id*.) If the arrest warrant sets a bail amount, the magistrate must admit the defendant to bail in that amount and set a date by which the defendant is required to appear before the magistrate or court who issued the warrant—not to exceed 25 days.

408.     An unreasonable delay between arrest and arraignment converts a lawful arrest into an unlawful

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 83

detention. (*People v. Pettingill* (1978) 21 Cal. 3d 231.) An unreasonable delay in bringing the defendant before the magistrate may serve as a ground for a civil suit against the arresting officer. (*Dragna v. White* (1955) 45 Cal.2d 469.)

409.     On March 2, 2009, a felony complaint was filed in the Superior Court for the County of Riverside in case no. INF064492, charging Mr. Garcia with one count each of felony grand theft (Pen. Code §487) and identity theft (Pen. Code §530.5). An arrest warrant was also issued and affixed Mr. Garcia's bail at $1,000,000 (one million dollars).

410.     On March 9, 2009, at approximately 1:30 p.m., Sacramento Detectives arrested Mr. Garcia pursuant to the aforementioned out-of-county arrest warrant. Mr. Garcia repeatedly asked to see a copy of the arrest warrant and to know the cause for his arrest; however, the Detectives failed to provide the warrant or inform Mr. Garcia of the charges.

411.     Upon information and belief, Mr. Garcia was booked into the Downtown Sacramento County Jail at approximately 2:00 p.m. on March 9, 2009. Sacramento Officers failed to inform Mr. Garcia in writing, as required by Penal Code §821, of his right to appear before a local magistrate within 48 hours.

412.     Mr. Garcia's arrest occurred during business hours on March 9, 2009—a Monday—and court was in session in Sacramento County. Mr. Garcia had a legal right to be brought  "without unnecessary delay" before a local magistrate, within 48 hours, for arraignment. Such an arraignment should have taken place by no later than 1:30 p.m. on Wednesday, March 11, 2009. However, officers failed to take Mr. Garcia before a local magistrate as required, thereby converting his otherwise lawful arrest into an *unlawful detention*.

413.     In fact, officers **never** took Mr. Garcia before a local magistrate and instead held him in unlawful detention for five days before suddenly, and without notice, placing him on a bus on March 13, 2009 for transport to Riverside County.

414.     Mr. Garcia was subsequently transferred from Sacramento to the Robert Presley Detention Center in Riverside, California in the early hours on Friday, March 13, 2009. Court was in session and arraignments were taking place at 1:30 p.m. in the Master Calendar Department in Riverside; however, Mr. Garcia was not brought to court for a timely arraignment. Mr. Garcia was ultimately not brought before a magistrate until Monday, March 16, 2009—seven days after his arrest.

415.     Defendants performed the above-described acts and omissions under color of state law,

deliberately, intentionally, with malice, and with reckless indifference to Mr. Garcia's clearly established legal rights. No reasonable officer in 2009 would have believed this conduct was lawful.

416.    As a direct and proximate result of Defendants' conduct, Mr. Garcia was unlawfully detained during which he was subjected to improper police interrogation that formed the basis for the filing of additional charges. But for Defendants' misconduct, Mr. Garcia would not have been falsely charged, maliciously prosecuted, tried, wrongfully convicted, an incarcerated for nearly twelve years.

<div align="center">

**FIFTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for Unlawful Police Interrogation in Violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution**

</div>

417.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

418.    The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right. . .to have the Assistance of Counsel for his defense." *U.S. Const. amend. VI.* The Sixth Amendment applies to state criminal prosecutions through the Fourteenth Amendment. *Gideon v. Wainwright* (1963) 372 U.S. 335, 342.

419.    The Sixth Amendment right to counsel attaches at initiation of judicial criminal proceedings. *Kirby v. Illinois* (1972) 426 U.S. 682, 689-90.)The filing of a complaint by a prosecutor in California triggers the Sixth Amendment right to counsel. *People v. Viray* (2005) 134 Cal.App.4th 1186, 1205. Once the right attaches, a criminal defendant is entitled to the assistance of counsel at all critical stages in the proceedings—including during police interrogations.

420.    In *Edwards v. Arizona*, the Supreme Court held that a suspect who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel be made available to him, unless the accused himself initiates further communication." *Edwards v. Arizona* (1981) 451 U.S. 477. Under *Edwards v. Arizona*, once a suspect asserts his *Miranda* right to counsel, like [defendant] did during the first interrogation, the interrogation must cease and any resumption of the interrogation must be at the suspect's instigation, not the police's. The police may not try to recommence the interrogation even about a different crime, *Arizona v. Roberson*, 486 U.S. 675 (1988).

421.    In *McNeil v. Wisconsin*, the Supreme Court held that the right to counsel secured by the Sixth Amendment and the right to counsel protected by *Miranda v. Arizona* are separate and distinct, such that invoking one does not implicitly invoke the other. The Court explained:

In *Edwards v. Arizona*, 451 U. S. 477 (1981), we established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," 451 U. S., at 484-485 — which means, we have most recently held, that counsel must be present, *Minnick v. Mississippi*, 498 U. S. 146 (1990). If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey*, 494 U. S. 344, 350 (1990). The *Edwards* rule, moreover, is not offense specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present. *Arizona v. Roberson*, 486 U. S. 675 (1988).

*McNeil v. Wisconsin* (1991) 501 U.S. 171, 177.

422.     When an accused is represented by counsel and has been formally charged with a crime, police questioning on that case without giving defense counsel the opportunity to speak to the defendant and to be present during questioning and without a valid waiver by counsel, violates the Sixth Amendment. *Minnick v. Mississippi* (1990) 498 U.S. 145; see also, *Fellers v. United States* (2004) 540 U.S. 519, 524-25 (Sixth Amendment violation when defendant made incriminating statements during voluntary discussion at home because discussion took place after formal charges and without informed waiver of right to counsel.).

423.     In *Minnick*, *supra*, the Court further held that "when counsel is requested, interrogation must cease, and officials may no reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney."

424.     In addition to the Sixth Amendment right to the assistance of counsel during police questioning, the Fifth Amendment provides in pertinent part that "[n]o person. . .shall be compelled in any criminal case to be a witness against himself." *U.S. Const. amend V.* The privilege against self-incrimination applies to the states through the Fourteenth Amendment. *Maryland v. Shatzer* (2000) 559 U.S. 98, 103.

425.     In *Miranda v. Arizona*, the Supreme Court held that custodial interrogations have the potential to undermine the Fifth Amendment privilege against self-incrimination by possibly exposing a suspect to physical or psychological coercion. (*Miranda v. Arizona* (1966) 384 U.S. 436, 446-50, 467.) To guard against such coercion, the Court established prophylactic procedural mechanism that requires a suspect to receive a warning before custodial interrogation begins. (*Id*. at 444.)  Unless suspects are warned of their Fifth Amendment rights, any statements elicited from them are unlawful and inadmissible.

426.     An invocation of the right [to remain silent] precludes further questioning on any offense, not just the one that was the subject of the interrogation. *Arizona v. Roberson* (1988) 486 U.S. 675, 685.

427.     On March 2, 2009, a felony complaint was filed in the Superior Court for the County of Riverside, in case no. INF064492, charging Mr. Garcia with felony grand theft and identity theft. The filing of a felony complaint triggered the Sixth Amendment right to counsel, which Mr. Garcia exercised by retaining private attorneys to represent him in that matter.

428.     Both Mr. Garcia and his attorneys notified law enforcement that he was represented and desired to interface with the government through counsel. This prohibited any attempts by law enforcement to question Mr. Garcia absent his attorneys' knowledge, presence, and consent.

429.     On March 4, 2009, Palm Springs Detective Frank Browning acknowledged in his written report that during a recorded telephone call Mr. Garcia had informed him that he had retained private counsel to represent him in the criminal case pending in Riverside County. This precluded Detective Browning and any other members of law enforcement from questioning Mr. Garcia about the charged offenses absent his attorney's knowledge, presence and consent.

430.     On March 9, 2009, immediately following Mr. Garcia's arrest, Sacramento Police Detectives proceeded to interrogate him **despite no *Miranda* advisements** and **without the knowledge, presence, or consent of Mr. Garcia's attorney**. The detectives' questions pertained to ownership of property they believed to be possible evidence pertaining to the charged offenses. Mr. Garcia invoked his right to remain silent and asked to call his attorney. Sacramento Detectives refused his request and threatened to damage Mr. Garcia's valuable property if he did not answer their questions. Mr. Garcia's  responses to the detectives' questions were later used by the prosecution to justify a warrantless search and seizure of the voluminous personal property that was derivative evidence of the unlawfully obtained statement.

431.     Sacramento Detectives Hansen, Glen and Hitchcock further failed to record or adequately document their interrogation of Mr. Garcia leading to vague and conflicting accounts in their respective reports and subsequent testimony.

432.     It is well established that once a suspect invokes his Fifth Amendment rights in response to police questioning, law enforcement officials must immediately stop the interrogation. See *Rodriguez v. McDonald* (9th Cir. 2017) 872 F.3d 908, 913, 924. Further interrogation without counsel present is barred unless the accused himself initiates further communication. This includes questions about unrelated and uncharged crimes. See *Arizona v. Roberson* (1988) 486 U.S. 675, 683; see also *McNeil v. Wisconsin* (1991) 501 U.S. 171, 177 ("Once a suspect

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 87

1  invokes the *Miranda* right to counsel for interrogation regarding one offense, he must not be reapproached regarding

2  *any* offense unless counsel is present.") In *Roberson,* the suspect was arrested for burglary and refused to answer

3  questions without counsel. (1988) 486 U.S. at 678. Three days later while the suspect was still in custody, police

4  again read him his *Miranda* rights, interrogated him about a different burglary, and obtained an incriminating

5  statement concerning that crime. *Id.* The Court stated that the presumption that a suspect considers himself unable to

6  withstand the pressures of custodial interrogation without legal assistance—"do not disappear simply because the

7  police have approached the suspect, still in custody, still without counsel, about a separate investigation." *Id.* at 683.

8  In such situations, police are required to determine whether the suspect had *ever* requested counsel before initiating

9  questioning. See, e.g. *United States v. Lucas* (9th Cir. 1992) 963 F.2d 243, 247. Furthermore, the ban on further

10  interrogation applies to all officers, not only those present when the suspect invoked his rights. See *Roberson*, at

11  687. (Another officer's lack of knowledge that the defendant invoked rights under *Miranda* during previous

12  interrogation does not justify a refusal to honor the request for counsel. All officers are presumed to have

13  constructive knowledge of a suspect's previous invocation of his *Miranda* rights.)

14      433.   Mr. Garcia had clearly invoked his Sixth Amendment right to counsel pertaining to the charged

15  offenses when he retained private counsel to defend him. Mr. Garcia further invoked his Fifth Amendment right to

16  counsel when—responsive to custodial interrogation by Sacramento detectives—he asked for his attorney and

17  stated that he did not wish to answer any questions. As a consequence, all police officers were forbidden from

18  initiating further questioning about both charged and uncharged offenses absent Mr. Garcia's attorney's knowledge

19  and consent.

20      434.   Nevertheless, on March 13, 2009, only four days after the initial unlawful interrogation by

21  Sacramento police detectives, Palm Springs Police Detective Frank Browning initiated a custodial interrogation of

22  Mr. Garcia. At bare minimum, Detective Browning was fully aware that Mr. Garcia was represented by counsel in

23  respect to the then charged offenses and should have known that any questioning regarding those offenses was

24  strictly forbidden. In addition, Detective Browning is presumed to have constructive knowledge that Mr. Garcia

25  had invoked his Fifth Amendment rights pertaining to *any* offenses whether or not charged and were therefore

26  forbidden from questioning him regarding *any* offenses.

27      435.   Mr. Garcia's unlawfully obtained statements and the derivative evidence was later used by

28  prosecutors to justify the additional criminal charges against Mr. Garcia—including capital murder. This

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 88

unlawfully obtained evidence also formed the basis of Mr. Garcia's wrongful conviction and was repeatedly referenced by the Court of Appeal in their opinion upholding his conviction and sentence.

436.    On August 26, 2020, Judge Anthony R. Villalobos ordered Mr. Garcia's statement to Detective Browning partially suppressed because of a violation of his Sixth Amendment right to counsel regarding questioning pertaining to the charged offenses.

437.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil intent, done in bad faith, and/or involved callous indifference to Mr. Garcia's federally protected rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of the City of Palm Springs and County of Riverside and under color of state law. No reasonable officer in 2009 would have believed this conduct to have been lawful and therefore punitive damages are warranted.

438.    The Defendants performed the above described acts under color of state law, deliberately, intentionally, with malice, and deliberate indifference to Garcia's clearly established constitutional rights.

439.    As a direct and proximate result of Defendants' unlawful actions, Mr. Garcia was unlawfully interrogated, deprived of his personal property, charged with additional offenses, wrongfully prosecuted, detained, and incarcerated for nearly twelve years and suffered the other grievous injuries and damages set forth above.

### SIXTH CAUSE OF ACTION
### 42 U.S.C. §1983 (Civil Rights Act)
### Claim for the Government's Use of Jailhouse Informants and Violation of Right to Counsel Under the Sixth and Fourteenth Amendments to the United States Constitution

440.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

441.    The Supreme Court held that incriminating statements deliberately elicited by federal agents in the absence of counsel after the proceeding had begun violate the Sixth Amendment. The prosecution could not use these statements against [defendant]. *Massiah v. United States* (1964) 377 U.S. 201

442.    Defendants, the Riverside County District Attorney's Office and Riverside County Sheriff's Department, have a pattern of using undercover jail house informants to solicit incriminating evidence in the absence of the criminal defendants' attorneys. Jail house informants used by the Prosecution who were intentionally housed with Mr. Garcia and/or his codefendants in order to attempt to obtain incriminating statements in violation of the Sixth Amendment Right to Counsel are: Juan Tagle, Arthur Soliz Jimenez, John Childs, Albert Farrar, Anthony Coleman, and Daniel Omar Henderson.

443.    The Defendants performed the above described acts under color of state law, deliberately, intentionally, with malice, and deliberate indifference to Garcia's clearly established constitutional rights.

444.    As a direct and proximate result of Defendants' egregious misconduct, Mr. Garcia was denied his constitutionally protected right to counsel by the Riverside County Sheriff's Department and Riverside County District Attorney's Office as the result of their use of jailhouse informants and suffered irreparable harm including unlawful and prolonged incarceration for nearly twelve years, substantial financial losses, and other egregious injuries as set forth above.

**SEVENTH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to Penal Code Section 637.2(a)**
**for the Unlawful Monitoring, Recording and Dissemination of Telephonic and In-Person Privileged**
**Conversations in Violation of Penal Code Section 636**

445.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

446.    California Penal Code §636 states that:

(a)  Every person who, without permission from all parties to the conversation, eavesdrops on or records, by means of an electronic device, a conversation, or any portion thereof, between a person who is in the physical custody of a law enforcement officer or other public officer, or who is on the property of a law enforcement agency or other public agency, and that person's attorney, religious adviser, or licensed physician, is guilty of a felony punishable by imprisonment pursuant to subdivision (h) of Section 1170.

(b)  Every person who, intentionally and without permission from all parties to the conversation, nonelectronically eavesdrops upon a conversation, or any portion thereof, that occurs between a person who is in the physical custody of a law enforcement officer or other public officer and that person's attorney, religious adviser, or licensed physician, is guilty of a public offense. This subdivision applies to conversations that occur in a place, and under circumstances, where there exists a reasonable expectation of privacy, including a custody holding area, holding area, or anteroom. This subdivision does not apply to conversations that are inadvertently overheard or that take place in a courtroom or other room used for adjudicatory proceedings. A person who is convicted of violating this subdivision shall be punished by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail for a term not to exceed one year, or by a fine not to exceed two thousand five hundred dollars ($2,500), or by both that fine and imprisonment.

447.    California Penal Code §637 further provides that any person who discloses the contents of a telephonic communication, without a lawful court order, is guilty of a misdemeanor punishable by imprisonment in a county jail or a fine.

448.    California Penal Code §637.2(a) specifically authorizes the filing of a legal action by any person injured under sections 636 and 637, against the person who committed the violation, for the greater of **$5,000 per violation** or three times the amount of actual damages, if any, sustained by the plaintiff.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 90

449.     Upon information and belief, in approximately 2008, Defendant the County of Riverside entered into a contractual agreement with Defendant Global Tel Link (GTL) whereby GTL would be the sole telephone service provider for all calls placed by inmate-detainees at the five county jails operated by the Riverside County Sheriff's Department. In addition to providing phone service to inmate-detainees, GTL agreed to provide and maintain a system whereby Sheriff's Department officials could monitor and record all telephone calls placed by inmate-detainees—including privileged conversations between inmates-detainees and their attorneys, licensed physicians, and religious advisors.

450.     Upon information and belief,  Defendant County of Riverside was offered—and specifically rejected—a feature provided by Defendant GTL that would automatically block the monitoring and recording of any calls placed to telephone numbers registered with the California State Bar Association as belonging to licensed attorneys. This demonstrates that Defendants were aware of their legal obligations pursuant to Penal Code §636 to refrain from unlawfully monitoring and recording privileged telephone conversations, but, instead, chose to knowingly, intelligently, intentionally, and deliberately deploy a telephone system that would clearly violate established legal rights of inmate-detainees.

451.     The Defendants instead implemented a policy of requiring individuals protected by Penal Code §636, such as attorneys, licensed physicians, and religious advisors, to take affirmative steps to register their telephone numbers with the Riverside County Sheriff's Department and GTL in order to have any calls placed to them designated as privileged and thus blocked from monitoring and recording. Not only does Penal Code §636 not require any affirmative steps be taken by a party to prevent their privileged conversations from being unlawfully monitored and recorded, but also such a policy was wholly inadequate as Defendants still possessed the ability to—at will—remove any telephone number previously designated as privileged and to continue unlawfully monitoring and recording privileged conversations without the knowledge and consent of the parties to the call. Such a policy was particularly unconscionable by lulling the affected parties into a false sense of security that their calls were safe, secure, and private, all the while Defendants continued to unlawfully and surreptitiously monitor and record their privileged conversations.

452.     To the extent that Defendants attempt to claim that they had specific consent—either implied or explicit—of the call parties to monitor and record the telephone conversations due to a posted or audio warning preceding each call—they are mistaken. California Civil Code §51.7(c)(1) provides that no person shall require

another to waive their legal right as a condition of entering into a contract for goods or services. Penal Code §636 creates a clearly established legal right of inmate-detainees to enjoy privileged conversations with their attorneys, physicians, and religious advisors without monitoring and recording. The substantial monetary fees paid to GTL by inmate-detainees and their called parties for telephone calls constitutes a utility service contract. Therefore, any requirement that call parties must waive their rights as protected by Penal Code §636 as a condition for entering into a contract for goods or services is a clear violation of Civil Code §51.7(c)(1) and is therefore unlawful.

453.    Upon information and belief, it is alleged that between March 13, 2009 and October 12, 2012, the time during which Plaintiff was initially detained within the county jails operated by the Riverside County Sheriff's Department, Defendants unlawfully monitored and recorded over 1,000 (one thousand) privileged conversations between Plaintiff and his attorneys, physicians, and religious advisors that took place during phone calls that occurred from within the county jails.

454.    It is further alleged that at no time did Plaintiff or any of the approximately three dozen parties called, who qualify as privileged under Penal Code §636, consent to the monitoring and recording of their private phone calls by Defendants.

455.    Upon information and belief, it is further alleged that the monitoring and recording of Plaintiff's privileged telephone conversations took place both before and after Plaintiff and his called parties specifically objected to their calls being monitored and recorded and took affirmative steps to prevent the monitoring and recording of their calls—such as registering their telephone numbers with Defendants as privileged and obtaining protective orders from the Superior Court.

456.    It is further alleged that individually named Defendants of the Sheriff's Department unlawfully disclosed the contents of Plaintiff's telephonic communications without lawful court order, in violation of Penal Code §637, by disseminating copies of Plaintiff's recorded calls to named Defendants at the District Attorney's Office on at least twenty-one (21) separate occasions as follows:

    A.    On or about May 21, 2009, one hundred fifty-seven (157) recordings were released by Defendants Reichle, Higuera, and Phillips to Defendants Pickowitz, Bishop, and DiMaria;

    B.    On or about June 11, 2009, one hundred ninety-six (196) recordings were released by Defendants Higuera and Reichle to Defendants Blanck and DiMaria;

C. On or about August 6, 2009, one hundred seven (107) recordings were released by Defendants Higuera and Reichle to Defendants Blanck and DiMaria;

D. On or about August 6, 2009, one hundred fifty-two (152) recordings were released by Defendants Higuera and Reichle to Defendants Blanck and DiMaria;

E. On or about August 13, 2009, one hundred twenty-one (121) recordings were released by Defendants Higuera and Reichle to Defendants Blanck, Bishop and DiMaria;

F. On or about August 21, 2009, twenty-one (21) recordings were released by Defendants Higuera and Reichle to Defendants Blanck and DiMaria;

G. On or about September 1, 2009, thirty (30) recordings were released by Defendants Backstrom and Higuera to Defendants Blanck and DiMaria;

H. On or about September 24, 2009, eighteen (18) recordings were released by Defendants Higuera and Reichle to Defendants Blanck and DiMaria;

I. On or about November 3, 2009, four hundred twelve (412) recordings were released by Defendants Higuera and Doe No. 1 to Defendants Jimenez and DiMaria;

J. On or about December 9, 2009, sixty-four (64) recordings were released by Defendants Higuera and Reichle to Defendants Blanck and DiMaria;

K. On or about February 16, 2010, one hundred six (106) recordings were released by Defendant Tesinsky to Defendants Blanck and DiMaria;

L. On or about February 22, 2010, one hundred fourteen (114) recordings were released by Defendants Higuera and Navarro to Defendants Blanck and DiMaria;

M. On or about April 29, 2010, ninety-six (96) recordings were released by Defendants Higuera and Tesinsky to Defendants Blanck and DiMaria;

N. On or about May 20, 2010, thirty-four (34) recordings were released by Defendants Higuera and Tesinsky to Defendants Blanck and DiMaria;

O. On or about November 15, 2010, sixty-five (65) recordings were released by Defendants Higuera and Tesinsky to Defendants Berakovich and DiMaria;

P.   On or about February 10, 2010, February 22, 2010, April 26, 2010, and May 18, 2010, an unknown quantity of recordings were released by Defendant Tesinsky to Defendants Blanck and DiMaria.

457.   It is further alleged that the dissemination of recordings of Plaintiff's telephonic conversations and their contents, as described above, occurred without a subpoena, search warrant, or other court order and was therefore unlawful. The offending Defendants disseminated Plaintiff's recorded calls pursuant to written requests utilizing the Sheriff's Department "Inmate Telephonic Monitoring System Recording Request Form." Such form clearly demonstrates the Sheriff's Department, under the supervision and management of Sheriff Stanley Sniff, created, implemented, and ratified a specific policy, practice, and procedure regarding the dissemination of recordings of telephonic communications of inmates while knowing that such a policy was in clear violation of Penal Code §§636 thru 637.

458.   In addition to the individually named Defendants of the Sheriff's Department who unlawfully disseminated Plaintiff's recorded telephonic communications to named Defendants of the District Attorney's Office, it is further alleged that Defendants DiMaria and Papanastasatos further disseminated a yet unknown quantity of said recordings to each of Plaintiff's five jointly-charged co-defendants in case no. INF064492. Such dissemination was deliberate, intentional, malicious, and with full knowledge of the unlawfulness of Defendants' actions.

459.   Plaintiff repeatedly objected to the unlawful monitoring and recording of his privileged telephone conversations and to the dissemination of his recorded calls to the other defendants and third-parties. Plaintiff and his called parties took affirmative steps—although not legally required—to prevent the unlawful monitoring and recording of their privileged conversations, including registering their telephone numbers with the Sheriff's Department as privileged, filing administrative grievances, obtaining court protective orders, and filing a civil action against Defendants. Despite Plaintiff's efforts, Defendants were un-detoured and continued their egregious and unlawful conduct in violation of Plaintiff's clearly established legal rights.

460.   Despite Plaintiff's repeated demands for the return of his unlawfully recorded telephonic communications, Defendants willfully refused to comply. Not until on or about June 25, 2020, did Defendants Kirk and Hightower finally turn over to the Superior Court—not Plaintiff—*some* of the compact discs contained an unspecified number of the unlawful recordings of Plaintiff's privileged telephonic conversations. Defendants failed

to apologize for the unlawful conduct and failed to explain why it took more than a decade to return *some* of the recordings, failed to detail who was provided copies, and what efforts were taken to retrieve all copies that were unlawfully disseminated.

461.    As a direct and proximate result of Defendants' intentional and unlawful actions, as detailed above, Plaintiff has been damaged in an amount in excess of the jurisdictional minimum of this Court. Plaintiff will seek leave to amend this claim to set forth the full amount and extent of damages when they can be more clearly ascertained or proven. Plaintiff has discovered that more than a **thousand privileged phone calls** were recorded by the Riverside County Sheriff's Department and GTL in violation of the law and subsequently disseminated to Defendant DDA DiMaria through her DA investigators, and several other third parties resulting in over ten thousand (10,000) individual violations of the statute, each one of them actionable. Pursuant to Penal Code §637.2(a), Plaintiff is entitled to recover from Defendants the greater of either **$5,000 per violation** or treble the actual damages suffered. As such, Plaintiff is entitled to more than **$50 million** in statutory damages.

462.    The actions of Defendants, as set forth above, were done intentionally, maliciously, and oppressively with the specific design to cause Plaintiff harm, and done by Defendants with the intent of depriving Plaintiff of his clearly established legal rights. Plaintiff is therefore entitled to exemplary and punitive damages against the named-Defendants and each of them.

**EIGHTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Government's Intentional Intrusion into the Attorney-Client Relationship in Violation of the Sixth and Fourteenth Amendments to the United States Constitution**

463.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

464.    The jail's practice of interfering with and recording attorney-client legal visits, denial of legal visits, recording privileged telephone calls, denial of inmate access to telephones, opening and photocopying privileged legal mail,  violated the Sixth and Fourteenth Amendment rights under the United States Constitution.

465.    Evidence Code 954 is the California statute that makes communications between attorneys and their clients privileged and confidential and guarantees the right of a client to share all relevant information with is attorney without worrying that it may be used against him in court.

466.    The evidentiary privilege against self-incrimination is also set forth in Section 15 of the California Constitution.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 95

467.    Denial of the Right to Counsel because of the denial of access to phones, legal mail tampering, and denial of legal visitation is a violation of the California State Constitution Article I and the California Civil Code §52.1  (Tom Bane Civil Rights Act).

468.    The Court of Appeals held that "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship, the right to counsel is sufficiently endangered to require reversal and a new trial." *Weatherford v. Bursey* (1977) 429 U.S. 545.

469.    The Court of Appeals also held that an inmate has the right to receive legal mail without government intrusion. *Nordstrom v. Ryan* (9th Cir. 2017) 856 F.3d 1265, 1271.

470.    The Riverside County Sheriff's Department intentionally interfered with Mr. Garcia's attorney-client contracts with Attorney Mario Rodriguez, Attorney Robin Sax, Attorney David Wright, Attorney Mark Pahor, paralegal Scott Karpf, Attorney Michael Goldstein, paralegal Chuck Spiteri, and Attorney John Russo.

471.    As a direct and proximate result of Defendants' actions, Plaintiff was denied his right to effective representation and right to assistance of counsel and has suffered these egregious violations of his constitutional rights.

## NINTH CAUSE OF ACTION
### Claim Under California State Law for Tortious Interference (Intentional Interference) with Attorney-Client Contracts

472.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

473.    The jail's practice of interfering with and recording attorney-client legal visits, denial of legal visits, recording privileged telephone calls, denial of inmate access to telephones, opening and photocopying privileged legal mail resulted in tortious interference between Plaintiff and his attorneys in violation of California law.

474.    Once a person has an attorney to represent him, the State must respect that he has representation. The rights to counsel and to appointed counsel at the preliminary examination are guaranteed not only by statute (Pen. Code §§859, 860, 987) but also by the Sixth and Fourteenth Amendments. *Coleman v. Alabama* (1970) 399 US 1. The right to counsel includes the right to the effective assistance of counsel at the preliminary examination. *People v. Coleman* (1988) 46 C3d 749, 773. It is an abuse of discretion, for the court to deny a motion to appoint particular counsel when the defendant's preference is timely made and based on a relationship of trust derived from

prior representation in related cases, and when no countervailing considerations have comparable weight. *People v Cole* (2004) 33 C4th 1158, 1179 (court not required to appoint private attorney who had earlier represented defendant while he was employed by Alternate Defense Counsel, because criteria not met); *People v Daniels* (1991) 52 C3d 815, 844 (court not required to appoint private attorney who had represented defendant in earlier case, because criteria not met); *Harris v Superior Court* (1977) 19 C3d 786, 799 (attorneys of defendants' choice ordered appointed because they met these criteria). Despite knowing that Mr. Garcia had hired attorneys to represent him, the Defendants were unrelenting in interfering with those relationships and contracts.

475.    Mr. Garcia entered into written fee agreement contracts with Attorneys Mario Rodriguez, Robin Sax, David Wright, Mark Pahor, Michael Goldstein, and John Russo. The Defendants knew that these contracts existed, and yet took affirmative steps to interfere with the parties' ability to perform their duties enumerated in the contracts and are therefore liable under California State law for tortious interference.

476.    The Riverside County Sheriff's Department intentionally interfered with Mr. Garcia's attorney-client contracts with Attorney Mario Rodriguez, Attorney Robin Sax, Attorney David Wright, Attorney Mark Pahor, paralegal Scott Karpf, Attorney Michael Goldstein, paralegal Chuck Spiteri, Attorney John Russo, and legal runner Amanda Rivera.

477.    The Defendants performed the above described acts under color of state law, deliberately, intentionally, with malice, and deliberate indifference to Mr. Garcia's clearly established constitutional rights.

478.    As a direct and proximate consequence of Defendants' actions, Mr. Garcia was denied the benefits of the terms and conditions of his attorney-client contracts, was denied his constitutional protected right to his privately retained counsel of choice, suffered substantial financial losses as a result of the breached contracts, and suffered the other grievous injuries and damages as set forth above.

**TENTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Denial of the Right to Privately Retained Counsel of Choice in Violation of the Sixth**
**Amendment to the United States Constitution**

479.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

480.    It is well established that enshrined within the Sixth Amendment to the United States Constitution is the qualified right of a criminal defendant to privately retain an attorney of his or her choice. See *Powell v. Alabama* (1932) 287 U.S. 45, 53 "[A] defendant should be afforded a fair opportunity to secure counsel of his own

choice."); see also *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 147-148 (right to choose counsel violated even if erroneously appointed counsel is effective because choice and quality of representation are distinct rights.

481.    The denial of a criminal defendant's right to choice of counsel creates "consequences that are necessarily unquantifiable and indeterminate" constituting structural error not subject to harmless error review. *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 149-150. Such structural errors, as opposed to trial errors, involve defects in the fundamental framework by which criminal trials assess guilt and "trigger automatic reversal because they undermine the fairness of a criminal proceeding as a whole." *United States v. Davila* (2013) 569 U.S. 597, 610-612.

482.    A criminal defendant's choice of counsel is a clearly established right under the United States Constitution and should have been reasonably known to each of the Defendants.

483.    Plaintiff had retained several private attorneys on March 9, 2009. Plaintiff entered into a verbal agreement with criminal defense attorney Mario Rodriguez to represent Plaintiff in the underlying criminal action filed in Riverside County in case no. INF064492. The same day, Mr. Rodriguez notified the Riverside County District Attorney's Office and Palm Springs Police Department that he represented Plaintiff Daniel Garcia.

484.    On March 16, 2009, Mr. Garcia and Mr. Rodriguez executed a written attorney-client retainer agreement and Mr. Rodriguez was paid the agreed upon retainer. The written attorney-client contract solidified the terms of representation as required by state law. See California Business and Professions Code §6148 requiring written attorney retainer agreements if fees and costs will exceed one-thousand dollars.

485.    On March 19, 2009, Mr. Rodriguez formally appeared in the criminal action as attorney of record for Mr. Garcia.

486.    On August 9, 2011, Mr. Garcia and Attorney Robin Sax executed a written attorney-client fee agreement and Ms. Sax was paid the agreed upon retainer.  The written attorney-client contract solidified the terms of representation as required by state law. California Business and Professions Code §6148, *supra*.

487.    The Defendants were aware of the contractual agreements between Mr. Garcia and his private attorneys and yet took affirmative steps to intentionally interfere with the performance of the conditions and terms enumerated therein.

488.    DiMaria, Sterling, and Pacheco, as well as the individually named Defendants of the Riverside County Sheriff's Department, were aware that attorney Mario Rodriguez and Robin Sax, respectively were

1    Plaintiff's retained counsel of choice; however, they engaged in a concerted effort with others yet unknown to

2    intentionally undermine the efficacy of Mr. Rodriguez' and Ms. Sax', respective representation and to interfere with

3    the attorney-client relationship.

4         489.    Various Defendants of the Riverside County Sheriff's Department frustrated efforts by Mr.

5    Garcia's attorneys to communicate with him by repeatedly moving him to different jails in order to delay or obstruct

6    legal visitation, denying legal visitations, opening legal mail, intercepting and copying written legal mail, and by

7    unlawfully monitoring and recording privileged conversations.

8         490.    Defendants further caused Mr. Garcia to not be transported to attend important court hearings

9    critical to the criminal proceedings thereby causing delays and forcing Mr. Rodriguez to make decisions without Mr.

10   Garcia's knowledge, presence, and consent.

11        491.    The Defendants' egregious misconduct of interfering with Mr. Garcia's attorney-client contracts

12   caused his relationships to sour and prevented effective representation.

13        492.    The Defendants performed the above described acts under color of state law, deliberately,

14   intentionally, with malice, and with deliberate indifference to Mr. Garcia's clearly established constitutional and

15   legal rights.

16        493.    As a direct and proximate consequence of Defendants' actions, Mr. Garcia was denied his

17   constitutionally protected right to his counsel of choice and suffered irreparable harm including unlawful and

18   prolonged incarceration for nearly twelve years, substantial financial losses, and other grievous injuries and

19   damages as set forth above.

20                       **ELEVENTH CAUSE OF ACTION**
                         **42 U.S.C. §1983 (Civil Rights Act)**
21   **Claim for the County of Riverside's Failure to Timely and Completely Pay for Court-Ordered Ancillary**
     **Defense Funds Thereby Denying Defendant Due Process and the Right to a Fair Trial in Violation of the**
22   **Fifth, Sixth, and Fourteenth Amendments to the United States Constitution**

23        494.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

24   herein, and further alleges as follows:

25        495.    The constitutional right to effective representation includes the right to have "reasonably

26   necessary ancillary defense services" paid for at public expense. *Corenesky v. Superior Court* (1984) 36 Cal.3d

27   307, 319. State statutes providing authority for requesting public funds for ancillary defense services include Penal

28   Code §987.2 (state funds for ancillary defense services), Penal Code §987.8(g)(1) (legal representation includes

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 99

1    ancillary services), and Evidence Code §730 (payment of court-appointed experts at county expense).

2        496.    The federal constitutional right to due process and a fair trial imposes an affirmative duty on the

3    state to assist indigent defendants from obtaining ancillary services such as experts necessary for presenting a full

4    and meaningful defense. See *Ake v. Oklahoma* (1985) 470 U.S. 68, 83 (due process requires defendant be given

5    access to experts at trial or sentencing furnished at state expense).

6        497.    Riverside County's Controller Paul Angulo failed to timely pay for defense investigators and

7    experts both during defendant's first trial as well as during preparation for the upcoming retrial proceedings. Failure

8    to timely pay investigators and defense experts violated defendant's right to due process and the right to a speedy

9    trial as delays in payment caused investigators and experts to have to stop work until they were paid again.

10   Following submission of invoices, it has taken months for the county to remit payment for defense investigators and

11   experts. Even though Judge Downing had authorized ancillary defense funds, the county comptroller's office and

12   court's executive office refused to honor the judge's orders and failed to pay several defense invoices **after** the

13   experts had already performed the work. For example, computer forensic expert Chris Pavan was never paid for over

14   $100K worth of work that he had performed pursuant to orders that had been issued by Judge Downing specifically

15   authorizing Pavan's work. As a consequence, Mr. Pavan was unwilling to assist Mr. Garcia in the retrial

16   proceedings, necessitating the hiring of a new computer forensic expert.

17       498.    Upon information and belief, during defendant's first trial, it took approximately three to five

18   months for defense investigators and expert witnesses to be paid.

19       499.    Upon information and belief, during the retrial proceedings in 2020 and 2021, it has taken

20   anywhere from six to twelve weeks to obtain **approval** for ancillary defense funds from the three-judge Pay Panel.

21   Then even after approval, it is taking several months for defense investigators and experts to receive payment from

22   Riverside County.

<div align="center">

**TWELFTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for Unlawful Search and Seizure**
**Pursuant to Warrants Issued without Probable Cause and Obtained by Judicial Deception in**
**Violation of the Fourth and Fourteenth Amendments to the United States Constitution**

</div>

26       500.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

27   herein, and further alleges as follows:

28       501.    The Fourth Amendment to the United States Constitution provides that: "The right of the people

to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. amend. IV.* The Fourth Amendment is applicable to state officials through the Due Process Clause of the Fourteenth Amendment. See *Wolf v. Colorado* (1949) 338 U.S. 25, 27-28, overruled on other grounds by *Mapp v. Ohio* (1961) 367 U.S. 643.

502.    Every search or seizure by a government agent must be reasonable, and the Fourth Amendment imposes a presumptive warrant requirement for search and seizures. *Katz v. United States* (1967) 389 U.S. 347, 357. The Fourth Amendment classifies a warrantless search or seizure as unreasonable unless it falls within a clearly recognized exception. *Missouri v. McNeely* (2013) 569 U.S. 141, 148.

503.    On March 9, 2009, Sacramento Police Detectives arrested Mr. Garcia inside a private residence. Mr. Garcia was taken into custody without incident and sat on an ottoman by the front door. Their sole objective was to arrest Mr. Garcia pursuant to an out-of-county arrest warrant. Despite having achieved their objective, the detectives failed to leave and instead remained inside the private residence for an additional 30 minutes while they conducted an extensive warrantless search of the entire home and its contents.

504.    The Sacramento Detectives searched every room in the residence including closed closets and drawers within the master bedroom, where Mr. Garcia was staying, and the detectives found numerous luggage on and around the bed. The Detectives asked Messrs. Garcia and Shahbazian to whom the property belonged and both men identified their respective pieces of property. Messrs. Garcia and Shahbazian also specifically objected to the detectives searching the contents of their luggage without a search warrant.

505.    Sacramento Detectives called the owner of the residence, Mr. Seitze, who confirmed that both Messrs. Garcia and Shahbazian were his invited overnight guests in his home. Mr. Seitze further confirmed that all the luggage found by detectives in the master bedroom belonged to Mr. Garcia and/or Mr. Shahbazian. At no time did Mr. Seitze give officers consent to search the contents of the luggage or ask that any of the property be removed from his home.

506.    As an overnight guest, Mr. Garcia had a reasonable expectation of privacy in his personal property within the private residence. At no time did Mr. Garcia abandon his property or waive his expectation of privacy. Mr. Garcia remained at all times adamantly opposed to the search and/or seizure of his personal property.

507.    See *United States v. Place* (1983) 462 US 696, 706-07. The Fourth Amendment protects against

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 101

1  governmental intrusions into "legitimate expectations of privacy" and persons possess legitimate privacy interests in

2  personal luggage. The *Place* Court found that the seizure of defendant's luggage was initially valid because police

3  reasonably suspected it contained "contraband or evidence of a crime." However, the Supreme Court ultimately

4  found that the seizure of luggage was not reasonable when the police detained it for ninety (90) minutes, moved it to

5  a different airport, and made misrepresentation to the defendant. The overriding factors are the diligence of the

6  police in conducting the investigation quickly and the use of *minimally intrusive* procedures.

7       508.    The Sacramento detectives nevertheless opened the closed pieces of luggage and searched their

8  contents. Inside of several pieces of luggage the detectives found various electronic devices including laptop

9  computers, cellular phones, and numerous hard drives. They then called Palm Springs Police Department Detective

10  Simon Min and told him what they had discovered during their unlawful search of Mr. Garcia's personal property.

11  Detective Min recognized the need to obtain a search warrant and asked that the Sacramento detectives remain on

12  the scene to secure the property while they sought the issuance of a search warrant from a local judge.

13       509.    Nevertheless, Sacramento Police Sergeant Gautier instructed the Sacramento detectives to simply

14  seize "anything they felt was of evidentiary value to the Palm Springs Police Department" including all of Mr.

15  Garcia's property **without a search warrant**. Sergeant Gautier stated that the Palm Springs Police Department

16  could obtain their own search warrant at a later time **post-seizure**. There was no justification for the warrantless

17  search and seizure of the property as the search occurred at 1:30 p.m. on a Monday afternoon when the Superior

18  Court was in session and a search warrant could have been obtained. There were no exigent circumstances justifying

19  the warrantless search.

20       510.    "In cases where the securing of a warrant is reasonably practicable, it must be used, and when

21  properly supported by affidavit and issued after judicial approval protects the seizing officer against a suit for

22  damages. In cases where seizure is impossible except without warrant, the seizing officer acts unlawfully and at his

23  peril unless he can show the court probable cause." *United States v. Kaplan*, 286 Fed. 963, 972. It is clear that

24  officers had sufficient opportunity to obtain a search warrant prior to the illegal seizure of Mr. Garcia's property, but

25  failed to do so—and instead Sacramento Police Officers illegally opened closed containers containing his personal

26  property, searched them, inventoried the contents, reported the contents to officers at Palm Springs Police

27  Department, and seized and held the items for Palm Springs Police Department. Such actions violate the Fourth and

28  Fourteenth Amendments.

511.     Palm Springs Police Detective Simon Min, then on March 12, 2009, obtained search warrant no. PSSW0004 *post-seizure* from the Honorable James A. Cox in Riverside Superior Court, but failed to inform the magistrate that the property had been *previously unlawfully* been seized. In support of the warrant, Detective Min further made material misstatements of fact in order to intentionally deceive the magistrate into believing that the property had somehow been abandoned and therefore Mr. Garcia had forfeited his reasonable expectation of privacy. In addition, the warrant and supporting affidavit did not particularly describe the items to be searched and seized nor their relevancy to the charged offenses, but merely made vague and ambiguous accusations against Mr. Garcia—therefore, the warrant was issued without probable cause in violation of Mr. Garcia's Fourth Amendment rights. Detective Min's obtaining a search warrant *post-seizure* violated Mr. Garcia's right to be free from unreasonable searches and seizures as protected under the Fourth Amendment to the United States Constitution.

512.     Defendants performed the above-described acts under color of state law while acting in their capacities as employees or agents of the City of Palm Springs and/or County of Riverside. The foregoing acts and omissions were deliberate, intentional, reckless, wanton, cruel, done in bad faith, and/or involved willful indifference to Mr. Garcia's legally protected rights. No reasonable officer in 2009 would have believed this conduct was lawful.

513.     As a direct and proximate result of Defendants' actions, Mr. Garcia was deprived of his Fourth Amendment right to privacy and to be secure from unreasonable and warrantless search and seizures. His property was seized and unlawfully disposed of.

### THIRTEENTH CAUSE OF ACTION
**California State Tort Claim for Trespass to Personal Property and Conversion
in Violation of Civil Code Sections 3336 and 3355**

514.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

515.     On March 9, 2009, Sacramento Police Detectives unlawfully seized Mr. Garcia's personal property inside of a private residence without a search warrant or other legal excuse. Detectives wrongfully took the property of Mr. Garcia and intentionally interfered with his lawful possession and enjoyment of said property. The Detectives' intentional meddling with Mr. Garcia's possessory interest by unlawfully taking and withholding his personal property constitutes the tort of trespass to personal property.

516.     In addition to unlawfully seizing Mr. Garcia's property, the Detectives intentionally, deliberately,

1  and willfully refused to return said property upon demand. On or about March 11, 2009, Mr. Garcia's power of

2  attorney contacted the Sacramento Police Department's evidence room to request the release and return of Mr.

3  Garcia's personal property. The Detectives claimed they had been asked by the District Attorney of Riverside

4  County—not to release the property to Mr. Garcia. There was no valid court order authorizing the continued

5  retention of the property or other legal prohibition to releasing the property back to Mr. Garcia via his duly

6  appointed agent. The wrongful retention of Mr. Garcia's personal property constitutes the tort of conversion.

7       517.      On or about March 17, 2009, the Sacramento Police did knowingly and intentionally convert Mr.

8  Garcia's personal property by transferring it to the custody of the Palm Springs Police Department Detective Frank

9  Browning with the intent to permanently deprive Mr. Garcia of the possession and use of his personal property.

10       518.      Despite repeated demands from Mr. Garcia, both the Riverside County District Attorney's Office

11  and the Palm Springs Police Department have refused to return any of the personal property unlawfully taken from

12  Mr. Garcia. They have also failed to compensate Mr. Garcia for the replacement value of the property. The

13  continued wrongful retention of Mr. Garcia's unlawfully seized personal property constitutes the tort of conversion.

14       519.      Amongst the property wrongfully taken from Mr. Garcia was over $2,000 (two thousand dollars)

15  in U.S. currency, several pieces of Louis Vuitton luggage, a laptop computer, various electronic devices and

16  accessories, jewelry, a platinum Mont Blanc pen, assorted clothing and personal effects, his U.S. passport, and

17  other small bags. The approximate full replacement value for these items taken is $35,000 (thirty-five thousand

18  U.S. dollars).

19       520.      In addition to the physical property taken, the Defendants also deprived Mr. Garcia of the

20  voluminous electronic records and data contained on the various electronic storage devices. Approximately 8TB

21  (eight terabytes) of data were taken including irreplaceable records such as thousands of personal pictures and

22  documents from throughout Mr. Garcia's life. Additionally, all of the business records pertaining to Mr. Garcia's

23  proprietary technology called *The Hydra Project*, including the design, schematics, white paper, source code,

24  results of experiments, results of the alpha and beta testing, business plan and financial prospectus, were all

25  wrongfully taken and retained by Defendants constituting a further tort for conversion.

26       521.      As a consequence of Defendants' wrongful actions, Mr. Garcia was prevented from pursuing

27  lucrative contracts to license his innovative technology causing him substantial financial losses. A similar, but less

28  effective, system to Mr. Garcia's *The Hydra Project* developed by technology entrepreneur Hank Asher, came at a

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 104

reported cost of over $100 million to develop and was sold for $775 million in 2013. Other ventures backed by private companies and governmental agencies alike have also come at substantial costs with limited success. Given the tremendous success of *The Hydra Project* at effectively detecting and tracking illicit file types such as child pornography, terrorist materials, and pirated content, it would have likely become a dominant force in the marketplace had Mr. Garcia been able to continue its development. However, due to Defendant's actions, Mr. Garcia, via his surrogates, was unable to license or sell *The Hydra Project*'s technology.

522.    Defendants performed the above described acts under color of state law, deliberately, intentionally, with malice, and deliberate indifference to Mr. Garcia's clearly established constitutional and legal rights. No reasonable officer or prosecutor would have believed this conduct was lawful.

523.    As a direct and proximate result of the wrongful acts of Defendants as described above, Plaintiff has suffered special damages in excess of $100,000,000 (one-hundred million dollars) and general damages of $20,000,000 (twenty-million dollars).

<div align="center">

**FOURTEENTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for Bad Faith Spoilation of Relevant and Possibly Exculpatory Evidence by Government Officials in Violation of the Right to Due Process and a Fair Trial Under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution**

</div>

524.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

525.    A defendant's due process right to the preservation of evidence is violated if the police: 1) fail to preserve evidence that is apparently exculpatory; or 2) act in bad faith by failing to preserve evidence that is potentially exculpatory. *Arizona v. Youngblood* (1988) 488 U.S. 51.

526.    The right to the preservation of evidence or its production at trial stems from the individual's right to procedural due process as guaranteed by the Fifth and Fourteenth Amendments of the federal Constitution. *California v. Trombetta* (1984) 467 U.S. 479. ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing motions of fundamental fairness.")

527.    DDA Lisa DiMaria authorized the victim's car to be released from impound back to the victim's estate without any notice to the defense. The vehicle was subsequently sold to an unknown buyer before the defense was informed thus resulting in the defense's inability to have forensic experts perform an analysis of the vehicle for blood or DNA evidence. As a result, the prosecution deprived the defense of the ability to perform their

own analysis and resulted in bad faith spoilation of evidence.

528.      DDA Lisa DiMaria also authorized the sale of the victim's home and lifting of the crime scene hold without any prior notice to the defense after having already been previously informed by the defense that defense experts intended to perform their own forensic analysis of the alleged crime scene by the defense's blood expert. As a result, the prosecution deprived the defense of the ability to perform their own analysis and resulted in bad faith spoilation of evidence.

529.      The relevancy of the evidence from both the victim's house and car was obvious as the prosecution's theory of the case was that the victim Mr. Lambert had been brutally murdered and that potential blood or DNA evidence may have been present. However, because of the loss of both items due to the bad faith failure of the prosecution to preserve them, and failure of the prosecution to provide adequate notice of their impending sale and destruction of the evidence to the defense, Mr. Garcia was unable to have his own forensic experts analyze these vital pieces of evidence thereby prejudicing Mr. Garcia's defense.

530.      As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

## FIFTEENTH CAUSE OF ACTION
### 42 U.S.C. §1983 (Civil Rights Act)
**Claim for the Denial of Due Process and Equal Protection Due to the Prosecutor's Abuse of Power in Maliciously Prosecuting Plaintiff Garcia in Violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution**

531.      Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

532.      The Supreme Court held in *Berger v. United States* that a prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done…while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States* (1935) 295 U.S. 78, 88.

533.      The Supreme Court in *Darden v. Wainwright*, noted the proper standard to evaluate whether a prosecutor's comments require reversal, "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright* (1986) 477 U.S. 168, 181.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 106

534.     "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort. . . .[F]or an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'" *Bordenkircher v. Hayes* (1978) 434 U.S. 357, 363.

535.     The Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution require that criminal prosecutors be neutral and objective. It is a violation of the Due Process Clause for criminal prosecutors to have a personal, financial stake in the cases they prosecute. *Marshall v. Jerrico Inc.* (1980) 446 U.S. 238, 249-50 (A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions.)

536.     Each of the named Defendant prosecutors of the Riverside County District Attorney's Office involved with or assigned to prosecute Mr. Garcia's criminal case and related habeas corpus petition had, and continue to have, a substantial personal, professional, and/or financial interest in the outcome of those proceedings.

537.     Throughout the duration of the criminal prosecution of Mr. Garcia, both law enforcement and the prosecution became aware of evidence proving Mr. Garcia's innocence, yet the assigned prosecutor DDA Lisa DiMaria, under the direction and supervision of Defendants Pacheco, Sterling, Zellerbach, and Hestrin, continued to maliciously prosecute Mr. Garcia. It is abundantly clear that the malicious prosecution was directly motivated by the personal, financial, professional, and legal interests of prosecutor DiMaria and the other prosecutorial defendants.

538.     Even after Mr. Garcia successfully appealed to have his entire conviction reversed, the Riverside County District Attorney's Office continues to maliciously prosecute Mr. Garcia for no legitimate reason, but rather to advance their own personal goals. Defendants are concerned about the substantial legal and financial liability they face for wrongfully prosecuting and convicting Mr. Garcia, and therefore, seek to reconvict him in order to minimize their own liabilities.

539.     As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to due process and equal protection under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

**SIXTEENTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Selective and Discriminatory Prosecution Based on Sexuality in Violation of Equal Protection Standards of the Fourteenth Amendment to the United States Constitution**

540.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

541.     The District Attorney of Riverside County prosecuted the five homosexual defendants including plaintiff Daniel Carlos Garcia for greater crimes despite lesser culpability while only offering a plea bargain to the single heterosexual defendant, Craig Anthony McCarthy, for a lesser punishment and lesser charges despite his greater culpability which is unlawful.

542.     As a direct and proximate result of Defendants' actions, Mr. Garcia was denied equal protection under the Fourteenth Amendment to the United States Constitution.

**SEVENTEENTH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to Civil Code §52.1  (Tom Bane Civil Rights Act) for Selective and Discriminatory Prosecution Based on Sexuality in Violation of the California State Constitution**

543.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

544.     The District Attorney of Riverside County prosecuted the five homosexual defendants including plaintiff Daniel Carlos Garcia for greater crimes despite lesser culpability while only offering a plea bargain to the single heterosexual defendant, Craig Anthony McCarthy, for a lesser punishment and lesser charges despite his greater culpability which is unlawful.

545.     As a direct and proximate result of Defendants' actions, Mr. Garcia was denied equal protection under California State Law.

**EIGHTEENTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Deprivation of Personal Liberty Without Due Process of Law and Denial of the Right to a Fair Trial in Violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution**

546.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

547.     DDA DiMaria's repeated and egregious misconduct included her ex parte communications with the trial court, conspiring with Judge Downing to rig the trial in favor of the prosecution, making misleading and deceptive statements to the court and to the jury, and acting in bad faith.

548.     As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to due

process of law and a fair trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

### NINETEENTH CAUSE OF ACTION
### 42 U.S.C. §1983 (Civil Rights Act)
### Claim for the Denial of the Right to a Fair Trial Before an Unbiased Judge in Violation of the Sixth and Fourteenth Amendments to the United States Constitution

549.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

550.    The Supreme Court held in *Tumey v. Ohio* that Tumey's conviction violated the Fourteenth Amendment, reasoning that it "deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." *Tumey v. Ohio* (1927) 273 U.S. 510.

551.    *In re Murchison* the Supreme Court said, "[d]ue process guarantees 'an absence of actual bias' on the part of a judge." In assessing that bias, "[t]he Court asks whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is 'likely' to be neutral, or whether ther is an unconstitutional 'potential for bias.'" The Court further held that the same person could not be both accuser and adjudicator without their being the potential for bias. *In re Murchison* (1955) 349 U.S. 133, 136-139.

552.    In *Williams v. Pennsylvania* the Supreme Court found that a judge was obligated to recuse himself where he had "significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Williams v. Pennsylvania* (2016) 136 S. Ct. 1899, 1904-1907.

553.    Judge Downing was undeniably biased against Mr. Garcia and his codefendants as evidenced in the court recess recordings where Judge Downing repeatedly makes disparaging remarks about the defendants, states that he is going to rig the trial against them, and all of Judge Downing's subsequent rulings clearly demonstrate that he was biased against the defendants.

554.    Further, Judge Downing's warrantless seizure of Mr. Garcia's privately purchased hard drives and electronic client file further demonstrate Judge Downing's bias against Mr. Garcia as he failed to hold any hearings on the matter and solely acted as both accuser and adjudicator in seizing Mr. Garcia's property and trying to directly interfere with his appellate rights by refusing to return either following the conclusion of the trial proceedings. Rather than recusing himself from making decisions on the return of Mr. Garcia's property, where he clearly had a personal interest in the outcome, Judge Downing unilaterally seized Mr. Garcia's property and failed

1    to return demonstrating his bias and violating Mr. Garcia's due process rights.

2        555.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to a fair

3    trial before and impartial and unbiased judge in violation of the Sixth and Fourteenth Amendments to the United

4    States Constitution.

5                      **TWENTIETH CAUSE OF ACTION**
     **Claim Under California State Law for Improper Ex Parte Communications Between the Prosecution and**
6    **Trial Judge and Judicial Officers in Violation of the Right to a Fair Trial Under**
                   **the California and United States Constitutions**

7        556.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

8    herein, and further alleges as follows:

9        557.    Under California Rules of Professional Conduct Rule 3.5:

10       (b) Unless permitted to do so by law, an applicable code of judicial ethics or code of judicial
         conduct, a rule or ruling of a tribunal, or a court order, a lawyer shall not directly or indirectly
11       communicate with or argue to a judge or judicial officer upon the merits of a contested matter
         pending before the judge or judicial officer, except: (1) in open court; (2) with the consent of all
12       other counsel and any unrepresented parties in the matter; (3) in the presence of all other counsel
         and any unrepresented parties in the matter; (4) in writing with a copy thereof furnished to all
13       other counsel and any unrepresented parties in the matter; or (5) in ex parte matters.

14       558.    Under the California Code of Judicial Ethics Canon 3B(7):

15       A judge shall accord to every person who has a legal interest in a proceeding, or that person's
         lawyer, the full right to be heard according to law. Unless otherwise authorized by law, a judge
16       shall not independently investigate facts in a proceeding and shall consider only the evidence
         presented or facts that may be properly judicially noticed. This prohibition extends to information
17       available in all media, including electronic. A judge shall not initiate, permit, or consider ex parte
         communications, that is, any communications to or from the judge outside the presence of the
18       parties concerning a pending* or impending* proceeding, and shall make reasonable efforts to
         avoid such communications, except as follows:

19       (a) Except as stated below, a judge may consult with other judges. A judge presiding over a case
20       shall not engage in discussions about that case with a judge who has previously been disqualified
         from hearing that case; likewise, a judge who knows he or she is or would be disqualified from
21       hearing a case shall not discuss that matter with the judge assigned to the case. A judge also shall
         not engage in discussions with a judge who may participate in appellate review of the matter, nor
22       shall a judge who may participate in appellate review of a matter engage in discussions with the
         judge presiding over the case A judge may consult with court personnel or others authorized by
23       law, as long as the communication relates to that person's duty to aid the judge in carrying out
         the judge's adjudicative responsibilities.

24       In any discussion with judges or court personnel, a judge shall make reasonable efforts to avoid
         receiving factual information that is not part of the record or an evaluation of that factual
25       information. In such consultations, the judge shall not abrogate the responsibility personally to
         decide the matter.

26       For purposes of Canon 3B(7)(a), "court personnel" includes bailiffs, court reporters, court
27       externs, research attorneys, courtroom clerks, and other employees of the court, but does not
         include the lawyers in a proceeding before a judge, persons who are appointed by the court to
28       serve in some capacity in a proceeding, or employees of other governmental entities, such as
         lawyers, social workers, or representatives of the probation department.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 110

559.     Private conversations repeatedly occurred between Judge Downing, his courtroom staff, and the prosecution during mid-day courtroom recesses and lunch breaks as evidenced by at least several dozen of the court recess recordings. It is unknown how many other times this may have occurred, as the mid-day court recesses and lunch breaks are the only times where the court and prosecution were caught.

560.     As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to a fair trial before an impartial and unbiased judge in violation of the California and United States Constitutions.

### TWENTY-FIRST CAUSE OF ACTION
**Claim Under California State Law Pursuant to Civil Code §44 for Slander and Defamation of Character for Derogatory Statements Made by the Defendants for Personal Reasons Not Under Color of State Law**

561.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

562.     The freedom of speech guaranteed by the First Amendment is not absolute. The courts are required to balance the vital guarantee of free speech against other pervasive and strong social interests, including society's interests in preventing and redressing attacks on reputation.

563.     Under California Civil Code §44, defamation can be effected by either libel or slander. California Civil Code §45 defines libel as "false and unprivileged publication by writing printing, picture, effigy or other fixed representation to the eye, which exposes any person to contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation. Slander is governed by California Civil Code §46, and includes spoken words, transitory gestures or any form of communication other than those which constitute libel.

564.     See *Naffe v. Frey* (9th Cir. 2015) 789 F. 3d 1030, 1036-1037 where the Court held that in claims related to a claim under 42 U.S.C. Section 1983, must be related in a meaningful way to the person's governmental status or the performance of his job duties.

565.     In June 2012, Plaintiff discovered that his court-issued laptop computer had recorded off-the-record conversations that occurred during lunch breaks in the public courtroom. A review of the recordings revealed that Defendants Downing, Hinos, DiMaria, Sterling, Sultan, Runyon, and other persons whose identities are presently unknown, engaged in highly inappropriate conversations in which they defamed Plaintiff.

566.     The Defendants knowingly made false statements of fact about Plaintiff.

567.     The statements were understood as being about Plaintiff who was referred to by name and

1   intended to harm Plaintiff's reputation.

2        568.    The statements were published to at least one other person, other than Plaintiff, and subjected

3   Plaintiff to contempt, ridicule, or hatred.

4        569.    Many of the false statements made by Defendants were slanderous *per se* such as falsely

5   claiming Plaintiff had committed serious crimes.

6        570.    The statements made by Defendants occurred during court recesses and lunchtime breaks in the

7   judicial proceedings and were not made in the course of the Defendants' officials duties. Because the statements

8   were made by Defendants in their individual capacity, and not under the color of state law pursuant to their official

9   duties, they do not enjoy absolute immunity from liability for their defamatory statements.

10       571.    Plaintiff is entitled to general damages to compensate him for non-specified harms such as

11  disgrace, or dishonor in the eyes of the community, humiliation, injured reputation, and emotional distress.

12       572.    Plaintiff is also entitled to special damages for any and all economic and monetary losses that

13  resulted from the Defendants' slanderous statements.

14       573.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to a fair

15  trial in violation of the California and United States Constitutions.

16                          **TWENTY-SECOND CAUSE OF ACTION**
                            **42 U.S.C. §1983 (Civil Rights Act)**
17  **Claim for the Denial of the Right to Confrontation to Cross-Examine Codefendant Kaushal Niroula in**
                **Violation of the Sixth Amendment to the United States Constitution**

18       574.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

19  herein, and further alleges as follows:

20       575.    The Supreme Court held in *Bruton v. United States* that a Bruton was substantially prejudiced

21  against because of the high risk that the jury considered his codefendant's confession when deciding Bruton's guilt.

22  Admitting the codefendant's confession into evidence violated Bruton's Sixth Amendment right to cross-

23  examination. *Bruton v. United States* (1968) 391 U.S. 123, 137.

24       576.    The Court of Appeal undoubtedly found that Mr. Garcia's Sixth Amendment right to cross-

25  examine codefendant Kaushal Niroula was in fact violated. The Court of Appeal agreed that the Superior Court had

26  erred in denying Mr. Garcia his right to confront and cross-examine codefendant Kaushal Niroula. The Court of

27  Appeal in their decision stated:

28       [W]e consider whether the trial court's action violated Garcia's Sixth Amendment right of confrontation.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 112

As explained ante, a primary interest secured by the confrontation clause is a defendant's right to cross-examine witnesses against him (Davis v. Alaska (1974) 415 U.S. 308, 315.) Niroula refused to answer Garcia's questions. Because Garcia was unable to cross-examine Niroula, we conclude Garcia's right of confrontation was violated.
Court E057519, pg. 30.

The Court of Appeal then went onto comment that none of Niroula's potential motives provided any sound reason for the trial court to not strike his entire testimony for failing to answer Garcia's questions during direct examination and that the trial court erred by failing to strike his testimony.

577.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to a fair trial in violation of the Sixth Amendment to the United States Constitution.

**TWENTY-THIRD CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Denial of the Right to Compel the Testimony of Witnesses at Criminal Trial Due to the Prosecution's Dissuading Witnesses from Attending Trial in Violation of the Sixth and Fourteenth Amendments to the United States Constitution**

578.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

579.    In *Washington v. Texas*, the US Supreme Court held that the Compulsory Process Clause of the Sixth Amendment to the United States Constitution guaranteeing the right of a criminal defendant to force the attendance of witnesses for their side at trial is applicable in state courts as well as federal courts. The Supreme Court reasoned that the Due Process Clause of the Fourteenth Amendment made the right to be able to compel defense witnesses to testify necessary for a defendant's Due Process rights to fair proceedings which applies to the states. *Washington v. Texas* (1967) 388 U.S. 14, 17-18.

580.    DDA Lisa DiMaria dissuaded two key defense witnesses from testifying on behalf of the defense. The Riverside District Attorney's Office filed perjury charges against Bryant Guerrero thereby preventing him from testifying on behalf of the defense that prosecution witness Craig Anthony McCarthy had lied about the events involving the alleged murder of Clifford Lambert and that Mr. McCarthy had recounted information about his lies to Mr. Guerrero.

581.    DDA DiMaria also dissuaded key defense prosecution witness retired San Francisco Police Department Inspector Gregory Ovanessian from testifying in Mr. Garcia's trial by calling him and falsely telling him that he had been recused by the court and that he had been relieved from testifying and no longer needed to appear. Mr. Ovanessian prepared and signed a notarized declaration that was filed with Plaintiff's habeas corpus

1   petition which included a claim of prosecutorial misconduct for witness dissuasion which was ignored and not

2   ruled upon by Judge Gunn in the Riverside County Superior Court.

3        582.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to a fair

4   trial in violation of the Sixth and Fourteenth Amendments to the United States Constitutions.

**TWENTY-FOURTH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to California Civil Code §52.1 (Tom Bane Civil Rights Act) for the Prosecution Criminally Dissuading Defense Witnesses from Testifying in Violation of Penal Code §133 and the Sixth Amendment to the United States Constitution**

7        583.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

8   herein, and further alleges as follows:

9        584.    The Confrontation Clause found in the Sixth Amendment provides that "in all criminal

10   prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him."

11        585.    Article I, §15 of the California Constitution, a criminal defendant has the right to be "personally

12   present with counsel, and to be confronted with the witnesses against the defendant."

13        586.    California Penal Code §133 states:

14        Every person who practices any fraud or deceit, or knowingly makes or exhibits any false statement,
15   representation, token, or writing, to any witness or person about to be called as a witness upon any trial,
proceeding, inquiry, or investigation whatever, authorized by law, with intent to affect the testimony of
16   such witness, is guilty of a misdemeanor.

17        587.    DDA Lisa DiMaria dissuaded two key defense witnesses from testifying on behalf of the defense.

18   The Riverside District Attorney's Office filed perjury charges against Bryant Guerrero thereby preventing him

19   from testifying on behalf of the defense that prosecution witness Craig Anthony McCarthy had lied about the

20   events involving the alleged murder of Clifford Lambert and that Mr. McCarthy had recounted information about

21   his lies to Mr. Guerrero.

22        588.    DDA DiMaria also dissuaded key defense prosecution witness retired San Francisco Police

23   Department Inspector Gregory Ovanessian from testifying in Mr. Garcia's trial by calling him and falsely telling

24   him that he had been recused by the court and that he had been relieved from testifying and no longer needed to

25   appear. Mr. Ovanessian prepared and signed a notarized declaration that was filed with Plaintiff's habeas corpus

26   petition which included a claim of prosecutorial misconduct for witness dissuasion which was ignored and not

27   ruled upon by Judge Gunn in the Riverside County Superior Court.

     589.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to a fair

28   trial in violation of California Penal Code §133 and the Sixth Amendment  to the United States Constitution.

1

**TWENTY-FIFTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**

2

**Claim for Denial of the Right to Due Process and a Fair Trial as a Result of the Prosecution's Knowing Introduction of False Evidence and False Testimony and Failure to Correct the Record in Violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution**

3

4

590.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

5

herein, and further alleges as follows:

6

591.    The prosecution knowingly used false testimony from jailhouse informant Arthur Soliz Jimenez

7

despite knowing that his testimony was false and contradicted by both his earlier statements as well as other

8

witness statements. Mr. Jimenez testified that Mr. Garcia had placed a "hit" on him and that he was attacked as a

9

result by inmate Albert Farrar. However, the prosecution at the time of Mr. Jimenez' testimony knew this

10

information to be blatantly false even before they made these allegations in open court, based on both Mr. Jimenez'

11

statements made to Riverside County Sheriff's Department Investigators and documented in their reports as to the

12

cause of his altercation with Mr. Farrar, as well as from earlier interview conducted by DDA DiMaria of Mr. Farrar

13

who was the assailant who told them that the altercation between the two of them was a "personal matter" over a

14

stolen jar of coffee and had nothing to do with Mr. Garcia or this case.

15

592.    No evidence was ever presented by the prosecution showing that Mr. Garcia had ever made any

16

payment of any type to Mr. Farrar despite the prosecution continuing to repeat Mr. Jimenez' false statements.

17

593.    Despite all this evidence to the contrary, the prosecution continued to repeat the lie regarding the

18

alleged "hit" against Mr. Jimenez by assailant Albert Farrar and did nothing to correct the record with the court or

19

to even point out the serious inconsistencies between Mr. Jimenez' earlier statements and his later court testimony.

20

The prosecution was aware and had this information since April 2009 regarding the altercation between Mr.

21

Jimenez and Mr. Farrar before Mr. Jimenez had even been disclosed as a prosecution witness.

22

594.    Further, the prosecution failed to notify the Court of Appeal to correct the record regarding this

23

false accusation made against Mr. Garcia.

24

595.    During Mr. Garcia's habeas corpus proceedings before the Riverside Superior Court, DDA Alan

25

Tate continued to make false allegations against Mr. Garcia to the court on the record and in their pleadings that

26

Mr. Garcia had "put a $10,000 hit" on prosecution witness Mr. Jimenez, despite the prosecutor knowing that this

27

statement was blatantly false and untrue based on both Mr. Jimenez's and Mr. Farrar's earlier statements to DDA

28

DiMaria and senior DA investigators that the altercation between Farrar and Jimenez was about a stolen jar of

1    coffee and had nothing to do with the prosecution's case against Mr. Garcia.

2        596.    The prosecution knowingly used codefendant Craig Anthony McCarthy's testimony which was

3    known by the Prosecution to be false in Mr. Garcia's first trial. Numerous witnesses have come forward both

4    before and after the trial stating that Mr. McCarthy told them that he had lied during the first trial and that his trial

5    testimony is inconsistent with the facts of what actually occurred the night that Mr. McCarthy, Mr. Bustamante,

6    and Mr. Niroula were in Mr. Lambert's home and the circumstances surround Mr. Lambert's alleged death.

7        597.    After completion of the trial, when Mr. McCarthy attempted to recant his testimony and correct

8    his false testimony, the prosecution ignored Mr. McCarthy's attempts to recant and proceeded to continue to

9    sentence Mr. Garcia and his codefendants and failed to notify the court.

10       598.    The prosecution knowingly used false text messages and electronic evidence taken from the

11   seized Apple laptop computer that they knew to be forged, false or altered and still sought to introduce these items

12   into evidence despite their lack of foundation and lack of veracity.

13       599.    Defendants knowingly failed to disclose required information critical to the defense and failed to

14   correct false testimony when they were aware that witnesses had lied under oath. *Napue v. Illinois* (1959) 360 U.S.

15   264, 269 (addressing government's obligation to disclose when government witnesses lie under oath); *Giglio v.*

16   *United States* (1972) 405 U.S. 150, 152-155 (addressing government's obligation to correct false testimony

17   regardless of whether trial prosecutor is aware when prior prosecutor was aware testimony was false). See also

18   *United States v. Agurs* (1976) 427 U.S. 97 (addressing government's obligation to disclose without a request).

19       600.    The prosecution team for the retrial, DDA Hightower and DDA Kirk, failed to disclose that Mr.

20   McCarthy had committed perjury and continued to proceed on charges to bring Mr. Garcia to trial even despite

21   learning from their August 2020 in-person interview of Mr. McCarthy where Mr. McCarthy admitted to

22   committing perjury and stated that he had gone along with Detective Browning's lead and the prosecution's theory

23   of the case, despite knowing of inaccuracies, falsehoods, and misstatements. Even after DDA Hightower and DDA

24   Kirk became aware during their August 2020 interview that Mr. McCarthy had committed perjury and that his

25   statements showed that the prosecution's previous theory of the case was not true and no longer substantiated, they

26   failed to correct the record, they failed to notify defendants of Mr. McCarthy's perjured testimony, and the

27   prosecution continued to list Mr. McCarthy as a prosecution witness.

28       601.    Additionally, DDA DiMaria knowingly told Judge Hopp on the record that all defendants in the

1  case had consented to revised restitution amounts when they had not and argued that the court did not need to

2  transport defendants to the hearing and could make a ruling without them or their counsel being present in court.

3      602.    At no time did the prosecution seek to notify the Court of Appeal or to correct the official court

4  record in any of the proceedings of the previous misstatements of facts and errors in the record.

5      603.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied the right to due

6  process and the right to a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States

7  Constitution.

8                          **TWENTY-SIXTH CAUSE OF ACTION**
                            **42 U.S.C. §1983 (Civil Rights Act)**
9  **Claim for the Denial of Due Process and a Fair Trial by Prosecutorial Misconduct and Improper Comments
   in Violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution**

10     604.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

11  herein, and further alleges as follows:

12     605.    A prosecutor's duty in a criminal prosecution is to seek justice. (See *Berger v. United States*

13  (1935) 295 U.S. 78, 88.) Therefore, a prosecutor should prosecute with "earnestness and vigor" but may not use

14  "improper methods calculated to produce a wrongful conviction." (*Id.*) Prosecutorial misconduct justifies reversing

15  a conviction only where it  "so infected the trial with unfairness as to make the resulting conviction a denial of due

16  process." *Darden v. Wainwright* (1980) 477 U.S. 168, 181 (quoting *Donnelly v. DeChristoforo* (1974) 416 U.S.

17  637, 643.). A claim of prosecutorial misconduct that, taken in the context of the trial as a whole, violated the

18  defendant's due process rights. See, e.g., *United States v. Plascencia-Orozco* (9th Cir. 2017) 852 F.3d 910, 926-27.

19     606.    Although the line between proper and improper advocacy is not always clear, courts have

20  consistently found certain types of prosecutorial conduct improper. A prosecutor may not express personal opinions

21  about the defendant's guilt or credibility and must avoid epithets or other remarks regarding the defendant's

22  character, the defendant's counsel, or the defendant's witnesses. Nor may a prosecutor express opinions about

23  matters requiring personal experience or expert knowledge. A prosecutor may not vouch for the credibility of

24  government witnesses or allude to his or her own personal integrity or oath of office to bolster the government's

25  case. In addition, a prosecutor may not appeal to jurors to act as a conscience for the community or make other

26  remarks likely to inflame the passions of the jurors if the remarks are intended to lead to a conviction for an

27  improper reason.

28     607.    During Mr. Garcia's 2012 criminal trial, Deputy District Attorney Lisa DiMaria's inappropriate

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 117

1    comments throughout the entire trial ran the full gambit of every conceivable kind of misconduct. Some of her

2    improper statements included the following:

3        a.   DDA DiMaria repeatedly expressed her personal opinion about Mr. Garcia's guilt and

4             credibility of his defense. See, e.g., *United States v. Brown* (D.C. Cir. 2007) 508 F.3d 1066,

5             1076 (prosecutor's statements regarding defendant's guilt improper because implied personal

6             belief).

7        b.   She further compared Mr. Garcia to Charles Manson whose cult of followers committed mass

8             murder. See e.g., *United States v. Burden* (2d Cir. 2010) 600 F.3d 204, 221-22 (prosecutor's

9             comparison between al-Qaeda and defendant's organization improper).

10       c.   DDA DiMaria called Mr. Garcia and his codefendants "a pack of vultures who picked the

11            victim's estate clean", and called Mr. Garcia a "punk", "snot-nosed brat", a "con man", and

12            other derogatory and inflammatory terms. See, e.g., *Hein v. Sullivan* (9th Cir. 2010) 601 F.3d

13            897, 913 (prosecutor's statements that defendants were "a pack of wolves" and calling a

14            defendant "little punk" improper).

15       d.   DDA DiMaria also claimed that Mr. Garcia was a fugitive at the time of his arrest when he

16            was, in fact, arrested only a few blocks away from his apartment, one week after the issuance

17            of the arrest warrant, and while remaining in constant contact with police while his attorney

18            prepared for a voluntary surrender. *United States v. Goodwin* (5th Cir. 1974) 492 F.2d 1141,

19            1147 (prosecutor calling defendant a "fugitive" improper).

20       e.   DDA DiMaria also attacked Mr. Garcia's mental health referring to him as a "sociopath"

21            when his mental health was not at issue and he had never been diagnosed with sociopathy.

22       f.   DDA DiMaria also commented on Mr. Garcia's failure to present evidence of his innocence,

23            although not legally required, and mocked his failure to present the testimony of San

24            Francisco Police Inspector Gregory Ovanessian whom she had dissuaded from testifying.

25       g.   DDA DiMaria also showed the jury her official badge and stated that if Mr. Garcia was

26            innocent, she would have to "ring her hands" and ask that the charges be dismissed. See, e.g.

27            *Cargle v. Mullin* (10th Cir. 2003) 317 F.3d 1196, 1218 (prosecutor's remark that state does

28            not prosecute innocent people improper).

h.    During her closing remarks, DDA DiMaria told the members of the jury that Mr. Garcia was attempting to con them and that they could choose not to be "victims" by convicting Mr. Garcia on all counts. See, e.g. *United States v. Barragan* (9th Cir. 2017) 871 F.3d. 689, 707-08.

608.    DDA DiMaria's inappropriate comments and behavior throughout the trial infected the proceedings with such unfairness that the resulting conviction violated Mr. Garcia's constitutional right to due process. Every time Mr. Garcia attempted to object, Judge Downing overruled him, berated Mr. Garcia in front of the jury, and told him to be quiet. Judge Downing further defended DDA DiMaria's improper comments stating that he did not feel she had "gone too far" and that the slanderous names she called Mr. Garcia "fit."

609.    Defendant DiMaria's egregious misconduct throughout the trial, as ratified by Defendant Downing, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Mr. Garcia's defense.

610.    Defendants performed the above-described acts under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and with deliberate indifference to Mr. Garcia's clearly established constitutional rights. No reasonable prosecutor or judge in 2012 would have believed this conduct was lawful. As such, their misconduct warrants the imposition of punitive damages.

611.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied his constitutional rights to due process and a fair trial, was wrongfully convicted, sentenced to life imprisonment without the possibility of parole, was incarcerated for an additional eight years, and suffered the other grievous injuries and damages set forth above.

**TWENTY-SEVENTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Unlawful Warrantless Seizure of Plaintiff's Privately Purchased Hard Drives Containing Plaintiff's Entire Electronic Defense Client File in Violation of the Fourth and Fourteenth Amendments to the United States Constitution**

612.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

613.    Judge Downing unlawfully ordered the seizure of Petitioner's privately-purchased external hard drives and electronic client file without a search warrant, then subsequently claimed that the external hard drives purchased by Petitioner's mother were the property of the court—when they were not. These unlawful acts by

Judge Downing prevented Petitioner from being able to access or use them during his criminal appeal.

614.    Plaintiff's privately-purchased hard drives and electronic file have still not been returned to Mr. Garcia and continue to be held unlawfully by the Riverside Superior Court who still refuses to return them to Petitioner.

615.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied his right to his electronic client file and, as a result denied his right to an effective appeal, and denied his right to adequately and timely prepare for his retrial, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

### TWENTY-EIGHTH CAUSE OF ACTION
**Claim Under California State Law For Conversion of Personal Property by Holding Privately-Purchased Hard Drives Without Legal Justification Under California Civil Code §3336 and §3355 – Trespass to Personal Property and Conversion**

616.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

617.    California Civil Code §3336 reads:

The detriment caused by the wrongful conversion of personal property is presumed to be:

First—The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and

Second—A fair compensation for the time and money properly expended in pursuit of the property.

618.    California Civil Code §3355 reads:

Where certain property has a peculiar value to a person recovering damages for deprivation thereof, or injury thereto that may be deemed to be its value against one who had notice thereof before incurring a liability to damages in respect thereof, or against a willful wrongdoer.

619.    The Riverside Superior Court illegally seized Mr. Garcia's privately-purchased external hard drives and his private property and illegally converted it into their own property, therefore, intentionally depriving Mr. Garcia from the use and ability to use his own property without due process of law. The Defendants' actions therefore constitute the state cause of action of conversion.

620.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied his right to due process, denied access to his electronic client file and privately-purchased hard drives and, as a result denied his right to an effective appeal, denied his right to access his own defense evidence and trial notes, and denied his right

to adequately and timely prepare for his retrial, in violation of California State law.

## TWENTY-NINTH CAUSE OF ACTION
**Claim Under California State Law Pursuant for Destruction of Personal Property by State Employees**

621.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

622.    As noted previously, Judge David B. Downing illegally seized Mr. Garcia's privately-purchased external hard drives just as the jury left for deliberation during Mr. Garcia's first trial. The external hard drives contained Mr. Garcia's entire electronic client file including his pleadings, trial notes, witness questions, and all of his defense evidence.

623.    After refusing to return Mr. Garcia's privately purchased hard drives to him, Judge Anthony Villalobos provided personal direction to the Riverside County Superior Court's IT Systems Administrator, Brenaman Jasmine, who attempted to gain access to the contents of the court-issued Apple laptop computer and Mr. Garcia's privately-purchased external hard drives which were to both recover the electronic client file and evidence, as well as to search for the presence of any additional audio recordings of the prior trial judge that could further embarrass the court and its judicial officers.

624.    Subsequent to Mr. Jasmine's efforts to access the contents of Mr. Garcia's privately-purchased external hard drives, it was determined by Mr. Garcia's digital forensic expert, Wayne Norris, that Mr. Jasmine appears to have "initialized" the external hard drive from a Microsoft Windows-based computer, which any IT professional should know means to erase the contents of the drive. As a direct and proximate consequence of Mr. Jasmine's mishandling of Mr. Garcia's private property, irreparable damage was caused to the contents of the external hard drive making it impossible to recover any usable data including Mr. Garcia's entire electronic client file. Such action would obviously rise to the level of gross negligence by a State employee.

625.    The failure of a state employee, who at the direction of Riverside Superior Court Judge Villalobos, failed to take any reasonable and appropriate forensic precautions before attempting to turn on and boot up the hard drives such as using a write-blocker has resulted in the destruction of Mr. Garcia's entire electronic client file which constituted of over three years of legal work, the loss of Mr. Garcia's previous trial notes, witness questions, and the detailed annotation of more than 10,000 pages of transcripts, and the destruction of irreplaceable defense-subpoenaed evidence. Whether negligent or intentional, the loss of Mr. Garcia's electronic client file by a state employee is catastrophic and constitutes the loss of thousands of hours of Mr. Garcia's work product and the

work product of his defense experts.

626.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied his right to his electronic client file and, as a result denied his right to an effective appeal, denied his right to access his defense evidence, and denied his right to adequately and timely prepare for his retrial, in violation of California State law.

### THIRTIETH CAUSE OF ACTION
### Claim Under California State Law for Alteration of Official Transcripts and Destruction of Defense-Subpoenaed Evidence Without Notice or Justification in Violation of Penal Code §§134-139 and California Evidence Code 1560(d)

627.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

628.    It is well established that both the state and federal constitutions protect a party's right to due process in all legal proceedings. In furtherance of this right, California has enacted several statutory provisions to ensure the preservation and proper disposition of records received in judicial proceedings and to dissuade any person from tainting the proceedings by introducing false evidence or altering or destroying the court's official records.

629.    California Evidence Code §1560(d) states:

"Unless the parties to the proceeding otherwise agree, or unless the sealed envelope or wrapper is returned to a witness who is to appear personally, the copy of the records shall remain sealed and shall be opened only at the time of trial, deposition, or other hearing, upon the direction of the judge, officer, body, or tribunal conducting the proceeding, in the presence of all parties who have appeared in person or by counsel at the trial, deposition, or hearing. Records that are **original documents and that are not introduced in evidence or required as part of the record shall be returned** to the person or entity from whom received. Records that are copies may be destroyed." (emphasis added)

630.    In addition to ensuring the preservation of records received by the court, several statutes make it a criminal offense to defraud the court through tampering with evidence. It is a felony to prepare a false or antedated book, paper, record, instrument in writing, or other matter with the intent that it will be introduced for a fraudulent or deceitful purpose at a trial, or at a legal proceeding or inquiry. Pen. Code §134. It is also a felony to knowingly offer in evidence as genuine or true a forged or fraudulently altered or antedated book, paper, document, record, or other writing. Pen. Code §132. The destruction, alteration, or concealment of evidence is a criminal offense. Pen. Code §§134-135.

631.    In preparation for his criminal trial, Mr. Garcia served more than one hundred (100) subpoenas duces tecum on various third parties seeking records relevant to his defense. In response, voluminous records were provided to the Superior Court including thousands of pages of documents and dozens of compact discs containing

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 122

1  hundreds of hours of audio and video recordings and other electronic files. Many of the responses indicated that the

2  records provided were the originals and no copies were retained.

3      632.    During the trial and select pre-trial proceedings, Mr. Garcia introduced a small portion of the

4  subpoenaed records into evidence. For various reasons, other records were not submitted into evidence. Some were

5  objected to by the other parties and others were not introduced for strategic reasons. Many more were reserved as

6  impeachment evidence to be used against witnesses that ultimately were never called to testify.

7      633.    All of the subpoenaed records were retained by the trial court in department 1B of the old Indio

8  courthouse. Mr. Garcia retained copies on his court-issued laptop computer.

9      634.    On September 7, 2012, Mr. Garcia was convicted by a jury on all counts. On October 5, 2012,

10  Judge David B. Downing sentenced Mr. Garcia to life in prison without the possibility of parole, plus six years. Mr.

11  Garcia timely filed a notice of appeal.

12      635.    On or about February 8, 2013, Judge Downing ordered his courtroom clerk, Kristine Hinos, to

13  destroy all of the records received from third-parties in response to subpoena duces tecum. No notice was provided

14  to any of the parties—including Mr. Garcia—and both Judge Downing and Ms. Hinos were well aware that Mr.

15  Garcia's direct appeal was pending in case no. E057519. No efforts were made to return the original records to the

16  person or entity from whom they were received as required by Evidence Code §1560(d).

17      636.    Defendants knowingly and maliciously destroyed all of the records subpoenaed by Mr. Garcia in

18  an intentional effort to cause him harm by preventing Mr. Garcia from introducing the records into evidence in

19  support of his petition for a writ of habeas corpus.

20      637.    Mr. Garcia has served over a hundred subpoenas in the retrial proceedings in an attempt to

21  recreate the lost evidence, but the majority of the subpoena returns have indicated that the evidence has been

22  destroyed or is no longer available. As such, the destruction of defense subpoenaed records has resulted in a loss

23  without any suitable replacement.

24      638.    In addition to destroying records received from third parties, Defendants also altered the Superior

25  Court's official records. Throughout the trial proceedings, Judge Downing secretly instructed the court

26  reporters/stenographers to sanitize the record by deleting and altering select portions of the transcripts. On several

27  of the now infamous court recess recordings, Judge Downing can be heard instructing lead court reporter Terri

28  Elizabeth Runyon to delete parts of the transcripts containing his inappropriate outbursts to remove any indication

of judicial bias from the trial record.

639.     The foregoing acts and omissions were deliberate, reckless, wanton, cruel, done in bad faith, and involved callous indifference to Mr. Garcia's federally protected rights. These acts were perpetrated while Defendants were acting under color of state law and in their capacities as employees or agents of the County of Riverside and State of California.

640.     As a direct and proximate result of Defendants' actions, Mr. Garcia continues to suffer prolonged and unlawful detention while being denied the evidence needed to prove his innocence, and end the wrongful prosecution and terminate the retrial procedures, and continues to suffer other grievous injuries and damages set forth above.

**THIRTY-FIRST CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Denial of Due Process on Direct Appeal Due to the Alteration and Sanitization of the Official Court Record in Violation of the Fourteenth Amendment to the United States Constitution**

641.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

642.     An appeal is based on the official court record. Matters not part of the record cannot be considered on appeal, even if counsel give the court affidavits to support the new information. *People v. Szeto* (1981) 29 C3d 20, 35. See also Cal Rules of Ct. 8.204(a) ("appellant's opening brief must … [p]rovide a summary of the significant facts limited to matters in the record"); *People v. Collie* (1981) 30 C3d 43, 57 n10 (declarations concerning facts not in record will be stricken); *People v. Green* (1979) 95 CA3d 991, 1001 (appellant's burden to provide adequate appellate record).

643.     California law goes further and guarantees both indigent and nonindigent defendants in felony cases the right to a record of sufficient completeness for proper review, furnished at state expense. *In re Armstrong* (1981) 126 CA3d 565, 570.

644.     The appellant bears the burden of ensuring that an adequate appellate record is provided. *People v. Barton* (1978) 21 C3d 513, 518; *People v. Green* (1979) 95 CA3d 991, 1001. When appellate counsel fails to ensure that the record is sufficient for full consideration and resolution of the appeal, he or she has provided constitutionally ineffective assistance. *People v Barton, supra.*

645.     The reporter's transcript is the verbatim record of official trial proceedings. The items that must be included in this transcript in a defendant's appeal from a judgment of conviction or a People's appeal from an

1    order granting a new trial are listed in Cal Rules of Ct. 8.320(c).

2        646.    The problem is that Mr. Garcia found major discrepancies and inaccuracies between statements

3    actually made by Judge Downing during the trial and what actually appeared in the completed reporters' transcripts

4    provided to the Court of Appeal, yet we had no way of actually demonstrating how much of the record had been

5    altered.

6        647.    Upon the order of Judge Downing it appears that the official court record was altered and the

7    court reporters "sanitized" the record of the proceedings, thereby depriving defendant of his due process rights.

8    Lead Court Reporter Terry Elizabeth Runyon and others yet unknown sanitized material portions of the record. We

9    know this not only because of the court recess recordings but also because specific very memorable comments and

10   outbursts that were made by both Judge Downing and prosecutor DDA DiMaria were taken in notes by witnesses

11   such as advisory counsel Attorney Mark Pahor and Petitioner's mother who were in the courtroom who found that

12   those sections are missing from the official court record prepared for the court of appeal. In addition, the

13   recollection of various witnesses in reviewing their previous testimony have noted that portions of their testimony

14   appear to be missing from the official record.

15       648.    As a direct and proximate result of Defendants' actions, Mr. Garcia was deprived of his right to a

16   fair and meaningful appeal, because the record relied upon by the Court of Appeal of the trial proceedings was not

17   accurate which violated Mr. Garcia's Due Process rights. Mr. Garcia's constitutional and statutory rights to due

18   process on appeal were violated as the Court of Appeal was misled, because they were unaware that the record

19   before them was inaccurate.

20                    **THIRTY-SECOND CAUSE OF ACTION**
21   **Claim Under California State Law Pursuant to California Civil Code §52.1 (Tom Bane Civil Rights Act) for
     the Denial of the Right to a Meaningful Appeal in Violation of the California State Constitution
     and Penal Code §1237**

22       649.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

23   herein, and further alleges as follows:

24       650.    Upon the order of Judge Downing it appears that the official court record was altered and the

25   court reporters "sanitized" the record of the proceedings, thereby depriving defendant of his due process rights.

26   Lead Court Reporter Terry Elizabeth Runyon and others yet unknown sanitized material portions of the record. We

27   know this not only because of the court recess recordings but also because specific very memorable comments and

28   outbursts that were made by both Judge Downing and prosecutor DDA DiMaria were taken in notes by witnesses

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 125

such as advisory counsel Attorney Mark Pahor and Petitioner's mother who were in the courtroom are missing

from the official court record. In addition, the recollection of various witnesses in reviewing their previous

testimony have noted that portions of their testimony appear to be missing from the official record.

651.     As a direct and proximate result of Defendants' actions, Plaintiff was deprived of his

constitutional and statutory rights to due process on appeal and the Court of Appeal was misled because they were

unaware that the record before them was inaccurate.

<center>

**THIRTY-THIRD CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Destruction of All Defense-Subpoenaed Evidence by Court Staff and Violation of Due Process**
**and the Right to a Fair Trial After Reversal in Violation of the Fifth, Sixth, and Fourteenth Amendments to**
**the United States Constitution**

</center>

652.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

herein, and further alleges as follows:

653.     It is well established that both the state and federal constitutions protect a party's right to due

process in all legal proceedings.

654.     In preparation for his criminal trial, Mr. Garcia served more than one hundred (100) subpoenas

duces tecum on various third parties seeking records relevant to his defense. In response, voluminous records were

provided to the Superior Court including thousands of pages of documents and dozens of compact discs containing

hundreds of hours of audio and video recordings and other electronic files. Many of the responses indicated that the

records provided were the originals and no copies were retained.

655.     During the trial and select pre-trial proceedings, Mr. Garcia introduced a small portion of the

subpoenaed records into evidence. For various reasons, other records were not submitted into evidence. Some were

objected to by the other parties and others were not introduced for strategic reasons. Many more were reserved as

impeachment evidence to be used against witnesses that ultimately were never called to testify.

656.     All of the subpoenaed records were retained by the trial court in department 1B of the old Indio

courthouse. Mr. Garcia retained copies on his court-issued laptop computer.

657.     On September 7, 2012, Mr. Garcia was convicted by a jury on all counts. On October 5, 2012,

Judge David B. Downing sentenced Mr. Garcia to life in prison without the possibility of parole, plus six years. Mr.

Garcia timely filed a notice of appeal.

658.     On or about February 8, 2013, Judge Downing ordered his courtroom clerk, Kristine Hinos, to

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 126

destroy all of the records received from third-parties in response to subpoena duces tecum. No notice was provided to any of the parties—including Mr. Garcia—and both Judge Downing and Ms. Hinos were well aware that Mr. Garcia's direct appeal was pending in case no. E057519. No efforts were made to return the original records to the person or entity from whom they were received as required by Evidence Code §1560(d).

659.     Defendants knowingly and maliciously destroyed all of the records subpoenaed by Mr. Garcia in an intentional effort to cause him harm by preventing Mr. Garcia from introducing the records into evidence in support of his petition for a writ of habeas corpus.

660.     The foregoing acts and omissions were deliberate, reckless, wanton, cruel, done in bad faith, and involved callous indifference to Mr. Garcia's federally protected rights. These acts were perpetrated while Defendants were acting under color of state law and in their capacities as employees or agents of the County of Riverside and State of California.

661.     As a direct and proximate result of Defendants' actions, Mr. Garcia continues to suffer prolonged and unlawful detention while being denied the evidence needed to prove his innocence, and end the wrongful prosecution and terminate the retrial procedures, and continues to suffer other grievous injuries and damages set forth above.  Further, as a direct and proximate result of Defendants' actions, Mr. Garcia was deprived of due process of law by depriving Plaintiff of access to all of his defense-subpoenaed records.

### THIRTY-FOURTH CAUSE OF ACTION
#### 42 U.S.C. §1983 (Civil Rights Act)
**Claim for the Denial of Access to the Courts and Due Process For the Court Clerk's Refusal to File Pleadings Submitted by Plaintiff in Violation of the Fifth and Fourteenth Amendments to the United States Constitution**

662.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

663.     It is well established that prisoners have a fundamental constitutional right to adequate, effective, and meaningful access to the courts to challenge violations of constitutional rights. *Bounds v. Smith* (1977) 430 U.S. 817, 828, overruled in part by *Lewis v. Casey* (1996) 518 U.S. 343. A prisoner's right of access to courts may not be denied or obstructed. *Johnson v. Avery* (1969) 393 U.S. 483, 485. Pretrial detainees retain at least those constitutional rights that are enjoyed by convicted prisoners. See *Bell v. Wolfish* (1979) 441 U.S. 520, 545. Defendant has a right under both the federal and state constitutions of access to the courts for both civil and criminal matters. He also has a right under the laws and Constitution of California to seek review of this court's

orders in the appellate courts. These clearly established rights may not be denied or obstructed.

664.    Throughout the post-conviction appellate process, habeas corpus proceedings and retrial proceedings, various clerks of the Riverside County Superior Court as well as judges have refused to file Mr. Garcia's pleadings and several judges have refused to even rule on his motions, and have instead issued orders indicating "no action taken" therefore depriving Mr. Garcia of his right to due process.

665.    In addition, denial of Plaintiff's access to the courts for both criminal and civil matters has included the denial of his use of the jail's law library kiosk, the trial court's refusal to provide Mr. Garcia with the use of the laptop computer for his use during the retrial that was previously provided for his use during the first trial which are all violations under the 6th Amendment of the U.S. Constitution and Federal Law 42 U.S.C. 1983 (Civil Rights Act).

666.    As a direct and proximate result of Defendants' actions, Mr. Garcia continues to suffer prolonged and unlawful detention while being denied access to the courts and due process and continues to suffer other grievous injuries and damages set forth above.

### THIRTY-FIFTH CAUSE OF ACTION
**Claim Under California State Law for the Prosecutor Misleading and Lying to the Court Constituting Judicial Deception in Violation of California Business and Professions Code §6068(d); and California Rules of Professional Conduct 5-200(B)**

667.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

668.    As described in detail in the Twenty-Fifth Cause of Action listed previously, DDAs DiMaria, Seebart, and Tate repeatedly have misled the court by alleging that Garcia had placed a $10,000 "hit" on jailhouse informant Arthur Jimenez, when the prosecution knew that claim was patently false and had knowledge and evidence to the contrary that the attack on Arthur Jimenez by inmate Albert Farrar had nothing to do with Mr. Garcia.

669.    California Business and Professions Code  §6068 states:

> It is the duty of an attorney to do all of the following:
> (d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.

670.    *See also Di Sabatino v. State Bar* (1980) 27 Cal.3d 159, 162 (court cited the California Business and Professions code and found that an attorney is obligated to "employ, for the purpose of maintaining the causes

1   confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any

2   judicial officer by an artifice or false statement of fact or law" and finding that an attorney has an affirmative duty

3   to fully and completely inform the court of all relevant facts and circumstances.)

4   671.   During pretrial motions before the start of the first trial, DDA DiMaria further committed judicial

5   deception by telling the court and claiming that a "body had been found" when the body had nothing to do with this

6   case and was unrelated to the victim, Mr. Lambert.

7   672.   Both Palm Springs Police Detectives and the prosecution repeatedly claimed and told the court

8   that blood evidence had been found in Mr. Lambert's home when the prosecution's own forensic experts had

9   clearly stated that this was not the case—and that no blood evidence whatsoever had been found. Detectives Min

10  and Browning stated in search warrants that blood evidence had been found in the victim's home which was a

11  material misstatement of fact and untrue.

12  673.   DDA DiMaria again deceived the court post-conviction when she falsely told the court that all of

13  the jointly charged codefendants had been notified and agreed to changes in the amount of restitution levied against

14  each defendant, when in fact, none of the defendants had agreed to any change in the restitution amounts.

15  674.   As a direct and proximate result of Defendants' actions and judicial deception, Mr. Garcia

16  continues to suffer prolonged and unlawful detention and continues to suffer other grievous injuries and damages

17  set forth above.

18                              **THIRTY-SIXTH CAUSE OF ACTION**
                                **42 U.S.C. §1983 (Civil Rights Act)**
19  **Claim for the Failure to Disclose Highly Significant Exculpatory Information Leading to Plaintiff's**
    **Continued Unlawful Detention in Violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments**
20                              **to the United States Constitution**

21  675.   Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

22  herein, and further alleges as follows:

23  676.   Pursuant to *Tatum v. Moody* (9th Cir. 2014) 768 F. 3d 806 cert. denied, (2015) 135 S.Ct. 2312,

24  Defendants failed to disclose exculpatory evidence to prosecutors leading to Mr. Garcia's lengthy detention in

25  violation of Mr. Garcia's constitutional right to due process. *United States v. Bagley* (1985) 473 U.S. 667

26  (government's duty to disclose favorable evidence under *Brady* arises regardless of whether the defendant is aware

27  of or makes a request for the evidence.).

28  677.   During their investigation of the criminal case against Mr. Garcia, Palm Springs Police

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 129

Department Detectives Simon Min and Frank Browning discovered substantial evidence that there had been a criminal conspiracy amongst Mr. Garcia's codefendants to murder Mr. Garcia and then implicate him in all the crimes against Mr. Lambert. The Detectives discovered several text messages sent between the various codefendants discussing their plans and efforts to kill Mr. Garcia. These text message conversations were subsequently corroborated during the Detectives interviews with witnesses and the various codefendants.

678.    The Detectives discovered evidence which impeached the prosecution's entire theory of the case, by demonstrating that Mr. Garcia was not a member of the criminal conspiracy, but, rather, a target. Despite the obvious exculpatory nature of this evidence, Detectives Min and Browning failed to disclose any of it to the prosecution or defense.

679.    Had Defendants disclosed what they had discovered, this evidence would have impeached the testimony of prosecution witnesses, tended to prove Mr. Garcia's innocence, cast doubt on the entire police investigation and prosecution, and led to the end of Mr. Garcia's unjust pretrial detention.

680.    Defendants performed the above described acts and omissions under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and with deliberate indifference to Mr. Garcia's clearly established constitutional rights. No reasonable officer in 2009 would have believed this conduct was lawful.

681.    As a direct and proximate result of Defendants' conduct, Mr. Garcia was wrongly and maliciously prosecuted, denied bail, bound over for trial, and suffered a prolonged pre-trial detention during the more than three and a half years that he was jailed, from March 9, 2009 until October 12, 2012, as well as the other grievous and continuing damages and injuries set forth above.

**THIRTY-SEVENTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for a Violation of Double Jeopardy by the Prosecution's Attempt to Retry the Criminal Case Against Mr. Garcia After Being Reversed for Egregious Misconduct by the Riverside County Superior Court and the Prosecution in Violation of the Fifth Amendment to the United States Constitution**

682.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

683.    In *Oregon v. Kennedy* the Court found that the double jeopardy claim applies where a defendant in a criminal trial successfully moves for a mistrial, he may invoke the bar of double jeopardy in a second effort to try him only if the conduct giving rise to the successful motion for a mistrial was prosecutorial or judicial conduct

1    intended to provoke the defendant into moving for a mistrial., because the prosecutorial misconduct that had

2    occasioned the mistrial, even if not intended to cause a mistrial, amounted to "overreaching". *Oregon v. Kennedy*

3    (1982) 456 U.S. 667, 676

4           684.    The Fifth Amendment to the United States Constitution provides that [no] "person shall. . .be

5    subject for the same offense and be twice put in jeopardy of life or limb. . ." *U.S. Const. Amend. V*. This guarantee

6    is also applicable to the State's Fourteenth Amendment.

7
              The Double Jeopardy Clause in the Fifth Amendment to the US Constitution prohibits anyone
8             from being prosecuted twice for substantially the same crime. The relevant part of the Fifth
              Amendment states, "No person shall . . . be subject for the same offense to be twice put in
9             jeopardy of life or limb . . . . "

10          685.    Mr. Garcia's conviction was reversed as a result of his *unopposed* habeas petition for judicial

11   bias and misconduct, so under both Federal and State law he should have been barred from re-prosecution and his

12   claim of double jeopardy should not have been denied by Judge Villalobos.

13          686.    As a direct and proximate result of Defendants' conduct to attempt to retry the criminal case

14   against Mr. Garcia, after it was reversed on a successful habeas appeal for egregious misconduct by the Riverside

15   County Superior Court overturning his conviction, Mr. Garcia has been wrongly and maliciously prosecuted,

16   denied bail, and suffered a prolonged pre-trial detention during the retrial of his case, as well as the other grievous

17   and continuing damages and injuries set forth above.

18                       **THIRTY-EIGHTH CAUSE OF ACTION**
                          **42 U.S.C. §1983 (Civil Rights Act)**
19   **Claim for Vindictive Prosecution for the Prosecutor Adding Special Circumstances Allegation to Seek
     Greater Punishment in Retaliation for Plaintiff Invoking His Statutory Right to Appeal**

20          687.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

21   herein, and further alleges as follows:

22          688.    The Due Process Clause prohibits a prosecutor from using criminal charges to penalize a

23   defendant's valid exercise of constitutional or statutory rights. See *Bordenkircher v. Hayes* (1978) 434 U.S. 357,

24   363 ("To punish a person because he has done what the law plainly allows him to do is a due process violation of

25   the most basic sort.") When a defendant successfully exercises his legal rights during or after trial, and upon

26   re-indictment faces an increase in the number or severity of the charges, a presumption of vindictiveness may be

27   created if "a reasonable likelihood of vindictiveness exists." *United States v. Goodwin* (1982) 457 U.S. 368, 373.

28          689.    In *Blackledge v. Perry* (1974) for instance, the Supreme Court held that the Due Process Clause

was violated when a prosecutor brought a more serious charge against a defendant who had pursued a statutory right of appeal from a conviction of a lesser charge for the same offense. *Blackledge v. Perry* (1974) 417 U.S. 21, 28-29; see also *United States v. Dvorin* (5th Cir. 2016) 817 F.3d 438, 455 (presumption of vindictiveness when no objective evidence to dispel defendant's reasonable fear that additional charge is vindictive.) A presumption is justified on the grounds that it is difficult to divine prosecutors' motives, and that, in certain circumstances, due process can be implicated by the mere appearance of vindictiveness. See *United States v. Goodwin* (1982) 457 U.S. 368 at 373 ("Motives are complex and difficult to prove. As a result, in certain cases in which action detrimental to the defendant has been taken after the exercise of a legal right, the Court has found it necessary to 'presume' an improper vindictive motive.)

690.    In August 2020, the Riverside County District Attorney's Office filed an Amended Felony Information that charged Mr. Garcia and four others with ten felony offenses. In Count 2, Mr. Garcia was charged with conspiracy to commit various criminal offenses including murder in the first-degree with a special circumstance allegation that the conspiracy was to commit murder for financial gain. This exposed Mr. Garcia to a potential sentence, if convicted in Count 2, of life without the possibility of parole.

691.    During Mr. Garcia's 2012 jury trial, the prosecutor Lisa DiMaria dismissed the special circumstance allegation in Count 2 and the jury was not provided with the enhancement instructions. As a consequence, the guilty verdict exposed Mr. Garcia to a maximum of 25-years to life for Count 2, which the trial court subsequently imposed.

692.    Mr. Garcia exercised his constitutional and statutory rights to a post-conviction appeal and collateral habeas corpus review, and successfully overturned his conviction in full. The case was remanded for retrial and assigned to two new prosecutors.

693.    In July 2020, prosecutors Kirsti Kirk and Rob Hightower, under the direction of District Attorney Michael Hestrin, filed a Second Amended Information that charged substantially the same ten offenses, but added the special circumstance allegation back to Count 2. This increased Mr. Garcia's potential exposure, if-convicted to *life without the possibility of parole* rather than twenty-five years to life *with* parole received after the first conviction. There was no explanation for the additional enhancement and it increased Mr. Garcia's potential sentence.

694.    In July 2020, Mr. Garcia demurred to the Second Amended Information and specifically

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 132

1    challenged the inclusion of the special circumstance in Count 2 arguing that it was not only vindictive, but violated

2    the State's Constitution's Double Jeopardy clause. Nevertheless, prosecutors Jesse Male, Kristi Kirk, and Rob

3    Hightower argued against dismissing the special circumstances on Count 2 with no sensical explanation. Judge

4    Villalobos denied Mr. Garcia's request to strike the special circumstance allegation stating that prosecutors have

5    wide discretion in charging cases.

6        695.    In August 2020, a Third Amended Information was filed by prosecutors Kirk, Hightower, and

7    Hestrin that left intact the special circumstance allegation in Count 2.

8        696.    Throughout the retrial proceedings, prosecutors Kirk and Hightower have acted in a rude and

9    unprofessional manner making snarky comments and personal attacks against Mr. Garcia on the record. Both Kirk

10    and Hightower are seasoned prosecutors with decades of experience. It would be unreasonable to believe that such

11    seasoned prosecutors would be unaware that adding the special circumstance allegation following a successful

12    appeal is prohibited by both the Federal and State Constitutions. The only reasonable conclusion is that they

13    knowingly and intentionally added the enhancement in direct response and in retaliation to Mr. Garcia successfully

14    exercising his legal right to appeal the previous conviction. As such, Defendants Kirk's, Hightower's and Hestrin's

15    actions constitute vindictive prosecution and are a violation of Mr. Garcia's Due Process Rights as secured by the

16    U.S. Constitution. Further, such actions subject Petitioner to a higher penalty following a successful appeal which

17    is not allowed under the California Constitution and shows the Riverside County District Attorney's Office's level

18    of vindictiveness against Petitioner.

19        697.    Defendants performed the above-described acts under color of state law, deliberately,

20    intentionally with knowledge and deliberate indifference to Mr. Garcia's clearly established constitutional rights.

21    No reasonable prosecutor or judge in 2020 would have believed that this conduct was lawful. As such, their

22    misconduct warrants the imposition of punitive damages.

23        698.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied his constitutional

24    right to due process during the retrial proceedings, exposed to a greater sentence following a successful appeal,

25    denied bail, has suffered prolonged pretrial detention, and suffered the other egregious injuries and damages as set

26    forth above.

27

28

**THIRTY-NINTH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to Civil Code §52.1  (Tom Bane Civil Rights Act)**
**for Vindictive Prosecution Seeking Greater Punishment Following a Successful Appeal**
**in Violation of the Double Jeopardy Clause of the California Constitution Article I, Section 15**

699.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

700.    Additionally, the California State Constitution's Double Jeopardy provision protects defendants from receiving greater sentencing following a retrial after a successful appeal. *People v. Henderson* (1963) 60 Cal.2d 482, 495. See also *People v. Mong* (1997) 16 Cal.4th 826 (imposition of greater sentence would unreasonably impair defendant's right to appeal erroneous judgements).

701.    Even after Mr. Garcia successfully appealed to have his entire conviction overturned due to an *unopposed* petition for a writ of habeas corpus, the Riverside County District Attorney's Office continues to attempt to re-prosecute Mr. Garcia for the same offenses in violation of his Fifth Amendment right to not be placed in double jeopardy.

702.    As explained in detail in the proceeding cause of action, prosecutors Kirk, Hightower and Hestrin added a special circumstance allegation to Count 2 following Mr. Garcia's successful appeal and reversal of his 2012 conviction. This action not only violates Mr. Garcia's Due Process Rights to be free from vindictive prosecution, but also his right to not be subjected to greater punishment as guaranteed under the California Constitution's Double Jeopardy provisions.

703.    California State Constitution Art. I, section 15, is similar to the Fifth Amendment to the United States Constitution, which provides: "Persons may not be twice put in jeopardy for the same offense. . . ." *People v. Saunders* (1993) 5 Cal.4th 580, 592-593.

704.    Defendants performed the above-described acts under color of state law, deliberately, intentionally with knowledge and deliberate indifference to Mr. Garcia's clearly established constitutional rights. No reasonable prosecutor or judge in 2020 would have believed that this conduct was lawful. As such, their misconduct warrants the imposition of punitive damages.

705.    As a direct and proximate result of Defendants' actions, Mr. Garcia was denied his constitutional right to due process during the retrial proceedings, exposed to a greater sentence following a successful appeal, denied bail, has suffered prolonged pretrial detention, and suffered the other egregious injuries and damages as set forth above.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 134

**FORTIETH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Denial of the Right to a Fair and Public Jury Trial Due to the Riverside Superior Court's Closure to the Public and Media in Violation of the First, Sixth and Fourteenth Amendments to the United States Constitution**

706.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

707.    The California Supreme Court has said that "every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial that is open to the public at all times." *People v. Woodward* (1992) 4 Cal.4th 376, 282.

708.    Failure to provide the right to a public trial is structural error and leads to automatic reversal. *United States v. Davila* (2013) 569-597, 610-612. See also *Presley v. Georgia* (2010) 558 U.S. 209, 212-216 regarding the right of the defendant to have the public present at trial.

709.    The United States Supreme Court has determined that several factors that must be met before a criminal trial may be closed to the public. *Waller v. Georgia* (1984) 467 U.S. 39, 45.

710.    The Sixth Amendment provides that "[in] all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." *U.S. Const. Amend. VI.* This right applies to the states through the Fourteenth Amendment. *In re Oliver* (1948) 333 U.S. 257, 272-273.

711.    The Sixth and Fourteenth Amendments of the U.S. Constitution and Federal Law 42 U.S.C. 1983 (Civil Rights Act), (which includes the right to a right to a public trial and the substantial prejudice caused to plaintiffs) guarantees the right to public trials, arraignments, and preliminary hearings.

712.    Judge Vineyard as the presiding judge of the Riverside Superior Court has authorized and has ordered that the Riverside Superior Court of the State of California to allow all judges to close the courtroom to the public due to the emergency procedures in response to the COVID-19 pandemic and public health emergency. However, this infringes on the defendant's right to a public trial. The defendant was not provided with any option or choice as to how the trial would proceed. Judge Villalobos stated that this is what the court would be doing— there was no motion or ability for the defendant to weigh in on the options. Defendant's petition regarding planning for a public trial was ignored by the Court and the Court failed to hear or rule on its merits. Audio streaming (no video) of the courtroom proceedings is available to the public, but the audio quality is extremely poor, individuals cannot be clearly heard unless they are speaking directly into the microphone, the audio levels fade in and out, and

1    technical difficulties have plagued this approach resulting in the failure to broadcast many hearings or hearings

2    being broadcast from an alternate courtroom when the public is not aware or notified how to listen into the

3    proceedings. The lack of video and inability to see the proceedings also limits the public's ability to watch the

4    proceedings.

5           713.    As a direct and proximate result of Defendants' actions, Mr. Garcia is being denied his

6    constitutional right to a fair and public jury trial during the retrial proceedings in violation of the First, Sixth, and

7    Fourteenth Amendments to the United States Constitution.

8    <center>**FORTY-FIRST CAUSE OF ACTION**</center>

9    <center>**Claim Under California State Law Pursuant to Civil Code §52.1  (Tom Bane Civil Rights Act) for the Denial of the Right to a Joint Trial with Codefendant David Replogle in Violation of Penal Code  §1098 and the California Constitution**</center>

10           714.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

11    herein, and further alleges as follows:

12           715.    On July 28, 2020, Judge Villalobos granted prosecutors DDA Rob Hightower and DDA Kristi

13    Kirk's unnoticed request for a four-way severance of the criminal trial of Mr. Garcia and his codefendants without

14    legal justification or proper notice to the defense.

15           716.    As a direct and proximate result of Defendants' actions, the severance deprived Mr. Garcia of the

16    right to a joint trial as mandated under state law and the favorable testimony of his codefendant David Replogle in

17    violation of California State law.

18    <center>**FORTY-SECOND CAUSE OF ACTION**</center>

19    <center>**42 U.S.C. §1983 (Civil Rights Act)**</center>
<center>**Claim for Denial of Right to Favorable Testimony of Codefendant David Replogle Through Improper**</center>

20    <center>**Severance of Trials at the Unwarranted Request of the Prosecution in Violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution**</center>

21           717.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

22    herein, and further alleges as follows:

23           718.    The granting of the severance of a jury trial deprived Mr. Garcia from the favorable testimony of

24    his codefendant David Replogle that he would have received during a joint trial.

25           719.    As a direct and proximate result of Defendants' actions, Mr. Garcia's rights have been violated

26    under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

27

28

1

**FORTY-THIRD CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**

2

**Claim for the Execution of an Improper Gag Order Restraining the Parties From Making Public Comments**
**to the Media in Violation of the Right to Freedom of Speech Under the First Amendment to the United States**

3

**Constitution**

4

720.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

5

herein, and further alleges as follows:

6

721.     A protective or "gag" order limiting pretrial publicity may be useful by prohibiting the parties

7

from discussing the merits of the case. *Sheppard v. Maxwell (1966) 384 U.S. 333*. However, seeking a gag order is

8

a drastic step and not to be embarked upon lightly. An order that bars persons from exercising their rights under the

9

First Amendment should only be sought when less restrictive measures will be ineffective. This is particularly the

10

case when a gag order is directed towards a criminal defendant and seeks to restrain his constitutional rights to

11

freedom of speech. See *Levine v. U.S. District Court* (9th Cir. 1985) 764 F.2d 590, 598-601; *Press-Enterprise Co.*

12

*v. Superior Court of Cal., Riverside Cty.* 464 US 501 - Supreme Court, (1984); *Press-Enterprise Co. v. Superior*

13

*Court of Cal., County of Riverside* 478 US 1 - Supreme Court; and *Press-Enterprise Co. v. Superior Court* (1988)

14

37 Cal. 3d 772, Supreme Court.

15

722.     A pretrial gag order directed towards the defense must be more narrowly crafted and may not

16

prohibit the defendant from describing the charge against him and unequivocally asserting his innocence. See

17

*Hamilton v. Municipal Court* (1969) 270 Cal.App. 2d 797, 802.

18

723.     On August 21, 2020, defendant Garcia appeared before the court for various matters. Neither

19

DDA Hightower nor DDA Kirk addressed any concerns over pretrial publicity or any prejudicial statements made

20

by defendant Garcia to the media. There was no mention or discussion of a protective "gag" order.

21

724.     Judge Villalobos granted prosecutors DDA Rob Hightower and DDA Kristi Kirk's an unnoticed

22

request for a gag order in of the criminal retrial of Mr. Garcia and his codefendants without legal justification or

23

proper notice to the defense.

24

725.     On the evening of August 21, 2020—after business hours on a Friday night—DDA Hightower

25

emailed to defendant Garcia's private investigator a proposed protective order to prohibit **only** the defendants from

26

distributing any materials concerning both the instant criminal case **and** the collateral habeas matters with anyone

27

outside the defense team. No similar provision restricting the prosecution was included in the draft.

28

726.     The proposed protective order was not accompanied by a motion or notice of a hearing date. No

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 137

memorandum of points and authorities detailing the acts and legal arguments in support of the apparent request was provided and there were no declarations or exhibits attached. The prosecution **produced nothing** in support of their proposed order.

727.     On Monday, August 24, 2020, the prosecution ambushed Mr. Garcia with an oral request to the court to issue the proposed order, which Mr. Garcia had not yet received or reviewed. **No legal arguments or facts** were presented by the prosecution and Mr. Garcia was not provided an opportunity to file an opposition to the request or present any evidence.

728.     The issuance of the unwarranted protective order clearly demonstrates this court's obvious conflict of interest and bias against defendant which creates an inability of the court to be fair and impartial during the retrial proceedings in violation of defendant's Sixth Amendment rights. Accordingly the protective order is invalid and unenforceable

729.     The court signed the order and amended it by interlineation to apply to both the defense and the prosecution. The order applied to the disclosure of both the criminal matter and the collateral habeas cases.

730.     As a direct and proximate result of Defendants' actions, Mr. Garcia's rights have been violated under the First and Sixth Amendments to the United States Constitution.

**FORTY-FOURTH CAUSE OF ACTION**
**42 U.S.C. §1985 (Civil Rights Act)**
**Claim for Conspiracy to Violate Civil Rights as Secured Under the United States Constitution**
**and Acts of Congress**

731.     Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

732.     In addition to creating a cause of action under 42 U.S.C. §1983 to seek relief for violations of clearly established federal civil rights by government officials acting under color of state law, the Civil Rights Act also enacted 42 U.S.C. §1985 to hold accountable two or more persons who conspire together to violate the same rights. See *Holgate v. Baldwin* (9th Cir. 2005) 425 F.3d 671, 676.

733.     As codified in 42 U.S.C. §1985 which states in relevant part:

[¶…]
(2)Obstructing justice; intimidating party, witness, or juror
If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure

such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3)Depriving persons of rights or privileges
If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

734. As stated in *Holgate v. Baldwin* (9th Cir. 2005) 425 F.3d 671, 676, the elements required to set forth a claim of a conspiracy to violate civil rights under 42 U.S.C. §1985 are as follows: have an adequate legal basis and to require a reasonable inquiry into the facts and law to determine that the complaint is well-founded.

735. Defendants and others yet unknown, agreed among themselves and others to act in concert to deprive Mr. Garcia of his clearly established constitutional rights as protected by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, including his right to the assistance of counsel, to be released from custody upon reasonable bail, to not be deprived of liberty without due process of law, and to be free from illegal search and seizures.

736. As described in detail above, in furtherance of the conspiracy, Defendants engaged in and facilitated numerous over acts in the conspiracy to violate Mr. Garcia's civil rights.

737. Defendants acted in concert and coordination with one another with a common purpose to impede, hinder, obstruct, or defeat, the due course of justice, with intent to deny Mr. Garcia—a citizen—the equal protection of the laws and to injure him and his property. Defendants' actions were done deliberately and intentionally and accompanied by force, fear, intimidation, and/or threats.

738. As a direct and proximate result of Defendants' overt acts, Mr. Garcia was deprived of his constitutional rights; wrongfully prosecuted, detained, and incarcerated for nearly twelve years; deprived of his

private property, and subjected to other grievous injuries and damages as set forth above.

**FORTY-FIFTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for the Intentional Infliction of Emotional Distress in Violation of the Eighth Amendment to the United States Constitution**

739.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

740.    As noted previously, Defendants acted in concert to intentionally inflict emotional distress on Mr. Garcia throughout both the first trial, during the pendency of his appellate process, during the habeas proceedings, and during the retrial proceedings in violation of the Eighth Amendment to the United States Constitution.

741.    The issue of intentional infliction of emotional distress in violation of the Eighth Amendment was addressed in *Rhodes v. Chapman* (1981) 452 U.S. 337, 101 S. Ct. 2392 as a result of prison overcrowding.

742.    As a direct and proximate result of Defendants' overt acts, Mr. Garcia was deprived of his constitutional rights under the Eighth Amendment of the United States Constitution.

**FORTY-SIXTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
***Monell* Claim against the City of Palm Springs, the County of Riverside and California State officials for the Failure to Train, Supervise, and/or Discipline Employees in Constitutionally Adequate Investigative Techniques, Law Enforcement Duties, Prosecutorial Duties, and Judicial Duties**

743.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

744.    County of Riverside, the City of Palm Springs and State of California officials enacted faulty policies and procedures and failed to properly train, supervise, and/or discipline employees in constitutionally adequate investigative techniques, law enforcement duties, prosecutorial duties and judicial duties under Federal Law 42 U.S.C. 1983 (Civil Rights Act).

745.    The legal definition of a "person" under §1983 includes actual people (e.g. police officers, wardens, prosecutors, etc.) as well as local governments and municipalities. See *Monell v. New York City Department of Social Services* (1978) 436 U.S. 658, 690; see e.g., *Jackson v. Barnes* (9th Cir. 2014) 749 F.3d 755, 764 (plaintiff could seek redress against sheriff's department because conducting criminal investigation renders department "county actor" under §1983).

746.    However, in order to be liable under §1983 there must be a direct causal link between deliberate municipal action and the deprivation of federal rights. See *Board of City Commissioners v. Brown* (1997) 520 U.S.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 140

397, 404; see, e.g. *Haley v. City of Boston* (1st Cir. 2011) 657 F.3d 39, 51, (allegations that city's police department had unconstitutional policy and failed to train personnel in evidence disclosure obligations both sufficient to state §1983 claim against city); *Jauch v. Choctaw County* (5th Cir. 2017) 874 F.3d 425, 435 (county liable under §1983 for sheriff policy of unconstitutional pretrial detention.).

747.    The City of Palm Springs, by and through their policymakers, created and maintained a custom, policy, and/or practice of failing to train, supervise and/or discipline their employees and agents, including Defendants, regarding constitutionally adequate investigation techniques.

748.    The County of Riverside, by and through their policymakers, created and maintained a custom, policy, and/or practice of failing to train, supervise, and/or discipline their employees and agents, including Defendants, regarding proper procedures following arrest and to ensure that arrestees are provided a copy of the warrant, informed of the charges, advised of their rights, allowed to call their attorney, and arraigned within 48 hours of arrest.

749.    The City of Palm Springs, by and through their policymakers, created and maintained a custom, policy, and/or practice of failing to train, supervise, and/or discipline their employees or agents, including Defendants, in constitutionally proper custodial interrogation procedures including the advisement of *Miranda* rights before initiating questioning and to refrain from coercive tactics.

750.    The City of Palm Springs, by and through their policymakers, created and maintained a custom, policy, and/or practice of failing to train, supervise, and/or discipline their employees and agents, including Defendants, regarding constitutionally proper search and seizure procedures including the warrant requirement, arms-reach rule, container doctrine, and photographing and/or documenting the area searched and items seized.

751.    The City of Palm Springs and the County of Riverside, by and through their policymakers, created and maintained a custom, policy, and/or practice of failing to train, supervise, and/or discipline their employees and agents, including Defendants, regarding their obligation to document and disclose exculpatory evidence pursuant to their *Brady*[76] obligations.

752.    The State of California, by and through their policymakers, created and maintained a custom,

---

[76] *Brady v. Maryland* (1963) 373 U.S. 83.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 141

1  policy, and/or practice of failing to train, supervise, and/or discipline their judges, employees and agents, including

2  Defendants, regarding their obligations, official judicial duties and the fair administration of justice, following of

3  the judicial cannons, and procedures for proper preservation of evidence and recordkeeping of the superior courts

4  pursuant to state law.

5  753.    The unconstitutional customs, policies, patterns, and practices of the City of Palm Springs and

6  County of Riverside have caused numerous individuals to be subjected to prolonged detentions, unlawfully

7  deprived of property, and wrongfully convicted.

8  754.    These unconstitutional customs, policies and practices of Defendants proximately and directly

9  caused Mr. Garcia's physical and constitutional injuries, including his unlawful detention, malicious prosecution,

10  unfair trial, wrongful conviction, illegal confinement, loss of property, and other damages described above.

### FORTY-SEVENTH CAUSE OF ACTION
### 42 U.S.C. §1983 (Civil Rights Act)
### Claim for Supervisory Liability Against All Named City, County, and State Supervisors

13  755.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

14  herein, and further alleges as follows:

15  756.    *Respondeat superior* liability claim against supervisors for failure to adequately train and

16  supervise their subordinates under Federal Law 42 U.S.C. 1983 (Civil Rights Act)..

17  757.    This claim alleges that the following supervisors in the Riverside County Sheriff, Chad Bianco;

18  Stanley Sniff Jr., Harold Reed, Geoffrey Raya, Raymond Gregory, Daniel Eaglin, District Attorney Michael

19  Hestrin; Paul Zellerbach; Rodric Pachecho; Otis Sterling III; Alan Tate; Presiding Judge John Vineyard; Presiding

20  Judge Rebecca Dugan, Judge David B. Downing, Judge Anthony R. Villalobos; Police Chief Bryan Reyes, Police

21  Chief Al Franz, Police Chief David Dominguez, Detective Frank Browning failed to properly train and supervise

22  their subordinates.

23  758.    Mr. Garcia's unlawful detention, delay in arraignment, prosecution, trial, wrongful conviction,

24  and prolonged incarceration was caused by the unconstitutional actions and inactions of Defendants acting in their

25  individual capacities and under color of state law.

26  759.    Upon information and belief, Defendants directly participated in the misconduct that resulted in

27  Mr. Garcia's wrongful conviction, including but not limited to unlawfully seizing his property, denying Mr. Garcia

28  the right to counsel, not allowing him to post bail, delaying arraignment, holding him in unlawful detention,

1   subjecting him to improper interrogation, and suppressing exculpatory information.

2        760.    Defendants knowingly refused to terminate the wrongful prosecution of Mr. Garcia, which, upon

3   information and belief, they knew or should have known was based on the unlawfully seized evidence, and the

4   coerced and false statement of Mr. Garcia and in spite of suppressed exculpatory information. As a result,

5   Defendants knew or reasonably should have known that Mr. Garcia's constitutional rights to be free from

6   unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

7        761.    Defendants culpably failed to adequately train, supervise, and/or control their subordinates, who

8   unlawfully seized property, denied Mr. Garcia the right to counsel, refused to allow him to post bail, delayed his

9   arraignment, held him in unlawful detention, subjected him to improper interrogation, and suppressed exculpatory

10  information.

11       762.    Defendants violated Mr. Garcia's constitutional rights by acquiescing in the deprivation of Mr.

12  Garcia's rights by their subordinates, and by generally showing a reckless or callous indifference to Mr. Garcia's

13  protected rights.

14       763.    Defendants failure to train, supervise, and/or control their subordinates, their indifference to the

15  actions of their subordinates, and their deliberate indifference to Mr. Garcia's rights, encouraged and permitted their

16  subordinates to do the egregious acts described above, including failing to document and to disclose exculpatory

17  evidence.

18       764.    The acts and omissions of Defendants, in their individual capacities and while acting under color

19  of state law, caused Mr. Garcia to suffer the constitutional deprivations and grievous personal injuries and damages

20  described above.

21       765.    As a direct and proximate result of Defendants' unlawful actions, Mr. Garcia was unlawfully

22  interrogated, deprived of his personal property, charged with additional offenses, wrongfully prosecuted, detained,

23  and incarcerated for nearly twelve years and suffered the other grievous injuries and damages set forth above.

24                        **FORTY-EIGHTH CAUSE OF ACTION**
         **Claim Under California State Law Pursuant to Government Code §815.2 for *Respondeat Superior* and**
25    **Vicarious Liability Against the City of Palm Springs, the County of Riverside, and the State of California**

26       766.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth

27  herein, and further alleges as follows:

28       767.    Plaintiff is informed and believes, and thereon alleges that "A public entity may be liable for

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 143

1  injury caused by acts or omissions of its employees in the course and scope of employment." (California

2  Government Code §815.2.)

3       768.    Plaintiff alleges a *Respondeat Superior* liability claim against supervisors in the Riverside

4  County District Attorney's Office, Riverside County Sheriff's Department, and Superior Court for Riverside

5  County in the State of California for failure to adequately train and supervise their subordinates under Federal Law

6  42 U.S.C. 1983 (Civil Rights Act). This claim alleges that the following supervisors in the Riverside County

7  Sheriff, Chad Bianco; Stanley Sniff Jr., Harold Reed, Geoffrey Raya, Raymond Gregory, Daniel Eaglin, District

8  Attorney Michael Hestrin; Paul Zellerbach; Rodric Pachecho; Otis Sterling III; Alan Tate; Presiding Judge John

9  Vineyard; Presiding Judge Rebecca Dugan, Judge David B. Downing, Judge Anthony R. Villalobos; Police Chief

10  Bryan Reyes, Police Chief Al Franz, Police Chief David Dominguez, Detective Frank Browning failed to properly

11  train and supervise their subordinates.

12       769.    Mr. Garcia suffered the aforementioned injuries as a proximate result of the misconduct of the

13  individual Defendants.

14       770.    During all relevant times, Defendants Reyes, Franz, Dominguez, Browning, Min were employees

15  of the Palm Springs Police Department and the City of Palm Springs.

16       771.    During all relevant times, Defendants Hestrin, Zellerbach, Pacheco, Sterling, DiMaria, Tate,

17  Seebart, Male, Kirk, Hightower, Pickowitz, Blanck, Berakovich, Bishop, Jimenez, and Papanastasatos were

18  employees of the Riverside County District Attorney's Office and the County of Riverside.

19       772.    During all relevant times, Defendants Bianco, Sniff, Reed, Raya, Gregory, Eaglin, Magdaleno,

20  Tesinsky, Lewis, Brandes, Diaz, Higuera, Navarro, Reichle, Phillips, Backstrom and Sultan were employees of the

21  Riverside County Sheriff's Department in the County of Riverside.

22       773.    During all relevant times, Defendants Angulo, Miller, and Camilo were employees of Riverside

23  County.

24       774.    During all relevant times, Defendants Vineyard, Dugan, Downing, Levine, Gunn, Villalobos,

25  Hinos, Runyan, and Jasmine were employees of the Superior Court for Riverside County in the State of California.

26       775.    The acts and omissions of defendants that proximately caused Mr. Garcia's injuries were within

27  the scope of Defendants' employment with their respective departments and offices in the City of Palm Springs,

28  County of Riverside, and State of California.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS
ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 144

**FORTY-NINTH CAUSE OF ACTION**
**42 U.S.C. §1983 (Civil Rights Act)**
**Claim for Denial of Speedy Trial Rights Upon Reversal and Remand in Violation of the Sixth Amendment to the United States Constitution**

776.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

777.    Denial of Speedy Trial Rights, Arraignments, and Preliminary Hearings under the Sixth and Fourteenth Amendments of the U.S. Constitution and Federal Law 42 U.S.C. 1983 (Civil Rights Act), (which includes the right to a speedy arraignment, speedy preliminary hearings, right to a speedy trial, the right to have motions heard in a timely fashion, the right to speedy habeas corpus proceedings, and the substantial prejudice caused to plaintiff).

778.    The acts and omissions, as described in this Verified Complaint, were performed by Defendants, individually and collectively, under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth, and with deliberate indifference to Mr. Garcia's clearly established constitutional rights.

779.    Plaintiff Daniel Carlos Garcia was denied the right to a fair trial upon remand for retrial as guaranteed under the Sixth Amendment of the United States Constitution.

**FIFTIETH CAUSE OF ACTION**
**Claim Under California State Law Pursuant to Civil Code §52.1 (Tom Bane Civil Rights Act)**
**for Denial of Speedy Trial Rights in Violation of Penal Code Section 1382,**
**California Constitution, Article I, §Fifteen**

780.    Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

781.    Denial of Speedy Trial Rights, Arraignments, and Preliminary Hearings under the California State Constitution and the California Civil Code §52.1 (Tom Bane Civil Rights Act), (which includes the right to a speedy arraignment, speedy preliminary hearings, right to a speedy trial, the right to have motions heard in a timely fashion, the right to speedy habeas corpus proceedings, and the substantial prejudice caused to plaintiff).

782.    The acts and omissions, as described in this Verified Complaint, were performed by Defendants, individually and collectively, under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth, and with deliberate indifference to Mr. Garcia's clearly established constitutional rights.

783.    Plaintiff Daniel Carlos Garcia was denied the right to a fair trial upon remand for retrial as guaranteed under the California State Constitution, Article I, §Fifteen.

**FIFTY-FIRST CAUSE OF ACTION**
**Claim For Declaratory and Injunctive Relief to Vindicate the Rights of Plaintiff and**
**to Permanently Enjoin the Defendants From Any Further Violations of Rights Protected by the Laws and**
**Constitution of the United States**

784.   Plaintiff hereby incorporates each of the allegations of this Verified Complaint as if fully set forth herein, and further alleges as follows:

785.   Request for Declaratory and Injunctive Relief under Rule 57 and Rule 65 of the Federal Rules of Civil Procedure which state and empower the Federal court to issue declaratory and injunctive relief.

786.   The acts and omissions, as described in this Verified Complaint, were performed by Defendants, individually and collectively, under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth, and with deliberate indifference to Mr. Garcia's clearly established constitutional rights.

787.   As a direct and proximate result of Defendants' unlawful conduct, Mr. Garcia suffered the substantial and grievous damages and injuries as set forth above. In addition, Defendants' egregious misconduct still continues unabated to this day, and for the foreseeable future. Unless and until enjoined and restrained by order of this Court, Defendants continued violation of Mr. Garcia's legally protected rights as identified above will cause Mr. Garcia great and irreparable injury. Mr. Garcia has no adequate remedy at law for the injuries being suffered, in that a judgment for monetary damages alone will not end the continued harms being inflicted upon Mr. Garcia.

788.   Therefore, Mr. Garcia moves for this Court to grant declaratory and injunctive relief to declare the rights and responsibilities of the parties and to permanently enjoin the Defendants from any continued and prospective violation of Mr. Garcia's rights.


**JURY DEMAND**

Pursuant to the Seventh Amendment to the United States Constitution, Mr. Garcia requests a jury trial on all issues and claims set forth in this Verified Complaint.

//

//

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Daniel Carlos Garcia respectfully requests:

1.   An order issuing an emergency injunction to command and compel Defendants to immediately cease and desist their unlawful conduct and to restore the rights of Plaintiff;

2.   An order declaring the rights and responsibility of the parties, and specifically finding that Defendants and their agents, officials, and employees violated the rights of Plaintiff as guaranteed by the Constitutions and laws of the United States of America and the State of California and that the actions of the Defendants were unlawful;

3.   An order permanently enjoining Defendants against any further unconstitutional treatment of Plaintiff, and commanding them to immediately restore to Plaintiff all of the property Defendants unlawfully seized and converted;

4.   A trial by jury on each of the Plaintiff's claims;

5.   An order referring the complaint of constitutional violations by the Defendants to a federal grand jury and the Department of Justice for investigation and criminal prosecution;

6.   That the Court award general and compensatory damages to Plaintiff and against Defendants, jointly and severally, in an amount to be determined at trial;

7.   That the Court award punitive damages to Plaintiff, and against the individual Defendants, in an amount to be determined at trial, in order to deter such egregious and unlawful conduct by Defendants in the future;

8.   For pre-judgment and post-judgment interest and recovery of costs, including the cost of this suit and litigation expenses including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983, §1985, and §1986 claims;

9.   That the Court award reasonable attorneys' fees and costs to Plaintiff as permitted by statute for each of the claims brought under California state laws; and

10.  That the Court award such other and further relief as deemed appropriate and just.

Dated this _16_ day of February 2021.

DANIEL CARLOS GARCIA
Plaintiff Pro Se

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL
RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 147

1          **VERIFICATION**

2          I, Daniel Carlos Garcia, declare as follows:

3          I am the Plaintiff in the above-entitled action.  I have prepared and read the foregoing Verified Complaint

4   for Declaratory and Injunctive Relief Under the Civil Rights Act and for Damages and assert that each of the factual

5   complaints alleged herein is accurate except as to those facts stated upon information and belief, and as to those

6   matters, I believe them to be true.

7          I declare under penalty of perjury under the laws of the United States of America and the State of

8   California that the foregoing is true and correct.

9          Executed this __16__ day of February 2021, at Riverside, California.

10

11                                                          Respectfully submitted,

12

13                                                  By: _____

14                                                          DANIEL CARLOS GARCIA
                                                            Plaintiff Pro Se

15          //

16          //

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL
RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 148

**CERTIFICATION AND CLOSING**

Under Federal Rules of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of Signing: _16_ day of February 2021, at Riverside, California.

Signature of Plaintiff: _____

DANIEL CARLOS GARCIA
Plaintiff Pro Se

//

//

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT, AND FOR DAMAGES (42 U.S.C. §§1983, 1985) DEMAND FOR JURY TRIAL  PAGE 149